# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

RECEIVED

JUN 3 0 2008

JUN 30 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States of America ex rel. )

ROOSEVELT DAVIS #N73889 )
_____ )
(Full name and prison number) )
(Include name under which convicted) )
)
)
PETITIONER )          CASE NO: _____
)                    (Supplied by Clerk of this Court)
vs. )
)
)
ILLINOIS DEPARTMENT OF CORRECTIONS )
(Warden, Superintendent, or authorized )    08CV3710
person having custody of petitioner) )       JUDGE LINDBERG
)                                            MAGISTRATE JUDGE  SCHENKIER
RESPONDENT, and )
)
(Fill in the following blank only if judgment )
attacked imposes a sentence to commence )
in the future) )
)
)
ATTORNEY GENERAL OF THE STATE OF )   Case Number of State Court Conviction:
)
_____ )   05 CR 2672
(State where judgment entered) )

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: CIRCUIT COURT OF COOK COUNTY, CHICAGO

ILLINOIS

2. Date of judgment of conviction: NOVEMBER 8th 2005

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

POSSESSION OF A CONTROLLED SUBSTANCE 05 CR 2672

4. Sentence(s) imposed:     EIGHT YEARS

5. What was your plea?  (Check one)      (A) Not guilty     ( X )
                                          (B) Guilty         (   )
                                          (C) Nolo contendere ( )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

## PART I -- TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):        Jury ( X )        Judge only (   )

2. Did you testify at trial?        YES ( X )        NO        (   )

3. Did you appeal from the conviction or the sentence imposed? YES ( X )   NO (   )

    (A) If you appealed, give the

        (1) Name of court:   APPELLATE COURT 1st JUDICIAL DISTRICT 3rd DIVISION

        (2) Result:   APPEAL DENIED

        (3) Date of ruling:   NOVEMBER 28th 2007

        (4) Issues raised:   STATES FAILURE TO ESTABLISH PROPER CHAIN OF CUSTODY, STATES

        FAILURE TO DISCLOSE EXCULPATORY EVIDENCE.

    (B) If you did not appeal, explain briefly why not:

4. Did you appeal, or seek leave to appeal, to the highest state court?   YES (X )      NO (   )

    (A) If yes, give the

        (1) Result    PETITION FOR LEAVE TO APPEAL WAS DENIED

        (2) Date of ruling:   MAY 29th 2008

        (3) Issues raised:   INEFFECTIVE ASSIATANCE OF APPELLATE COUNSEL, STATES FAILURE TO

        ESTABLISH PROPER CHAIN OF CUSTODY, STATES FAILURE TO DISCLOSE EXCULPATORY

        EVIDENCE.

    (B) If no, why not: _____

5. Did you petition the United States Supreme Court for a writ of *certiorari*?   Yes (   )   No ( X )

    If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

2

106051

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

May 29, 2008


Mr. Roosevelt Davis
Reg. No. N-73889
East Moline Correctional Center
100 Hillcrest Road
East Moline, IL 61244

No. 106051 - People State of Illinois, respondent, v. Roosevelt
           Davis, petitioner.  Leave to appeal, Appellate
           Court, First District.


    The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.


    The mandate of this Court will issue to the Appellate Court

on July 3, 2008.

106074

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

May 29, 2008


Mr. Roosevelt Davis
Reg. No. N-73889
East Moline Correctional Center
100 Hillcrest Road
East Moline, IL 61244

No. 106074 - People State of Illinois, respondent, v. Roosevelt
             Davis, petitioner.  Leave to appeal, Appellate
             Court, First District.


     The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.


     The mandate of this Court will issue to the Appellate Court

on July 3, 2008.

## PART II -- COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES ( )   NO (x)

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

A.  Name of court: _____

B.  Date of filing: _____

C.  Issues raised: _____

            _____

            _____

D.  Did you receive an evidentiary hearing on your petition?   YES ( )   NO ( )

E.  What was the court's ruling? _____

F.  Date of court's ruling: _____

G.  Did you appeal from the ruling on your petition?   YES ( )   NO ( )

H.  (a) If yes,   (1) what was the result? _____

           (2) date of decision: _____

    (b) If no, explain briefly why not: _____

I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

    YES ( ) NO ( )

    (a) If yes,   (1) what was the result? _____

           (2) date of decision: _____

    (b) If no, explain briefly why not: _____

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?     YES (x)     NO ( )

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1. Nature of proceeding     <u>PETITION FOR RELIEF FROM JUDGEMENT</u>

        2. Date petition filed     <u>MARCH 13th 2007</u>

        3. Ruling on the petition     <u>PETITION WAS DENIED</u>

        3. Date of ruling     <u>JUNE 25th 2007</u>

        4. If you appealed, what was
        the ruling on appeal?     <u>APPEAL STILL PENDING</u>

        5. Date of ruling on appeal _____

        6. If there was a further appeal,
        what was the ruling ?     _____

        7. Date of ruling on appeal _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?
YES ( )  NO (X)

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition? If so, state

        (1) Ruling: _____

        (2) Date: _____

4. **WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?**

YES (X)  NO ( )

If yes, explain: <u>I AM CURRENTLY AWAITING APPEAL ON MY PETITION FOR RELIEF FROM JUDGEMENT</u>

<u>WHICH APPELLATE ATTORNEYS ARE AWAITING TO FILE DUE TO NOT HAVING ALL OF THE RECORD.</u>

## PART III – PETITIONER'S CLAIMS

1. State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

   (A) Ground one  INNEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.
       Supporting facts (tell your story briefly without citing cases or law):

My appellate counsel refused to argue on direct appeal the trial courts denial of my

motion to quash arrest and suppress evidence. It was apparent from the record that

Chicago police officer Ruben Briones had given testimony contrary to that which he

gave under oath at an earlier grand jury hearing on January 20th 2005 which procured

an indictment against me. This officer's testimony at the motion to quash hearing du-

ring direct examination differed from that which he infact gave under oath during

cross examination. The court in its ruling stated that "I would agree that there was
**(see attached page with ground one continuation)**

   (B) Ground two  INNEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AND TRIAL COUNSEL
       Supporting facts:

On August 4th 2005, trial counsel filed an oral motion for the subpeona of fingerprints

from the large plastic bag the contained the recovered narcotics. This oral motion was

granted by the court. From the cases onset, I had told defense counsel that at no time

did I know that there was drugs in Mr. Martinez's car nor had I touched or possessed

this bag of narcotics, contrary to the testimony of Chicago police officer(s). Defense

counsel chose to against my decision to take me to trial without having secured the

the fingerprint analysis which the court had in fact granted our motion for. Appellate
counsel who was from the same office as my trial attorney(s) refused to argue this issue
on direct appeal. Had trial counsel obtained this evidence prior to taking me to trial,
it would have been useful evidence during the cross examining of the testifying officer(s).
The result of the fingerprint analysis would not have resulted in my fingerprints being
**(see attached page with ground two continuation)**

5

(C)  Ground three  INNEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
     Supporting facts:

The trial court on August 4th 2005 denied defense counsel's oral motion to subpeona

the confidential informant that Chicago police officer Ruben Briones testified before

a grand jury under oath as to having received information from regarding a narcotic

transaction that was going to take place. This officer would repeat this testimony

indept when he gave testimony during direct examination at my motion to quash arrest

hearing on June 30th 2005. But when this officer would be questioned during cross ex-

amination, he testified that he in fact had not spoken to an informant himself at all.
(SEE attached page with ground three continuation)
(D)  Ground four  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
     Supporting facts:

The prosecution before the start of and during the closing of my trial twice made

reference to an informant having given police information in the presence of the jury

on August 17th and 18th 2005. Prior to the start of my trial defense counsel had asked

the court to grant defense's motion in limine preventing the prosecution from making

reference to an informant or stating anything to the jury about an informant. In fact

on one occassion the court sustained defense counsel's objection to the prosecutions

statement to the jury about an informant/citizen providing police with information,
(See attached page with ground four continuation)

2  Have all grounds raised in this petition been presented to the highest court having jurisdiction?
     YES (X )    NO ( )

3.  If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:

_____

_____


(NOTE: Grounds five and six are continued on attached page(s) Ground seven also
     continued).

6

**(Ground one continued)**

NO reason the officers had for stopping the vehicle, but that is not how the officer testified that it went down. The officer testified that the vehicle was not stopped on western avenue. We all know that western avenue is a busy street". The court furthered stated that defense did have cause for impeachment against this officer regarding this officers earlier grand jury testimony. There is and was no reason appellate attorney should not have argued this issue on direct appeal. (SEE ATTACHED MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE HEARING TRANSCRIPTS). EXHIBIT A Clearly the courts ruling was against the weight of the evidence presented at this hearing on June 30th 2005.

**(Ground two continued)**

On this large bag because I never had this bag in my possession. There is no way appellate counsel should have not addressed and argued this issue on direct appeal. (SEE ATTACHED TRIAL TRANSCRIPT AND LETTER FROM APPELLATE DEFENDER DATED JUNE 4th 2007). EXHIBIT B

**(Ground three continued)**

In fact this officer would testify during cross examination that he himself had no personal knowledge of this informant. The fact that this officers grand jury testimony led to me being indicted due to this informant issue, there should have been no way appellate counsel should not have argued this issue on direct appeal. The fact that my case had been dismissed during my preliminary hearing and the only way the case was brought back up was when the prosecution went before the grand jury with officer Briones testimony. I was in fact prevented from receiving a fair trial because both prosecutors and Chicago police Sgt. James O'Grady would make reference to an informant and having been provided with a description. It is likely that my appeal may have been granted had appellate counsel addressed this issue as well on direct appeal. (SEE ATTACHED GRAND JURY TRANSCRIPT, AND TRIAL TRANSCRIPT, AND MOTION TO QUASH HEARING TRANSCRIPT) EXHIBIT C

**(Ground four continued)**

the jury was informed by the court to disregard the prosecutions making of this now the second reference to an informant. Appellate counsel was aware from the record that the making of these statements contributed to my not receiving a fair trial. The mere fact that my earlier motion before another judge for the subpeona of the informant was denied clearly warranted appellate counsel arguing this issue on direct appeal.(SEE ATTACHED TRIAL TRANSCRIPTS) EXHIBIT D

(E) Ground five <u>INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL</u>
Supporting facts:

When the trial court on August 18th 2005 refused to inform the jury during jury in-
structions of Chicago police officer Ruben Briones previous testimony(s) which were
completely opposite at two previous hearings, this aided in my being denied a fair
trial. The jury should have certainly been made aware of this officers previous in-
consistencies concerning his testimony. In fact trial counsel had requested before the
start of my trial that the jury be informed of this and the trial court refused to in-
form them. The jury should have been given a clear picture of the law regarding the
differences of this officer's testimony(s). In fact during deliberations the jury
sent a note back to the court requesting to see officer Briones's supplemental arrest
REPORTS which had came into question during my trial. The court denied the jury access
to these reports. The fact that the jury inquired about reveiwing this officers arrest
reports showed that there were questions and concerns the jury had with regard to this
officers testimony. This issue should have been raised on direct appeal by appellate
attorney. (SEE ATTACHED TRIAL TRANSCRIPTS) EXHIBIT E

(F) Ground six <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>
Supporting facts:

The trial court as well as the appeals court refused to give proper review to the fact
that the weight discrepency with regards to the drugs recovered and those which arrived
at the Illinois crime lab for testing on December 22nd 2004, had a bearing on my being
found guilty. There was clearly something wrong in that the Chicago police officer Ruben
Briones testified that he recovered and weighed the narcotics on a scale at the police
station and that that weight was 250 grams. It was testified by Brian Stevenson from the
state police crime lab that he received what he tested to be 110 grams of substance. This
issue clearly was not given proper review by either court. (SEE ATTACHED TRANSCRIPTS, TRIAL)

(G) Ground seven  <u>INEFFECTIVE ASSIATANCE OF COUNSEL</u>
     Supporting facts:

The trial court and the appeals court failed to give proper review of a Chicago police

arrest report which bore a Chicago police department tracking number. This report was

found after my trial during pre-sentence investigation. This report stated that on the

day of my arrest I was arrested and charged with being in possession of less than 15

grams of cocaine not 250 grams nor 110 grams as was testified to by Chicago police officer

Ruben Briones and state police lab chemist Mr. Brian Stevenson. This report also bared the

NAME OF TWO OF THE OFFICERS THAT TESTIFIED AT MY TRIAL. The court ruled against this evi-

dence at my sentencing hearing on November 8th 2005, stating that it contained no narra-

tive nor was it signed by anyone. The fact that it existed and could have been used to

cross examine the officers at my trial was indeed meritable and should have been reviewed

more thoroughly. Had this been done the result of my appeal may have been different.**(SEE**

**ATTACHED COPY OF ARREST REPORT, COPY OF OFFICIAL VERSION OF OFFENSE AND SENTENCING HEAR-**

**ING TRANSCRIPTS) EXHIBIT G**

## PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing  Frank Cece Jr. 53 W. Jackson St. Chicago Il 60604

(B) At arraignment and plea  Frank Cece Jr. "                                    "

(C) At trial  Ms. Stephanie Hirschboeck & Ms. Rosemary Costin 69 W. Washington St. Chi. Il

(D) At sentencing  Ms. Stephanie Hirschboeck & Ms. Rosemary Costin "           17thflr'

(E) On appeal  Mr. Bruce Landrum 69 W. Washington Chicago Il 60602 17th flr.

(F) In any post-conviction proceeding _____

(G) Other (state): _____

## PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES (  )   NO ( X )

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

    WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on:  June 13th 2008 _____          _____
           (Date)                              Signature of attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.

_Roosevelt Davis_
(Signature of petitioner)
#N73889 _____
(I.D. Number)
100 Hillcrest Rd. East Moline Il. 61244
(Address)

7

# Exhibit A

Exhibit A + C
For Grounds

1 + 3

# Exhibit C

1    IN RE:  PEOPLE VS. MIGUEL MARTINEZ,

2    ROOSEVELT DAVIS

3

4                                    GJ NO 2231

5                                    ARR DATE 2-9-05

6                                    05 CR 2672

7

8      BEFORE THE SPECIAL GRAND JURY OF COOK COUNTY,

9                        JANUARY, 2005

10

11              TRANSCRIPT OF TESTIMONY TAKEN IN THE

12    ABOVE ENTITLED MATTER ON JANUARY 20, 2005.

13

14              PRESENT:  MR. JAMES TOMASKA
                          ASSISTANT STATE'S ATTORNEY
15

16

17

18              REPORTED BY JOSEPH A. SZYBIST
                CERTIFIED SHORTHAND REPORTER
                ILLINOIS LICENSE NO. 084-1752
19

20

21

22    LIST OF WITNESSES:

23    OFFICER BRIONES

24

1            THE FOREPERSON:  Raise your right hand,

2    please.

3                    (Witness duly sworn.)

4            MR. TOMASKA:  The People of the State of

5    Illinois are seeking a True Bill of Indictment

6    before the Special January Grand Jury Number 2231

7    against the defendants Miguel Martinez and

8    Roosevelt Davis who are charged with the following

9    offenses:

10           Defendant Martinez is charged with

11   delivery of a controlled substance, 100 or more

12   grams but less than 400 grams of cocaine.

13           Defendant Davis is charged with

14   possession of a controlled substance, 100 or more

15   grams but less than 400 grams cocaine.

16           The Grand Jury does have the right

17   to subpoena and question any person against whom

18   the State's Attorney is seeking a Bill of

19   Indictment, or any other person, and to obtain and

20   examine any documents or transcripts relevant to

21   the matter being prosecuted by the State's

22   Attorney.

23           OFFICER BRIONES,

24   having been first duly sworn, was examined and

3

1    testified as follows:

2                    EXAMINATION BY

3                    MR. TOMASKA:

4        Q.   Officer, would you please state your

5    name, your star number and your current unit of

6    assignment.

7        A.   Officer Ruben Briones, star 19024,

8    presently assigned to Unit 189 of the Chicago

9    Police Department.

10       Q.   Officer, on December 16, 2004, at

11   approximately 2:10 p.m. were you on duty in the

12   area of 5402 North Western Avenue in Chicago, Cook

13   County, Illinois?

14       A.   That's correct.

15       Q.   Officer, were you there because you

16   received information that a narcotics transaction

17   was gonna happen at that location?

18       A.   That's correct.

19       Q.   And, officer, did you set up a

20   surveillance at that location?

21       A.   Yes, I did.

22       Q.   And did you observe defendant Davis

23   standing on the corner of that location for

24   approximately 15 minutes before a van pulled up

4

1  which was driven by defendant Martinez?

2      A.   That's correct.

3      Q.   Did defendant Davis then enter that van

4  on the passenger's side?

5      A.   Yes. he did.

6      Q.   Did you approach that van and observe

7  defendant Martinez hand defendant Davis a large

8  clear plastic bag that contained white powder,

9  suspect cocaine?

10     A.   That's correct.

11     Q.   And did defendant Davis look in your

12  direction and open the glove compartment and

13  attempt to place that bag inside the glove

14  compartment?

15     A.   Yes.

16     Q.   Were both defendants then placed into

17  custody?

18     A.   Yes.

19     Q.   Was that plastic bag recovered from the

20  glove compartment and found to contain suspect

21  cocaine?

22     A.   That's correct.

23     Q.   Did you inventory that plastic bag and

24  send it to the Illinois State Police crime lab for

1    testing and analysis?

2        A.   Yes, I did.

3        Q.   To the best of your knowledge, officer,

4    did they report back to you that the total weight

5    of the contents of that plastic bag came to

6    110 grams and that that weight and that substance

7    tested positive for cocaine?

8        A.   That's correct.

9            MR. TOMASKA:   Are there any questions for

10   the officer?

11           THE FOREPERSON:   No.

12           MR. TOMASKA:   Thank you.

13               (Witness excused.)

14               (Whereupon the Grand Jury was

15               left alone to deliberate,

16               after which the following

17               proceedings were had.)

18           THE FOREPERSON:   True Bill.

19               (Whereupon the above-entitled

20               cause was continued

21               for arraignment before

22               the Presiding Judge of

23               the Criminal Division.)

24

STATE OF ILLINOIS )

                    ) SS:

COUNTY OF C O O K )


            I, Joseph A. Szybist, a Certified Shorthand Reporter licensed to practice in the State of Illinois, do hereby certify that I reported in shorthand the proceedings had in the hearing of the above entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify is a true and accurate transcript of the proceedings had before the Grand Jury of Cook County.

                           _____

                           Joseph A. Szybist

**OFFICIAL VERSION OF THE OFFENSE:**

According to the Chicago Police Criminal History Report
CB#16036653: The Defendant was arrested December 16, 2004 by
Officer Mckenna of Dist. 020 of the Chicago Police Department and
charged with PCS-Possession-Less Than 15 Grams-Cocaine.  On
August 18, 2005, the Defendant was found guilty of Possession-100
Grams cocaine in case number 05CR267202.  The Defendant is
scheduled to appear before the Honorable Judge Mary Margaret
Brosnahan on September 20, 2005 for sentencing in case number
05CR267202.

**DEFENDANT'S VERSION OF THE OFFENSE:**

The Defendant stated that he was advised by his attorney to not
discuss his version of the offense.  He stated that he plans to
file for a new trial.

**SOCIAL HISTORY:**

The Defendant Roosevelt Davis stated that he was born April 24,
1967 in Chicago, IL. to the union of Allen Yarbrough and Lillian
Beard One of four children, the Defendant stated that he was
raised by both parents (separate homes) and described his
childhood as normal.  He stated that his upbringing was church
going and stern discipline.  The Defendant stated that he was
reared on the North Side of Chicago.

The Defendant reported a great relationship with his father who
lives in Robinsonville, Ms. and is employed as a driver for a
local casino.  He stated that h is father has failing health.  He
reported a "terrific" relationship with his mother who lives in
Chicago and is in fair health.  The Defendant reported a great
relationship with his siblings.

The Defendant denied any family history of physical, sexual or
emotional abuse.  He stated that he was disciplined sternly and
he denied any past or present DCFS involvement.

Upon his release from incarceration, the Defendant stated that he
will reside at 1900 W. Pratt, 1st Fl., Chicago, IL with his
fiance Dawna Swanson.  This investigator spoke with a Dawna
Swanson who identified as the Defendant's fiancee.  She stated
that the Defendant will reside at the above address upon his
release.  She also corroborated with the Defendant's statements
regarding his social history.

AKRR203

CPD-11.420C (REV. 4/97)

# CHICAGO POLICE DEPARTMENT

## ARREST REPORT

Page 1 of 1

| | | | | |
|---|---|---|---|---|
| Tracking No: 016036653 | CB No: 016036653 | Status: IDENT. CLEARED | | |
| | | Arrest Date: 16:10 16-DEC-2004 | Holding Facility: DISTRICT 020 LOCKUP | |

| | | | | |
|---|---|---|---|---|
| IR No: 706684 | Name: DAVIS, ROOSEVELT | | | |
| Nickname: | Alias: | | | |
| DLN/ID No: | State: | Scars/Marks: | | SSN: 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 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Photograph? N |
| Date of Birth: 23-APR-1967 | Sex: MALE | Eye Color: BROWN | Occupation: UNEMPLOYED | |
| Age: 37 | Race: BLACK | Hair Color: BLACK | Organization: | |
| Place of Birth: ILLINOIS | Height: 506 | Hair Style: BALD | Gang: | |
| Dependent Children? N | Weight: 170 | Complexion: MEDIUM | Resisted Arrest? N | |

Location Code: 092    ALLEY

| | Address | | Phone No | Beat |
|---|---|---|---|---|
| Arrest | 5402 N WESTERN AVE 1, CHICAGO, IL 60625 | | | 2011 |
| Residence | 6104 N OAKLEY AVE, CHICAGO, IL 60659 | | | 02413 |

Arrest Charges

| Statute | Description | G | T | Inchoate Code | DV | Victim | Amended? |
|---|---|---|---|---|---|---|---|
| 720 ILCS 570.0/402-C | PCS - POSSESSION - LESS THAN 15 GRMS - COCAINE | 4 | F | | | | N |

Court Charges/Dispositions

PD Charges/Dispositions

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Associated Cases RD No | |
| | | | | | | | | HK812324 | |
| Employee Role | Star No | Emp No | Unit/Agency | Name | Furlough | Day Off | Court Key | Beat | Date |
| 1ST ARRESTING OFFICER | 3942 | 9722 | 006 | MC KENNA, S M | 000 | 9 | Q | 6212 | 18:22 16-DEC-2004 |
| 2ND ARRESTING OFFICER | 19024 | 53003 | 009 | BRIONES, R | 000 | 4 | I | 6212 | 18:24 16-DEC-2004 |
| LOCKUP KEEPER | 9719 | 4406 | | MCCRAY, C | 000 | 2 | O | | 18:24 16-DEC-2004 |
| FINGERPRINTED BY | | 38254 | | POST, T H | 000 | 6 | | | 18:58 16-DEC-2004 |

| | | | |
|---|---|---|---|
| OID Requested? N | Print Check Waived? N | Desired Court Date: | |
| OID No: | Time Printed: 18:26 16-DEC-2004 | Desired Branch - Call: | |
| Property Receipt No: | Time Photographed: 18:36 16-DEC-2004 | Court Sgt. to Handle? N | |
| Phone Number Called: | Time Fed: | Bond Date: | |
| Time Called: | Cell No: | Bond Receipt No: | |

Narrative:

I solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

Signature of First Arresting / Appearing Officer / Investigator: _____

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and it's description (include Property Inventory numbers.) Money taken must be itemized for operation identification. Indicate number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes and hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody." All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

# Narcotic & Gang Investigation Section Supplementary Report
CHICAGO POLICE-FOR USE BY B.I.S. PERSONNEL ONLY

**HK812324**

| Offense Classification / Last Report | IUCR Code | Offense Reclassification / DNA | | Revised IUCR |
|---|---|---|---|---|
| **Possession of a Controlled Subst./Powder Cocaine** | 2024 | DNA | | |

| Address of Occurrence | Type of Location | Location Code | Date of Occurrence | Time of Occurrence | Beat of Occ | Beat Assigned |
|---|---|---|---|---|---|---|
| 54██ N. Western | Alley | 092 | 16DEC2004 | 1410 | 2011 | 6212 |

| Victims | Victim's Name | | Relation | Method Code | Method Assigned | Unit | Safe Method | If Residence / Where |
|---|---|---|---|---|---|---|---|---|
| 1 | State of Illinois | | | 024 | Field | 189 | DNA | DNA |

| Offenders | Offender's Name | | Relation | Num Arrested | Arrest Unit | Adults | Juveniles | Fire | Gang Related |
|---|---|---|---|---|---|---|---|---|---|
| 2 | ███████ | ███ | | 2 | 189 | 1 | 0 | No | No |

**Update Information    *See Narrative For Updated Information**

| Victim | Verified | [ ] | Offender Verified | [ ] | Property Verified | [ ] | Circumstances Verified | [ ] |
|---|---|---|---|---|---|---|---|---|
| Victim | Update | [ ] | Offender Updated | [ ] | Property Updated | [ ] | Circumstances Updated | [ ] |

**STATUS**

0 - Prog  1 - Sus  2 - Unf  3 - C/C  4 - C/O  5 - C/C/X  6 - C/O/X  7 - C/N/C
[ ]      [ ]      [ ]      [ ]      [ ]      [ ]        [ ]        [ ]

**HOW CLEARED**

1- Arrest  2- Juv-Ct  3- Ref Pros  4- Comm Adj  5- Other
[ ]        [ ]        [ ]          [ ]          [ ]

**EVENT NUMBER: 11884** ███████████          **R.D. NUMBER: HK812324**

This Is A Narcotic & Gang Investigations Section Investigation Officer's Report By Beat 6212

OPERATION / MISSION #:          SNAP

OFFENDER(S):                    **IN CUSTODY-**████████████████

                               #2- DAVIS, Roosevelt  M/B/37 24Apr67,
                               506 hgt., 170 lbs., bald head 6104 N. Oakley

GANG AFFILIATION(S):           ████████████████
                               Offender #2-Denied

CHARGE(S):                     Possession of a Controlled Substance

COURT BRANCH, DATE AND COURT   Br 57-2 on 27Jan05 ██████████
OFFICER:

POLICE PERSONNEL ON SCENE:     ████████████████████████████



| 90.EXTRA COPIES REQ'D | 91.DATE SUBMITTED | TIME | |
|---|---|---|---|
| | **16 Dec 04** | | |
| 93.REPORTING OFFICER-PRINT | | | 16DEC2004-1830 |



CPD-11.411/C-B (Rev 3/97) COMPUTER GENERATED          SIGNATURES IN BLUE INK

**HK812324**

Case 1:08-cv-03308  Document 1  Filed 06/30/2008  Page 24 of 13

---

| | | |
|---|---|---|
| EVIDENCE RECOVERED | Inv# ████████ | One (1) plastic bag containing suspect cocaine as recovered from glove compartment of offender #1's vehicle b████ |
| | Inv# ██████ | $453.00 recovered from offender #1's person by █████ |
| TOTAL WEIGHT & STREET VALUE: | 250 GRAMS $31, 250.00 | |
| EVIDENCE OFFICER: | ████████ | |
| VEHICLE SEIZED: | One (1) 1996 Mercury Licence applied for ████████ | |
| NOTIFICATIONS: | OEC, 189 W/C | |

HISTORY OF INVESTIGATION: In summary, on stated date the undersigned received information ████████ ████████ that a narcotics transaction would be taking place in the vicinity of 5400 N. Lincoln at approx. 1400 hours █████████ stated that the subject facilitating the transaction would be a male Black subject, approx. 35 years old, 5'06 hgt. 180 lbs, with a shaved head. Based upon this information █████████. At approx 1300 hours, ████████ observed a male Black subject arrive driving a small dark Saturn sedan. This subject exited his vehicle and stood on the corner of Balmoral and Western for about fifteen minutes. The subject then began walking east on Balmoral to Western where he waited on the northwest corner of that location in the bus stop █████████ was maintained upon this subject as he repeatedly made or received phone calls. Tat approx 1410 hours a 1996 Mercury Mystique with applied for licence plates pulled into the rear of 54██ N. Western and parked. The driver of this vehicle honked the horn and the male Black subject immediately turned in that direction and ran up to the car. The male Black subject then entered the vehicle and subjects were observed ████████ inspecting some item. ████████████ notified team members and assist units to investigate and move in. ████████ approached the vehicle and observed offender #1 hand to offender #2 a large plastic bag containing suspect cocaine. Offender #2 then looked up and saw ████████████████ approaching. Offender #2 then opened the glove compartment and placed the cocaine inside. The subjects were removed from the vehicle and the substance recovered from the glove compartment. Both subjects were placed under arrest and transported with the evidence to 020 for processing.

| PRE████ | | APPROVAL-SIGN OR INITIAL |
|---|---|---|

# ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) • 1-(800) 255-3323 (TDD)

Rod R. Blagojevich
*Governor*

December 22, 2004

Larry G. Trent
*Director*

RUBEN BRIONES 19024
CHICAGO POLICE DEPARTMENT UNIT 189
NARCOTICS SECTION
3340 WEST FILLMORE STREET
CHICAGO IL 60624

Laboratory Case #C04-056604
RD #HK812324

OFFENSE: Violation of Controlled Substances Act
SUSPECT: Roosevelt Davis

The following evidence was received by the Forensic Science Center at Chicago on December 21, 2004:
Inventory# 10452143

| LAB EXHIBIT | ITEM SUBMITTED | FINDINGS |
|---|---|---|
| 1 | 110.0 grams of white chunky substance from one item | Cocaine |

730 ILCS 5/5-9-1.4(b) states that a criminal laboratory analysis fee of $100 shall be imposed for persons adjudged guilty of an offense in violation of the Cannabis Control Act or the Illinois Controlled Substances Act.

Respectfully submitted,

Brian A. Stevenson
Forensic Scientist

# CHICAGO POLICE
# ARREST REPORT
CPD-11.420 (REV. 3/02)

| 1. NAME (LAST - FIRST - MIDDLE) | | | 2.SEX | 3.RACE | 4. AGE | 5. DATE OF BIRTH |
|---|---|---|---|---|---|---|
| DAVI, ROOSEVELT | | | M | 1 | 39 | DAY 24 MONTH APR YEAR 67 |

| 6. C.B. NO. | 7. ALIAS OR NICKNAME | | 8. DIST./RES. | 9. HEIGHT | 10.WEIGHT | 11. HAIR | 12. HAIR STYLE | 13. EYES | 14. COMPLEXION |
|---|---|---|---|---|---|---|---|---|
| 16036653 | | | 020 | 5'6 | 170 | BLK | BALD | BR | MED |

| 15. I.R. NO. | 16. RESIDENCE ADDRESS | APT. NO./FLOOR | 17. DISTING. MARKS, SCARS, DISABILITIES, ETC. | 18. SOCIAL SECURITY NO. |
|---|---|---|---|---|
| 706684 | 6104 N. OAKLEY | | N/V | 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 |

| 19. Y.D. NO. | 16A. CITY - STATE | ZIP CODE | HOME TELEPHONE | 20. STATE/PLACE OF BIRTH | 21. DRIVERS LICENSE NO. | STATE |
|---|---|---|---|---|---|---|
| | CHGO IL | 60625 | ( ) NONE | CHGO | NONE | |

| 22. RD NO. | 23. OCCUPATION | 24. BUSINESS NAME - ADDRESS | CITY - STATE ZIP CODE | BUSINESS TELEPHONE |
|---|---|---|---|---|
| HK 812324 | UNEMPLOYED | | | |

| 25. ADDRESS OF ARREST | 26. NO. ARRESTED | 27. LOCATION CODE FOR NATURE OF PREMISES | 28. BEAT OF ARREST | 29. DATE OF ARREST | | | 30. ARRESTEE TRANSPORTED | | |
|---|---|---|---|---|---|---|---|---|---|
| 54 N. WESTERN | 2 | 092 | 2011 | DAY 16 | MONTH DEC | YEAR 04 | TIME 1610 | TO UNIT 020 | BY BEAT 2063B | TIME 1620 |

| 31. RESISTED ARREST | 32. WEAPON | | | | 33. PROPERTY INVENTORY NO(S). | 34. FOR NARCOTIC ARREST | APPROX. WT/ EST. STREET VALUE |
|---|---|---|---|---|---|---|---|
| YES ☐ NO ☑ | PISTOL - REVOLVER ☐ | RIFLE - SHOT-GUN ☐ | KNIFE ☐ | OTHER (SPECIFY) ☐ | 10452143 | ☐ SUSPECT CANNABIS ☐ SUSPECT CONTROLLED SUBSTANCE | NO. PILLS 250GRM $31,250⁰⁰ |

| 35. VEHICLE OF ARRESTEE | YEAR | MAKE | MODEL | BODY STYLE | COLOR | STATE LICENSE NO. OR V.I.N. | DISPOSITION OF VEHICLE |
|---|---|---|---|---|---|---|---|
| | 0 | | N | | A | | |

| 36. PERSON IN INVESTIGATIVE UNIT NOTIFIED | UNIT NOTIFIED | TIME | 37. DOES ARRESTEE HAVE UNATTENDED DEPENDENT CHILDREN AT HOME | IF YES - NAME OF Y.D MEMBER NOTIFIED - TIME | 38.NAME OF A.S.A./FEL. REV. | CHARGES APPROVED | TIME |
|---|---|---|---|---|---|---|---|
| BY REPORT | | | ☐ YES ☐ NO | | BY LAW | ☑ YES ☐ NO | |

| 39. VICTIM-COMPLAIN-ANT | NAME | | | | |
|---|---|---|---|---|---|
| | STATE OF ILL. | SEX | RACE | AGE | HOME ADDRESS UNIT 185 | CITY - STATE | ZIP CODE | TELEPHONE NO. ( ) |

| VICTIM INJURED | IF YES - DESCRIBE INJURIES | | VICTIM HOSPITALIZED | HOSPITAL NAME |
|---|---|---|---|---|
| ☐ YES ☐ NO | | | ☐ YES ☐ NO ☐ TREATED & RELEASED | |

| 40. REFERENCES (CH. - PAR.) | 41.OFFENSES | 42. DISPOSITIONS | 40. REFERENCES (CH. - PAR.) | 41.OFFENSES | 42. DISPOSITIONS |
|---|---|---|---|---|---|
| 1 720 ILCS 570/401 | PCS | | 5 | | |
| 2 | | | 6 | | |
| 3 | | | 7 | | |
| 4 | | | 8 | | |

**43. NARRATIVE** (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

RD# HK 812324     RD ID# 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                    EVENT NO. 11884

THIS ARREST IS RELATED TO A ONGOING NARCOTICS INVESTIGATION WITHIN NAGIS ABOVE WAS ARRESTED AFTER HE WAS FOUND TO BE IN POSSESSION OF APPROX 250 GRAMS OF POWDER COCAINE. ABOVE PLACED IN CUSTODY, MIRANDA GIVEN TRANSPORTED TO 020 FOR PROCESSING.

GANG DENIES

| Vehicle Impounded (Refer to Box #35) |
|---|
| Yes _____    No _X_ |
| W/C Initial: ____ |

I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

| | STAR/EMPL. NO. | | 47. VEHICLE ASSIGNED |
|---|---|---|---|
| | | | 1 ONE 2 TWO 3 ☐ P.O. ☐ P.O. ☐ OTHER |

| | STAR/EMPL NO. UNIT | DATE | TIME | | | WAS THE OFFENDER RELEASED WITHOUT CHARGES? |
|---|---|---|---|---|---|---|
| WM OHern 260 | 48. RESULTS OF FINGERPRINT, CHECK | | | | 1610 DEC04 2730 | ☐ NO ☐ YES IF "YES", COMPLETE BELOW |

| WATCH COMMANDER'S NOTATIONS | | | | |
|---|---|---|---|---|
| 50. ARRESTEE SEARCHED BY | STAR/EMPL. NO. UNIT | 51. DATE RECEIVED - LOCKUP | TIME | 52. PERS. PROPERTY RECEIPT NO. | 53. IF PERSON WHO CALLED | TIME |
| SAINTIL | 9083 020 | 16 DEC 04 | NO | | (847) 733-9700 | 1858 |
| 54. BONDING OFFICER | STAR/EMPL NO. UNIT | 55. TIME FINGERPRINTED | 56. TIME PHOTOGRAPHED | 57. TIME FED | 58. PLACED IN CELL NO. |
| CRAIG | 1726 020 | 1838 | 1930 | | 10 |

**COURT INFORMATION**

| 59. ARR. OFF. DESIRED COURT DATE | BRANCH-CALL | 60. COURT SGT. TO HANDLE | 61. INITIAL COURT DATE | BRANCH-CALL | 62. FINAL CRT. DATE | BRANCH-CALL |
|---|---|---|---|---|---|---|
| 12/JAN/05 | 57-2 | ☐ YES ☑ NO | 17 DEC 04 | CBC-1 | | |
| 63. BONDED - DATE | TIME | 64. BOND RECEIPT NO. | 65. BOND DOCKET NO. | | 66. FINAL JUDGE'S NAME |
| TO | | COURT | | | |

## MOVING ARRESTEE OUT OF & INTO ARREST/DETENTION FACILITY

| | DATE | TIME | TURNED OVER TO/ RECEIVED FROM | STAR/ EMPL. NO. | REASON | LOCKUP KEEPER/ OTHER DEPT. MEMBER | STAR/ EMPL. NO. |
|---|---|---|---|---|---|---|---|
| OUT | | | | | | | |
| IN | | | | | | | |
| OUT | | | | | | | |
| IN | | | | | | | |

## RECORD OF INTERVIEWS IN LOCKUP

| DATE | TIME | INTERVIEWER | STAR NO. | REASON | LOCKUP KEEPER/ OTHER DEPT. MEMBER | STAR/ EMPL. NO. |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

## RECORD OF VISITORS TO ARRESTEE

| DATE | TIME IN | TIME OUT | VISITOR'S NAME - ADDRESS - TELEPHONE | RELATIONSHIP | W. C.'S APPROVAL (SIGNATURE) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

| RECEIVING SCREENING RECORD FOR ARRESTEE TO BE HELD IN LOCKUP | REFER TO GUIDELINES FOR ARRESTEE SCREENING, CPD-11.523. NOTE: ALL "YES" ANSWERS REQUIRE ACTION | DATE 16 DEC 04 | TIME 1845 |
|---|---|---|---|

| ARRESTEE'S NAME DAVIS, ROOSEVELT | C.B. NO. 16036053 | LOCKUP KEEPER'S NAME (PRINT) McCRAY | STAR NO. 9719 |
|---|---|---|---|

**LOCKUP KEEPER'S VISUAL CHECK** — YES NO
1. DOES ARRESTEE HAVE OBVIOUS PAIN OR INJURY? ☐ ☒
2. IS THERE OBVIOUS SIGN OF INFECTION? ☐ ☒
3. APPEARS TO BE UNDER THE INFLUENCE OF ALCOHOL/DRUGS ☐ ☒
4. ARE THERE VISIBLE SIGNS OF ALCOHOL AND/OR DRUG WITHDRAWAL? ☐ ☒
5. DOES ARRESTEE APPEAR TO BE DESPONDENT? ☐ ☒
6. DOES ARRESTEE APPEAR TO BE IRRATIONAL? ☐ ☒
7. IS ARRESTEE CARRYING MEDICATION? ☒ ☐

**LOCKUP KEEPER'S-ARRESTEE QUESTIONNAIRE** — YES NO REFUSED
8. ARE YOU PRESENTLY TAKING ANY MEDICATION? (For what . . . . . . . . . . .). ☒ ☐ ☐
9. (IF FEMALE) ARE YOU PREGNANT? ☐ ☐ ☐
10. IS THIS THE FIRST TIME YOU HAVE EVER BEEN ARRESTED? ☐ ☒ ☐
11. HAVE YOU EVER TRIED TO KILL YOURSELF OR DONE SERIOUS HARM TO YOURSELF? ☐ ☒ ☐
12.A. DO YOU HAVE ANY SERIOUS MEDICAL OR MENTAL PROBLEMS? (IF YES, specify problem under REMARKS) ☐ ☒ ☐
12.B. ARE YOU RECEIVING ANY TREATMENT? (If YES, specify under REMARKS) ☐ ☒ ☐

PERSON TO BE NOTIFIED IN CASE OF EMERGENCY - NAME SWANSON, DAWN+ ADDRESS 1900 W. PRATT TELEPHONE (847) 733-9100 RELATIONSHIP GIRLFRIEND

REMARKS (773) 842-5117 ARRESTEE RELATES THAT HE USES AN INHALER FOR ASTHMA — HAS AN INHALER WITH PERSONAL BELONGINGS.

## SPECIAL DISPOSITION
**COMPLETE ONLY FOR ARRESTEES REFERRED OUT OR TO BE MONITORED**

| REFERRED TO (Specify) | PLACED IN ONE-PERSON CELL NO. (for communicable disease cases) | PLACED IN TWO OR MORE PERSON CELL NO. UNDER SPECIAL/CLOSE OBSERVATION (potential suicides) |
|---|---|---|
| NOTE: LOCKUP KEEPER MUST SIGN IN ALL INSTANCES | LOCKUP KEEPER'S SIGNATURE | |

## RELEASE OF ARRESTEE FROM CUSTODY

FOR THE FOLLOWING REASON(S), I HAVE DETERMINED THERE IS NOT SUFFICIENT CAUSE TO FURTHER DETAIN/CHARGE THE ARRESTEE:

| SIGNATURE - ARR. OFF./DETECTIVE | STAR NO. UNIT | APPROVED - W/C - DETENTION FAC. - STAR NO. | DATE-TIME RELEASED FROM CUSTODY |
|---|---|---|---|

# VICE CASE REPORT

CHICAGO POLICE

**1. OFFENSE - PRIMARY CLASSIFICATION**
- ☐ 1 GAMBLING ☐ 2 NARCOTICS ☐ 3 LIQUOR LAW VIOLATION
- ☐ 4 PROSTITUTION ☐ 5 OBSCENITY ☐ 6 PUBLIC INDECENCY/UIC PREMISE

**2. SECONDARY CLASSIFICATION** Possession of a Cnn Subs

**3. UCR OFFENSE CODE** 5. 3. NO.

**4. ADDRESS OF LOCATION (NO. - DIR. - STREET - APT. NO.)**
54 N. Watson

**5. TYPE OF LOCATION/PREMISE WHERE OFFENSE OCCURED**
- ☐ 240 TAVERN/LIQUOR STORE
- ☐ 293 RESTAURANT
- ☐ 166 POOL ROOM
- ☐ 167 BARBER SHOP
- ☐ 193 DRUG STORE
- ☐ 260 HOTEL/MOTEL
- ☐ 165 NEWSSTAND
- ☐ 095 AIRPORT/AIRCRAFT
- ☐ 290 RESIDENCE
- ☐ 304 STREET
- ☐ 121 CHA APARTMENT
- ☐ 123 CHA PARKING LOT/GROUNDS
- ☐ 269 PARK PROPERTY

**5. DATE OF OCCURRENCE - TIME** 16 De 04 1410

**6. DATE & TIME ARRIVED - TIME** 16 De 04

**7. BEAT/UNIT ASSIGNED** 621 2

**8. BEAT OCCURRED** 20/1

**LOCATION CODE**

**10. LICENSEE'S NAME (CORP. IF APPLICABLE)**

**11. BUSINESS LICENSE NO(S).**

**12. VICTIM'S / COMPLAINANT'S NAME (LAST - FIRST - M.I.)**

**IS PERSON** ☐ 1 DISCOVERED ☐ 2 WITNESSED ☐ 3 REPORTED OFFENSE

**13. HOME ADDRESS (NO. - DIR. - STREET - APT. NO.)**

**14. SEX - RACE - AGE CODE**

**15. HOME PHONE**

**16. BUSINESS PHONE**

**17. TIME AVAIL.**

**19. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.)**

**20. OFFENDER IN CUSTODY** ☐ 1 YES ☐ 2 NO

**21. NICKNAME/A.K.A.**

**22. HOME ADDRESS**

**23. SEX - RACE - AGE CODE**

**HEIGHT** **WEIGHT** **EYES** **HAIR** **COMPL.**

**RACE CODES**
1. BLACK
2. WHITE
3. BLACK-HISPANIC
4. WHITE-HISPANIC
5. AMER.IND./ALASK. NAT.
6. ASIAN/PACIFIC ISLANDER

**24. DATE OF BIRTH**

**25. I.R./C.B. NO.**

**26. CHARGES**

**27. COURT BRANCH - CALL**

**28. COURT DATE**

**29. INVENTORY NO.**

**30. WEIGHT**

**31. E.S.V.**

**OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.)**

**OFFENDER IN CUSTODY?** ☐ 1 YES ☐ 2 NO

**NICKNAME/A.K.A.**

**HOME ADDRESS**

**SEX - RACE - AGE CODE**

**HEIGHT** **WEIGHT** **EYES** **HAIR** **COMPL.**

**DATE OF BIRTH**

**I.R./C.B. NO.**

**CHARGES**

**COURT BRANCH - CALL**

**COURT DATE**

**INVENTORY NO.**

**E.S.V.**

**OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.)**

**OFFENDER IN CUSTODY?** ☐ 1 YES ☐ 2 NO

**NICKNAME/A.K.A.**

**HOME ADDRESS**

**SEX - RACE - AGE CODE**

**HEIGHT** **WEIGHT** **EYES** **HAIR** **COMPL.**

**DATE OF BIRTH**

**I.R./C.B. NO.**

**CHARGES**

**COURT BRANCH - CALL**

**COURT DATE**

**INVENTORY NO.**

**E.S.V.**

**32. NO. OF OFFENDERS**

**33. NO. OF ARRESTEES**

**34. TYPE OF ARREST** ☐ ON VIEW ☐ WARRANT

**35. ADDRESS OF ARREST**

**VEHICLE USED BY OFFENDER(S)**

**YEAR** **MAKE** **BODY STYLE** **COLOR** **V.I.N.**

**OTHER VEHICLE IDENTIFIERS**

**38. VEHICLE CONFISCATED** ☐ 1 YES ☐ 2 NO

**STATE LICENSE NO.**

**STATE**

**POUND**

**39. MOTOR VEHICLE INVENTORY NO.**

**EXPIR. MO./YEAR**

**NARRATIVE (Do not duplicate or repeat information - for explanation or additional information only)**

**44. NOTIFICATIONS, IF APPROPRIATE, MADE BY**

**UNIT NOTIFIED**

**PERSON NOTIFIED**

**41. FLASH MESSAGE SENT?** ☐ 1 YES ☐ 2 NO

**42. GANG RELATED - AFFILIATION**
☐ VICTIM ☐ OFFENDER

**45. EXTRA COPIES REQUIRED (NO. & RECIPIENT)**
☐ NORMAL (3)

**CONTINUE ON OTHER SIDE**

**46. REPORTING OFFICER'S NAME (PRINT)**

**SIGNATURE**

**STAR NO.**

**47. DATE INVEST. COMPLETED - TIME** 16 De 04

**DATE SUPV. APPROVAL - TIME** 16 De 04

**DATE (DAY - MO. - YEAR) - TIME**

CONTINUATION OF NARRATIVE

RD NO.

...unless otherwise indicated. The sobriety of victims, witnesses and offenders is their apparent condition when reported. Witnesses' location at time of offense and distance from scene are the best approximation obtainable. All statements of victims, witnesses and offenders are summarizations unless otherwise indicated.

**STATUS**
☐ 0 PROGRESS      ☐ 1 SUSPENDED      ☐ 2 UNFOUNDED
☐ 3 CLRD CLOSED   ☐ 4 CLRD OPEN      ☐ 5 EXC.CLRD. CLOSED
☐ 6 EXC. CLRD OPEN ☐ 7 CLOSED - NON-CRIMINAL
☐ 0 REVISED
☐ 1 CORRECT
☐ 2 REVISED

UCR OFFENSE CODE    REV. CODE

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

**FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY**

IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEANUP OR FIRST CLEANUP OF MULTIPLE CLEANUP LIST)
☐ 1 ARREST & PROSECUTION
☐ 2 DIRECTED TO FAMILY COURT
☐ 3 COMPL. REFUSED TO PROSECUTE
☐ 4 COMMUNITY ADJUSTMENT
☐ 5 OTHER EXCEPTIONAL

☐ ADULT
☐ JUV.

I HAVE READ THIS REPORT AND BY MY SIGNATURE INDI-CATE THAT IT IS ACCEPTABLE

SUPERVISOR'S SIGNATURE                    DATE (DAY-MO-YR.)

PREPARED BY - SIGNATURE    STAR NO.    DATE (DAY-MO-YR.)    APPROVED BY - SIGNATURE    STAR NO.    DATE (DAY-MO-YR.)

JAN 2 6 2005

101

1

2          I N D E X

3     Date of hearing:  6-30-05

4     B-1 through B-62

5

6

7      WITNESSES:                    DX      CX      RDX     RCX

8    MIGUEL MARTINEZ                  4       9       31      43
            Petitioner-Defendant rests.....18

9    RUBEN BRIONUS
                                     19      31       43      47
10          People-Respondent rests.......48

11   Ruling........59

12                 * * * * * * * * * * * * * * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

                              B-2

1          MS. SMITH:  Judge, I will adopt these

2     questions with regard to Mr. Martinez.

3          THE COURT:  So note.

4          MS. SMITH:  No further questions.

5          MS. COSTIN:  No further questions at this

6     time.

7          THE COURT:  You may proceed, Mr. Kopec.

8          MR. KOPEC:  Thank you, your Honor.

9

10               CROSS-EXAMINATION

11               BY

12               MR.  KOPEC:

13     Q     Officer, how long have you been a Chicago

14     police officer?

15     A     11 years.

16     Q     And on 16, December, 2004, were you employed

17     and on duty with the Chicago police department?

18     A     That's correct.

19     Q     Officer, I just want to go into  -- you said

20     in the early afternoon you were in the area of 5402

21     North Western, in Chicago, correct?

22     A     That's correct.

23     Q     What brought you to that location on that

24     date and time?

1  A  Information about a confidential informant

2 related that there was a male Black subject,

3 approximately 35 years of age, five-six, 170 pounds,

4 with a shaved head that would be retrieving a couple

5 ounces of cocaine from the area of 5400 North Lincoln.

6  Q  And armed with that information, did you and

7 fellow officers set up a surveillance?

8  A  That's correct.

9  Q  Approximately how many other officers were

10 with you?

11  A  Five other officers.

12  Q  Officer, was this your first narcotics

13 surveillance or have you been involved in any other

14 narcotics surveillance?

15  A  I have been involved with hundreds of

16 narcotic surveillances.

17  Q  And you were -- what is the term, a

18 surveillance officer or were you an enforcement

19 officer?

20  A  Surveillance officer.

21  Q  What type of vehicle were you in?

22  A  I was in a covert vehicle.

23  Q  What do you mean by "covert" car?

24  A  It is just a regular vehicle.

1      Q      Do you recall what type of vehicle you were

2  in?

3      A      Yes.  It was Taurus.

4      Q      Were you -- or you weren't in a Crown

5  Victoria, an undercover police car?

6      A      No.

7      Q      This vehicle you had, was it equipped with

8  any lights or sirens?

9      A      No.

10     Q      Did you proceed to the area of Balmoral and

11 Lincoln Avenue, in Chicago, Illinois?

12     A      Yes, I did.

13     Q      And is that where you initially set up your

14 surveillance?

15     A      That's correct.

16     Q      Did you see anyone who you saw in court

17 today?

18     A      Yes, I did.

19     Q      Who was that?

20     A      The Defendant, Davis, in the tan --

21 the male Black in the tan D.O.C. outfit, sitting on

22 the bench.

23            MR. KOPEC:  Judge, may the record reflect the

24 identification of the Defendant.

1          THE COURT: So note the identification.

2    BY MR. KOPEC:

3        Q    How did you see the Defendant, Davis,

4    arriving in the area of Balmoral?

5        A    He arrived in a vehicle where.

6        Q    And what, if anything, did he do when he

7    arrived?

8        A    He parked the vehicle; got out of the

9    vehicle; just hung out by the vehicle and used his

10   phone.

11       Q    Where were you in relation to the Defendant?

12       A    I was sitting in my car approximately  -- I'd

13   say about 75 feet away.

14       Q    And you were watching the Defendant?

15       A    That's correct..

16       Q    How long did you watch the Defendant for?

17       A    Approximately 15 minutes.

18       Q    At the end of 15 minutes what, if anything,

19   did the Defendant do?

20       A    The Defendant walked eastbound on Balmoral to

21   Western Avenue.

22       Q    Did you maintain that position or did you

23   follow the Defendant?

24       A    I followed the Defendant.

1      Q      How did you follow the Defendant?

2      A      In my vehicle.

3      Q      And the Defendant was on foot or did he get

4  back into his vehicle?

5      A      He was on foot.

6      Q      Since you were in the vehicle, how did you

7  maintain your distance from the Defendant, who was on

8  foot?

9      A      I just let him get in front of me for like a

10  half a block.  And as he walked, I crept up behind

11  him.

12      Q      Is Balmoral a multi-lane street or is it a

13  small residential street?

14      A      It's a small residential street.  I think

15  it's two ways.

16      Q      Did you -- home blocks did you follow the

17  Defendant?

18      A      Three blocks.

19      Q      And what -- did the Defendant ultimately stop

20  at Western and Balmoral?

21      A      That's correct.

22      Q      Is there a bus stop there?

23      A      Yes, it is, on the northwest corner.

24      Q      Did the Defendant continue to wait at that

1          MR. KOPEC:   Thank you.

2          THE WITNESS:   Mr. Martinez drove by him and

3     honked at Mr. Davis.

4     BY MR. KOPEC:

5     Q     Were you able to hear this?

6     A     Yes.

7     Q     What, if anything, did Mr. Davis then do in

8     return?

9     A     Mr. Davis gave him a gesture with a head nod.

10    Q     Did the Mercury car then stop then at the

11    corner of Western and Balmoral?

12    A     No, it did not.

13    Q     Where did it proceed?

14    A     It turned westbound on Balmoral into the west

15    alley of Western, behind the building, directly behind

16    the building in a parking spot.

17    Q     And were you able to see this from your

18    surveillance point?

19    A     That's correct.

20    Q     And where did the vehicle end up?

21    A     Directly behind the building in the parking

22    spot in the alley of 5402 North Western.

23    Q     And do you recall which parking spot?

24    A     It was the first parking spot from the alley.

1    Q    Were you also able to observe Mr. Davis?

2    A    Yes.

3    Q    What, if anything, did he do at this point?

4    A    When he parked -- when Mr. Martinez parked,

5    Mr. Davis walked towards that vehicle.

6    Q    What did you do at this point?

7    A    I exited my vehicle and followed him on foot.

8    Q    Did you see Mr. Davis enter the passenger

9    vehicle of Miss Martinez' car?

10    A    Yes, I did.

11    Q    As you were walking down the street, Officer,

12    were you in plain clothes or were you in your uniform?

13    A    I was in plainclothes.

14    Q    Did you have any sort of bulletproof vest on

15    the outside of your clothes?

16    A    Not on the outside, no.

17    Q    Did you have your car visible?

18    A    No, I did not.

19    Q    Did you have your gun drawn or was your gun

20    visible?

21    A    It was not visible.

22    Q    Did you immediately, as you saw Defendant

23    Davis, enter the passenger vehicle or passenger car,

24    Mr. Martinez' car, did you immediatly walk up to that

B-26

1  vehicle?

2      A    Yes, I walked towards it.  Yes, I did.

3      Q    Did you walk directly toward it or did you

4  continue to walk down Balmoral?

5      A    Well, I continued to walk down Balmoral out

6  of his sight, and then I came down  -- up to the car.

7      Q    Was there other pedestrian traffic on

8  Balmoral and Western, in that area?

9      A    I'm sure there was.

10     Q    And after circled back towards the car that

11  was parked, was it still parked?

12     A    That's correct.

13     Q    And were you able to approach the passenger

14  side of that car?

15     A    Yes, I did.

16     Q    Do you recall if the passenger side had any

17  tinted windows?

18     A    No, I do not.

19     Q    At some point, how close did you get to that

20  car before you stopped?

21     A    About five to 10 feet away.

22     Q    And did you make any observations of what was

23  happening inside that vehicle between Mr. Davis and

24  Mr. Martinez from five to 10 feet away?

1    A    Yes, I did.

2    Q    What did you observe?

3    A    I observed Mr. Martinez hand Mr. Davis a

4  clear plastic bag that contained large chunks of

5  suspect cocaine.

6    Q    Officer, this was afternoon. This was

7  daylight, correct?

8    A    That's correct.

9    Q    Was there anything between you and the

10 vehicle?

11   A    No, it was not.

12   Q    Officer, have you ever made any narcotics

13 arrests in your 11 year career?

14   A    Hundreds.

15   Q    Have any of those arrests included arrests

16 for cocaine?

17   A    Yes.

18   Q    The bag that you saw Mr. Davis -- Mr.

19 Martinez hand to Mr. Davis, what did you believe was

20 in that bag?

21   A    I believed it was cocaine.

22   Q    Was that based on your experience through the

23 past 11 years?

24   A    That's correct.

1      Q      At this point, were you still standing five

2    to 10 feet away from the passenger side door?

3      A      When I saw this, I approached the vehicle

4    instead of getting closer.

5      Q      As you approached, what, if anything, did Mr.

6    Davis do at that point?

7      A      He looked in my direction.

8      Q      And what, if anything, did you do next?

9      A      And than he placed that plastic bag that was

10   given to him by Mr. Martinez into the glove box.

11     Q      What did you do at that point?

12     A      At that point, I was almost near the

13   passenger side door.  I yelled, "Police," and I told

14   him to get out of that car.

15     Q      And did Mr. Davis step out of the vehicle?

16     A      Yes, he did.

17     Q      Did you also have a sergeant with you

18   approaching the car?

19     A      Yes, I did.

20     Q      Was he approaching the same side or the

21   driver's side?

22     A      The driver's side.

23     Q      And did you observe him get Mr. Martinez, the

24   driver?

1      A     Yes, I did.

2      Q     At that point did you call for enforcement

3   officers?

4      A     Yes, I did.

5      Q     Did enforcement officers come and take

6   control of both Defendants?

7      A     Yes, they did.

8      Q     At that time, did you and your sergeant

9   conduct a search of that glove box?

10      A     That's correct.

11      Q     What, if anything, was recovered?

12      A     The clear plastic bag that was put in there

13   by Mr. Davis was recovered.

14      Q     And what did you find that to contain?

15      A     That contained large chunks of suspect

16   cocaine.

17      Q     And was a custodial search performed by

18   Officer McKenna on Defendant Martinez?

19      A     That's correct.

20      Q     Did that yield $435 United States currency?

21      A     That's correct.

22      Q     Officer, have you ever met Defendant Martinez

23   before the date in question?

24      A     No, I did not.

B-30

1    Q    Were you aware if any members of your team

2  ever met Mr. Martinez before the date in question?

3    A    No.

4    Q    Officer, how big was this plastic bag that

5  you saw Martinez hand to Davis?

6    A    It was bigger than a sandwich bag, but not

7  quite as big as a freezer bag.

8    Q    The size of a grapefruit, maybe?

9    A    That's correct.

10   Q    Specifically, how did you see Martinez hand

11 this grapefruit-size bag to Davis?

12   A    Well, when Martinez handed it to Davis, he

13 was cupping the bag underneath.

14   Q    He handed that over to Davis?

15   A    Yes.

16   Q    How did Davis take control?

17   A    He took control with his left hand almost the

18 same way.

19        MR. KOPEC:  Judge, nothing further.

20        THE COURT:  You may inquire.

21

22                  REDIRECT EXAMINATION

23                          BY

24                    MS. COSTIN:

1    Q    You said you spoke to a confidential

2   informant?

3    A    I did not.

4    Q    You did not speak to the confidential

5   informant. You don't know if the confidential

6   informant had been used before?

7    A    I know he has, yes. Yes he has been used

8   before.

9    Q    But you have no personal knowledge of that

10  confidential informant?

11   A    No.

12   Q    And was the confidential informant present at

13  this time?

14   A    No, he was not.

15   Q    Did the confidential informant tell you how

16  he obtained any information?

17        MR. KOPEC:  Objection.

18        THE COURT: No, he may answer, if he knows.

19  BY MS. COSTIN:

20   Q    Did you find out how the confidential

21  informant obtained that information?

22   A    No.

23   Q    Did he tell you  -- did you ever find out if

24  the confidential informant gave the name of a person?

B-32

1     A    No.

2     Q    No, you don't know or no, he didn't give the

3  name of a person?

4     A    No, I don't know.

5     Q    Did the confidential informant tell you

6  whether the person would be in a car or on foot?

7     A    He said he'd arrive in a car.

8     Q    He would arrive in a car. Did they tell you

9  what kind of a car?

10     A    No.

11     Q    What the license plate of that car would be?

12     A    No.

13     Q    Okay. What kind of a shirt that person would

14  be wearing?

15     A    No.

16     Q    What kind of pants, any kind of clothing

17  description?

18     A    No.

19     Q    Whether that person would be with another

20  person at that time?

21     A    No.

22     Q    You were not given any of this information?

23     A    That's correct.

24     Q    Were you given a description of the person he

1    would be meeting?

2        A    No.

3        Q    Were you given a description of whether that

4    person would be in a car?

5        A    No.

6        Q    Or a van?

7        A    No.

8        Q    So we're clear, you didn't have any of that

9    information?

10       A    That's correct.

11       Q    And so you didn't have -- or a license plate

12   number, for that matter?

13       A    No.

14       Q    You were told whether that person that he

15   would be meeting would be a man or a woman?

16       A    No.

17       Q    Or whether he'd be accompanied by more than

18   one person?

19       A    No.

20       Q    You were given no description of the person

21   that would be meeting him at all?

22       A    That is correct.

23       Q    And he told you the transaction that would

24   take place at 5400 North Lincoln?

B-34

1      A      Around that area.

2      Q      Okay. Where Mr. Davis was arrested, is that

3  Balmoral and Western?

4      A      That's correct.

5      Q      Where is the police station in that area?

6      A      From Lincoln, 5400 Lincoln or Balmoral and

7  Lincoln, I think it's only a couple blocks away.

8      Q      And so we're clear, no transaction took place

9  at 5400 North Lincoln?

10     A      No.

11     Q      Now, you saw a man arrive at Balmoral and

12 Western in a car?

13     A      Where are we talking?

14     Q      You took up surveillance at that area?

15     A      At where?

16     Q      Where did you originally take up

17 surveillance?

18     A      Originally?

19     Q      Yes.

20     A      5400 North Lincoln.

21     Q      And you saw a person -- did you see a person

22 arrive in a car at Balmoral and Western?

23            I withdraw that.

24            Did you see Mr. Davis arrive in his Saturn

```
 1    at Balmoral and Western?

 2        A    No.

 3             MS. COSTIN:  Marking Defense Exhibit No. 1

 4    for Identification.

 5                         (WHEREUPON, the document was
                           marked Defense Exhibit No. 1
 6                         for identification.)

 7    BY MS. COSTIN:

 8        Q    Did you make a police report that day,

 9    Officer?

10        A    I did not.

11        Q    Did you sign a police report?

12        A    I believe that's Sergeant O'Grady's.

13        Q    Did you put your initials at the bottom of

14    that police report?

15        A    No.

16             MS. COSTIN:  If I may approach, Judge?

17             THE COURT:  Sure.

18    BY MS. COSTIN:

19        Q    Showing you what has been marked Defense

20    Exhibit No. 1 for Identification.  Are these your

21    initials down at the bottom?

22        A    Yes.

23        Q    So, those are your initials?

24        A    Yes.
```

B-36

1    Q    So, you read that over before you signed it?

2    A    That's correct.

3    Q    Okay.  And did you sign the, "approximately

4 1300 hours that a male Black subject arrived driving a

5 small dark Saturn; subject exited his vehicle and

6 stood on the corner of Balmoral and Western." Did you

7 sign that police report?

8    A    Yes, I did.

9    Q    And Mr. Davis did arrive in a Saturn?

10    A    Yes, he did.

11    Q    Now, at the time that you initially took up

12 surveillance, how many undercover officers were there?

13    A    Five.

14    Q    How many vehicles?

15    A    I recall at least three.

16    Q    And were they all undercover vehicles?

17    A    That's correct.

18    Q    And everybody was in plainclothes?

19    A    That's correct.

20    Q    And what was the distance between you and

21 those other undercover vehicles?

22    A    I don't recall.

23    Q    And were you the closest undercover vehicle

24 to the surveillance point?

1    A    I don't recall.

2    Q    Could the other undercover vehicles, to your

3  knowledge, see what was going on?

4    A    Yes.

5    Q    So, were they· -- could you see them?

6    A    No.

7    Q    And when he got out of the car at Balmoral --

8  when he exited the Saturn, there is a Jiffy Lube right

9  there?

10   A    That's correct.

11   Q    He parked the car legally?

12   A    It was in the lot, in the Jiffy Lube.

13   Q    And he was in the Jiffy Lube parking lot for

14  approximately 50 minutes?

15   A    His car was.

16   Q    I'm sorry, Officer.

17        I'd like to once again show you defense

18  Exhibit No.1 for identification.

19        Officer, when he exited his vehicle, did he

20  stand there for approximately 15 minutes?

21   A    That's correct.

22   Q    And that's what you signed, correct, Officer?

23   A    That's correct.

24   Q    And that's the vehicle that was parked in the

B-38

1    Jiffy Lube?

2        A     That's correct.

3              THE COURT:   That's the vehicle you saw Mr.

4    Davis arrive in?

5              THE WITNESS:   Mr. Davis arrive, yes.

6    BY MS. COSTIN:

7        Q     Now, you saw Mr. Davis talking on the phone

8    at that time?

9        A     That's correct.

10       Q     Now, you couldn't hear that he was talking to

11   his wife?

12       A     (No response)

13       Q     Did you hear that he was talking to his wife?

14       A     No.

15       Q     Could you hear what he was saying at all?

16       A     No.

17       Q     And then you followed him approximately three

18   to four blocks?

19       A     That's correct.

20       Q     And he ended up by a bus stop?

21       A     That's correct.

22       Q     Okay.   Now, how many vehicles were with you

23   at this time?

24       A     The three vehicles again.


1    Q    And where were they located?

2    A    I don't recall.

3    Q    And the same amount of officers?

4    A    That's correct.

5    Q    Now, were you the closest vehicle at this

6    time?

7    A    I don't recall.

8    Q    Now, when you saw Mr. Martinez's car pull up,

9    what kind of a car was it?

10    A    It was a Mercury Mystique.

11    Q    Now so we're clear again, a Mercury Mystique

12    is a compact car?

13    A    It's a four-door.

14    Q    Four-door car?

15    A    That's correct.

16  .  Q    And you saw Mr. Davis get into that vehicle?

17    A    That's correct.

18    Q    Okay. Now, do you remember testifying at the

19    Grand Jury on January 20, 2005?

20    A    That's correct.

21    Q    And this is approximately 35, 40 days after

22    this occurred?

23    A    That's correct.

24    Q    And were you asked this question:

1           "Q.  And did you observe Defendant Davis

2                standing on the corner of that location

3                for approximately fifteen minutes before

4                a van pulled up, which was driven by

5                Martinez?"

6            Do you remember being asked that

7  question and giving that answer?

8     A    I don't recall him saying a van, no.

9     Q    Would you like to see, Officer, Defendant's

10  Exhibit No. 2 for Identification.

11         THE COURT:  So note.

12         MS. COSTIN: Page three, line 22.

13             (Brief pause)

14  BY MS. COSTIN:

15     Q    Is your memory refreshed now, Officer?

16     A    Yes.

17     Q    Do you recall being asked that question and

18  giving that answer?

19     A    It says, "Van."

20     Q    Did you say it was a van in the Grand Jury?

21     A    I said yes.

22     Q    And so we're clear, do you remember being

23  asked this question and giving this answer:

24           Page four, line three.

1          "Did Defendant Davis then enter that van on

2          the passenger side?

3          A.  Yes, he did."

4          THE WITNESS:  Yes.  That's what it says

5   there.

6          MS. COSTIN:  If I may have a moment, please,

7   your Honor?

8                    (Brief pause)

9   BY MS. COSTIN:

10     Q     Now, counsel asked you questions about you

11  approaching this car, slash, van?

12     A     It was a car.

13     Q     And looking inside of it, were you directly

14  down into the van, or car?

15     A     No.

16          MS. COSTIN:  If I could have a moment?

17          THE COURT:  Certainly.

18                    (Brief pause)

19          MS. COSTIN:  No further questions, Judge.

20          MS. SMITH:  Judge, I would adopt those

21  questions in relation to Mr. Martinez.

22          THE COURT:  Thank you.  Any additional

23  questions you wish to ask?

24          MS. SMITH:  No, Judge.

B-42

1           THE COURT: Mr. Kopec?

2                   RECROSS-EXAMINATION

3                   BY

4                   MR. KOPEC:

5       Q    Officer, the transcript that the Defense

6   counsel just showed you, that was a transcript from

7   the garage, correct?

8       A    That's correct.

9       Q    In that case the Assistant State's Attorney

10  who was asking you questions actually called that

11  vehicle a van, correct?

12      A    That's correct.

13      Q    The reports that you actually filled out, for

14  example, the Defendant Martinez's arrest report,

15  indicates that the car was a four-door Mystique,

16  correct?

17          MS. COSTIN:  Judge, I'm going to object.  You

18  can't rehabilitate a prior inconsistent statement.

19          THE COURT: I respectfully overrule the

20  objection.

21  BY MR. KOPEC:

22      Q    So, Officer, with respect to the report that

23  the police actually filled out, the arrest report

24  indicates that the vehicle was a four-door Mystique,

B-43

1    correct?

2        A    That's correct.

3        Q    And this vehicle was towed, correct?

4        A    That's correct.

5        Q    And the vehicle report also filled out by the

6    police indicate that it was a four-door Mystique,

7    correct?

8        A    That's correct.

9        Q    And in your vice-case report, the report you

10   filled out and the officers, you never referred to

11   this car as a van, correct?

12       A    That's correct.

13       Q    It is just the questioning by the Assistant

14   State's Attorney who kept referring to it as a van,

15   correct?

16       A    That's correct.

17       Q    Officer, the description counsel went through

18   with the description of what was not contained in the

19   information from the C.I., but the C.I. did describe

20   an individual with a shaved head, correct?

21       A    That's correct.

22       Q    And while the Defendant does that have a

23   shaved head today, at the time of his arrest, the

24   Defendant had a shaved head, correct?

1      A      That's correct.

2      Q      And the Defendant also matched the

3   approximate age, race, sex, height and weight of the

4   information from the C.I., correct?

5      A      That's correct?

6      Q      In addition to being at the location at the

7   time the C.I. had provided?

8      A      That's correct.

9      Q      Officer, just so everyone is clear, Western

10  Avenue runs north and south, correct?

11     A      That's correct.

12     Q      And at that point, Lincoln Avenue also runs

13  straight north and south, correct?

14     A      That's correct.

15     Q      And Balmoral runs east and west, correct?

16     A      Yes.

17     Q      And Lincoln Avenue is approximately three

18  blocks to the west of Western Avenue, correct?

19     A      Yes, it is.

20     Q      So, ndfor the Defendant to walk from Lincoln

21  and Balmoral to Western and Balmoral, he is only

22  walking approximately three blocks?

23     A      That's correct.

24     Q      And counsel pointed out that your report --

1    showed you a statement from your report where it said

2    that the Defendant was standing on the corner of

3    Balmoral and western for 15 minutes, correct?

4        A    That's correct.

5        Q    And the next sentence says the subject began

6    walking east on Balmoral to Western, correct?

7        A    That's correct.

8        Q    So, does it appear that there is a typo in

9    your report?

10       A    That's correct.

11       Q    The Defendant was initially on Lincoln and

12   Balmoral, correct?

13       A    That's correct.

14       Q    And then he walked east on Balmoral to

15   Western and Balmoral, correct?

16       A    That's correct.

17       Q    If you could just describe for the court what

18   type of road is Western?

19       A    Western Avenue is a busy, busy intersection

20   or busy road, street.

21            MR. KOPEC:    Judge, if I could have one

22   second.

23            THE COURT:    Sure.

24   BY MR. KOPEC:

1      Q      And how many lanes each way is Western Avenue

2    at that point?

3      A      I believe there are two lanes on each way,

4    going north and south.

5            MR. KOPEC:  Nothing further, Judge.

6            THE COURT:  Anything further?

7            MS. COSTIN:  Yes.

8

9            REDIRECT EXAMINATION

10           BY

11           MS. COSTIN:

12     Q      You were asked on more than one occasion at

13   the Grand Jury by the State's Attorney about a van.

14           MR. KOPEC:  Judge, asked and answered.

15           THE COURT:  You made your point, I think.

16           MS. COSTIN:  Okay.

17   BY MS. COSTIN:

18     Q      Did you ever get the Saturn out of the Jiffy

19   Lube lot?

20     A      No.

21     Q      And the Jiffy Lube is at Balmoral and

22   Western?

23     A      No.

24     Q      Not on the exact corner, but it's on that

1  block?

2      A      It's closer to Balmoral and Lincoln.

3          MS. COSTIN:  I have nothing further.

4          THE COURT:  Anything further by The state.

5          MR. KOPEC:  No.  Thank you very much.

6                      (Witness excused)

7          THE COURT:  Any additional witnesses you wish

8  to offer?

9          MS. SMITH:  No, Judge.  At this time the

10 Petitioner  rests.

11         MS. COSTIN:  Petitioner Davis rests.

12                PETITONER-DEFENDANTS REST

13         THE COURT:  State?

14         MR. KOPEC:  Judge, the State, with respect to

15 Mr. Martinez, seeks to introduce certified copies of

16 convictions, the 2003 conviction for PCS and a 1993

17 conviction for PSMV.

18         THE COURT:  It will be so noted.

19         MR. KOPEC:  Judge, with that, the State would

20 rest.

21                PEOPLE-RESPONDENT RESTS

22         THE COURT: Okay.  Both sides having rested,

23 the Petitioner may argue.

24         MS. SMITH:  Judge, you heard the testimony

1    today from client, Mr. Martinez, that he was the

2    driver of a vehicle that was stopped by the police

3    officers on December 16th of 2004.

4    When the vehicle was stopped, my client

5    was not committing any type of traffic offenses.  He

6    was not violating any state, local or federal laws.

7    And he was detained by the police officers for no

8    reason whatsoever, outside of the fact that he stopped

9    to pick up his friend, who was waiting at the bus

10   stop.

11   The police officers were at that

12   location based on general information that they

13   received from a confidential informant. The

14   information that the officers were acting upon is

15   extremely vague, and the only description that they

16   have was a male Black, with a bald head, weighing 180

17   pounds, five-six and 35 years old.

18   Judge, it's 2:00 in the afternoon. Any

19   Black male in that neighborhood could have fit that

20   description. The fact that my client stopped to help a

21   friend out at a bus stop doesn't mean that he was

22   doing anything unlawful.

23   The officers had no information about

24   who would be arriving at that location; who, if

B-49

1    anybody, would be involved in the transaction; whether

2    or not there would be a female or a male or the

3    nationality or ethnicity of any other individuals that

4    would be involved in this alleged transaction.

5           Judge, the officer testified that the

6    information provided that the alleged transaction

7    would take place at 5400 North Lincoln. My client was

8    on 5400 North Western.  So, there is a difference in

9    location. There is no license plate that was given, no

10   description of a vehicle that would be arriving at

11   that time.

12          Judge, the officer had testified previously

13   in the Grand Jury that he approached a van, and all

14   these transactions happened inside a van. However, his

15   police reports say a vehicle, a passenger car. The

16   officer -- I would ask you to accept that on that

17   particular day the officers were acting on information

18   and taking a hunch or a guess or a stab in the dark

19   about what was happening when my client picked up this

20   male Black.  And just because they were acting on a

21   hunch, pulled over this vehicle to try to find out

22   whether or not this individual, being Mr. Davis, was

23   involved in the transaction.  They unlawfully searched

24   the vehicle in which my client was the driver.

1          You have not heard any information or
2     testimony regarding if there was an exchange of money
3     between the parties. The narcotics were found inside
4     the glove box. Judge, most likely, the narcotics were
5     inside of the glove box all along, and that the
6     officer just randomly and unlawfully searched this
7     car.  And that's when they found these drugs.
8          It's not very credible that the officer
9     who testified before the court today, he just happened
10    to walk up on this vehicle and coincidentally found
11    these drugs in plane view.
12         I would ask that you find that we have
13    met our burden and grant our motion in regards to Mr.
14    Martinez; that he was just operating this vehicle,
15    picked up his friend, who just happened to fit the
16    general and vague description, being a male Black with
17    a bald head at that time, and his vehicle was
18    unlawfully searched based on that  -- or his friend's
19    vehicle was unlawfully searched based on that
20    information, and that the evidence that was recovered
21    should be suppressed.
22         THE COURT:  Thank you, Miss Smith.
23         MS. COSTIN:  Judge, we'll adopt that
24    argument.

1          THE COURT: I'll so note.

2          MS. COSTIN:  I would like to add that your

3   Honor is aware of the case of Florida versus Jackie

4   El.   That is a Supreme Court case. And in that case,

5   the court rejected the Prosecution's argument that

6   Tip was reliable because it described the Defendant by

7   age, clothing and location.

8               Here we don't even have the location

9   right. Also in that case, in Alabama versus White,

10  another Supreme Court case, a bare report of an

11  unknown, unaccountable who even explained how he got

12  the information and, what the officer said, he didn't

13  know or gave any corroboration of how he got that

14  information, was not a good basis for a Terry stop.

15              And indeed Mr. Martinez is a credible

16  witness here. He says he's driving away. The car is

17  stopped.  He says it's an undercover officer that

18  blocks his path. He says it's no lights.  He could

19  have given you full blown details, but he doesn't;

20  very reliable witness. He said just exactly what

21  occurred.

22              You also have the fact that the officer,

23  less than 40 days after this occurred, is testifying

24  at the Grand Jury, saying what he saw occur in the

1   van. Now, he wasn't asked it once. He was asked it a

2   couple of occasions.  And he never corrected it.

3          Judge, because of that we ask you grant

4   or Motion.

5          THE COURT:  State?

6          MR. KOPEC:  Judge, first of all with respect

7   to Mr. Martinez, you heard him testify. He's obviously

8   a convicted felon.  But even that aside, his version

9   of the events doesn't make any sense whatsoever.

10          He says that he is stopped on Western

11   Avenue by an undercovr detective car, not an

12   undercover car, but a detective car. And he says

13   rather than activate lights, activate a siren and pull

14   over the Defendant's vehicle, that he merely pulls in

15   front of him and stops his car.

16          So, let's think about that. He's driving

17   alone.  A car pulls in front of him and stops.  His

18   reaction is to stop his vehicle instead of just move

19   to the left lane and drive along. He decides to stop.

20   Not only does that not make any sense from a police

21   standpoint, why would you pull someone over like that?

22   How do you know to indicate that you are the police,

23   if Mr. Martinez never testified they flagged him down

24   or showed him any badge?

1          His testimony was cars pulled in front

2   of him and stopped.  Did he testify that other cars

3   blocked him in?  He says there were other cars but

4   they didn't come out until later. So, he had one car

5   pulling in front of him.  Not only doesn't that make

6   any sense from just the police practicality

7   standpoint, it doesn't make sense from a safety

8   standpoint.

9          Your Honor, I'm sure, is well aware of

10  the traffic on Western Avenue.  It is a busy street.

11  Are you going to pull over your car and get out of

12  your car on Western Avenue without activating any sort

13  of emergency equipment so that you don't get struck by

14  the car right behind you, apparently Mr. Martinez, or

15  other cars in the left .lane of traffic?

16          Why would police officers do that?  That

17  makes no sense in terms of safety.  That just would

18  not happen.  That scenario of an arrest makes no sense

19  whatsoever, Judge.

20          Additionally, his conspiracy theory of

21  those police -- you know, he wasn't doing anything;

22  the police stopped him for no reason; throw him on the

23  ground; throw him in the car, every conspiracy needs a

24  why.  Why him?  He never met those officers.  Those

1   officers never met him.  In fact, they don't have even

2   a description of him.   Why did they pull him over?

3   Why would they throw him on the ground?

4                   Judge, it doesn't make sense the way it

5   went down.  We ask you not to believe the Defendant,

6   Martinez's credibility. On the contrary you heard the

7   credible testimony of the police officer and his

8   version of how this arrest took place makes perfect

9   sense.   They had to make a description of the

10  Defendant -- what turned out to be the Defendant,

11  Davis.

12                  And counsel points out Florida versus

13  J.L. on the whole issue of how much predictive

14  information the C.I. can give to make a valid arrest.

15  But that's not what we have here.  And J.L. and those

16  type of cases, the police took the C.I. information

17  and made a stop, made an arrest. That's not what we

18  have here. Here they followed the Defendant. They

19  didn't arrest him on Lincoln and Balmoral as soon as

20  they saw him. They didn't arrest him on Western and

21  Balmoral as soon as they saw him meet with Mr.

22  Martinez. They merely walked up to the vehicle.

23  This is a completely different situation from J.L.

24  where they arrest the person based solely on the C.I.

1   information.

2          In this case in fact you can take

3   and draw out that whole C.I. information.  Because

4   what you essentially have here, when did you boil the

5   case down, is a police officer standing in a public

6   place where he has a right to be, five to 10 feet

7   away, he sees two Defendants with a bag, which in his

8   11 years as a police officer, he believes to be

9   cocaine.  He is on a public place.  He sees a crime.

10  That's probable cause to arrest the Defendants.

11         The C.I. issue is not an issue, Judge.

12  It merely explains how they got to the scene.  And

13  ultimately he was in a public place, he sees a crime.

14  He has probable cause to arrest both Defendants.

15         Judge, counsel went on and on about the

16  testimony if the Grand Jury of a van.  I think it is

17  clear, your Honor, other reports the police filled out

18  indicate a car.  The Assistant State's Attorney called

19  it a van.  That's the only impeachment against this

20  Defendant -- against the police officer.  We ask that

21  you accept this version of events, since they are the

22  ones that make the most sense, and that you disbelieve

23  Defendant Martinez and you deny both Defendants'

24  Motions.

1           THE COURT:  Thank you.

2                 Any response?

3           MS. COSTIN:  Yes, please.  That's huge.  It's

4    huge:  van, car.  It's huge.  Because it says what he

5    could see and what he could observe at that time.

6    It's huge.

7                 So, if the C.I.  --  he preferred to

8    ignore everything that happened with the C.I., then we

9    have to go on what this officer said.  And at a

10   different proceeding under oath he said it was a van.

11   And now he comes here and tells you it is a Mercury

12   Mystique. So, it's his ability to observe. He says one

13   thing at the Grand Jury and one thing here in front of

14   your Honor.

15                Also, just as an aside, the officer did

16   testify that there was no lights or anything on the

17   vehicle. So, Mr. Martinez was being correct when he

18   said that no van pulled in front of him with Mars

19   lights going and radioing and telling him to get out

20   of the car because the officer said those cars were

21   not equipped with that.

22                Nothing further.

23           THE COURT:  Miss Smith, any comments?

24           MS. SMITH:  Judge, just briefly in response

1    to the conspiracy of the why Mr. Martinez' vehicle was

2    stopped.  It is because a male Black entered inside

3    his car.  And that's the reason why he was stopped.

4    The officers were watching Mr. Davis for a period of

5    time.  They were suspicious.  And I'm sure in their

6    trainings, the trainings of 11 years, the officers

7    know how to pull over a vehicle to prevent it from

8    moving; jump out with their guns; make them get out of

9    car because they believe, over a hunch, that this was

10   some type of transaction.

11            And based on that, that's what made an

12   illegal search of the car.  And they found the

13   narcotics inside the glove box.  The narcotics weren't

14   found on anyone's lap or on the floor or weren't

15   dropped or anything.  They had to go inside in a

16   closed glove box inside this vehicle and recover the

17   drugs.

18            And that's what happened in this case,

19   based on that vague information of a tip that they

20   received from a confidential informant.  My client

21   testified credibly, and we ask that you grant our

22   motion.

23            MS. COSTIN: I will note that.

24            THE COURT: Thank you.  I will note that also.

B-58

1          There is no question if I believed the
2     story related by Mr. Martinez, I would quash the
3     arrest and suppress the evidence.

4          Insofar as Defense counsel's argument
5     regarding their having insufficient cause to pull the
6     vehicle over, I would agree. However, we have a
7     conflict in facts here.  And the officer testified
8     that's not how it went down. He rather was not stopped
9     on Western.  Western, we all know, is a very busy --
10    one of the main thoroughfares.  There's north and
11    south.  I think it runs from each end of Chicago,
12    north and south, and a main highway at that.  As a
13    matter of fact, it goes from Blue Island and beyond.

14         We all know that it was four-door car,
15    because Mr. Martinez testified it was a four-door car.
16    So, we know it was a car. I found unfortunately that
17    those that present matters to the Grand Jury in
18    leading questions quite frequently misstate facts,
19    causing problems like this and in doing it in a rapid
20    fashion as they do, says a van instead of a car. and
21    here you have a cause for impeachment. All the reports
22    indicate it was a car. Mr. Martinez indicates it was a
23    car.  I accept the fact it was a car.

24         If it occurred as the officers

1  testified, they don't need any informant whatsoever.

2  If for whatever reason, on a hunch, if they just have

3  the statement, in this area I saw what transpired, I'm

4  sure that would rather unlikely, but even if they did,

5  and finally got to the alley and saw what the officer

6  said he saw, a bag being transferred, and once Mr.

7  Davis got it, he saw somebody approaching the vehicle,

8  put it into the glove compartment, and at that point

9  there's an arrest.

10          Under all the intended circumstances, I

11  would believe the officers' testimony and find that

12  they did have probable cause to make the arrest.

13  Motion To Quash Arrest/Suppress Evidence will be

14  respectfully denied.

15          MS. COSTIN:  I would like a status date.

16          What is Mr. Davis' term?  I explained to

17  him that while the Motion was pending, no term had

18  been running.  Actually since I have been representing

19  him, no term has been running.

20          MR. KOPEC:  According to the State, if the

21  demand was running, the demand would be 56.

22          MS. COSTIN:  As your Honor recalls, Mr. Davis

23  is inquiring about his term time.  When I was

24  appointed, your Honor told him his term was not

1    running if he wanted the Public Defender's Office
2    appointed.
3           THE DEFENDANT:  If I remember correctly, I
4    was told by the State I had 55 days into my term.
5    That was in fact two months ago, which means that my
6    term should have been still running, unless I'm
7    confused.
8           THE COURT:  It doesn't run as long as you
9    have Motions pending.
10          THE DEFENDANT:  A motion was filed on the 8th
11   of June.  So, from the 8th until today should have
12   been the only time that my term should have stopped,
13   am I correct?
14          THE COURT:  Can I see the file?
15                   (WHICH WERE ALL THE PROCEEDINGS
16                    HAD IN THE ABOVE-ENTITLED CAUSE).
17                 * * * * * * * * * * * * * * * * *
18
19
20
21
22
23
24

```
 1    STATE OF ILLINOIS)
                      )   SS:
 2    COUNTY OF C O O K)

 3

 4

 5

 6

 7         I, BARBARA J. KIMBROUGH, CSR, Official Court

 8    Reporter of the Circuit Court of Cook County, County

 9    Department - Criminal Division, do hereby certify that

10    I reported in shorthand the proceedings had at the

11    hearing in the above-entitled cause; that I thereafter

12    caused to be transcribed into typewriting the above

13    Report of Proceedings, which I hereby certify is a

14    true and correct transcript of the proceedings heard

15    on said date, before the Honorable FRED G. SURIA, JR.,

16    Judge of said court.

17

18

19    _____
      Official Court Reporter
20    Circuit Court of Cook County
      .Criminal Division
21

22

23

24
```

B-62

# Exhibit B

1    STATE OF ILLINOIS  )
                                   )  SS:
2    COUNTY OF C O O K  )

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT - CRIMINAL DIVISION

4
    THE PEOPLE OF THE STATE          )
5    OF ILLINOIS,                     )
                                          )
6               Plaintiff,       )
                                          )
7      vs.                       )  No. 05 CR 2672-02
                                          )
8    ROOSEVELT DAVIS,                 )
                                          )
9              Defendant.       )

10       REPORT OF PROCEEDINGS had at the hearing of

11   the above-entitled cause, before the Honorable MARY

12   MARGARET BROSNAHAN, Judge of said court, on Wednesday,

13   the 17th day of August, 2005, at the hour of

14   approximately 1:30 o'clock p.m.

15      PRESENT:

16           HON. RICHARD A. DEVINE,
           State's Attorney of Cook County,
17         BY:  MR. JASON KOPEC,
           BY:  MS. EMILY L. STEVENS,
18         Assistant State's Attorney,
              On behalf of the People;
19
           MR. EDWIN A. BURNETTE,
20         Public Defender of Cook County,
           BY:  MS. ROSE COSTIN,
21         BY:  MS. STEPHANIE L. HIRSCHBOECK,
            Assistant Public Defender,
22              On behalf of the Defendant.

23   Laurel E. Laudien, RMR, RPR, CSR #084-001871
    Official Court Reporter - Circuit Court of Cook County
24   County Department - Criminal Division (773) 869-6065

1        THE COURT:  All right.  The case of the People

2   versus Roosevelt Davis, 05 CR 2672.

3        This matter was transferred up here for trial

4   from Judge Suria.

5        Both sides are answering ready for trial, is

6   that correct?

7        MR. KOPEC:  Yes, Judge.

8        MS. COSTIN:  Yes, your Honor.

9        THE COURT:  State is Jason Kopec K-O-P-E-C as well

10  Emily Stevens, S-T-E-V-E-N-S.

11       The Defense is Stephanie Hirschboeck, and

12  Miss Rose Costin, C-O-S-T-I-N.

13       They are getting the jury.

14       Could we have Roosevelt Davis, sir.

15                      (SHORT PAUSE.)

16       THE COURT:  Good afternoon.

17       You are Mr. Davis?

18       THE DEFENDANT:  Yes.

19       THE COURT:  Please have a seat right over there at

20  counsel table with your attorney.

21       Both sides are answering ready for trial.

22       I have the State as well as Defense, and

23  Defense has Investigator Stephanie Turner as a

24  potential witness.

1          With respect to additional voir dire

2    questions, the Defense has requested that I ask of all

3    if they know police officers, judges, or lawyers.  That

4    used to be on the juror card.  I am told it's not now

5    no longer on it.

6          State, you can make your request that we

7    discussed before the Court Reporter got here.

8    MS. STEVENS:  Judge, the one question we requested

9    each juror be asked if they have moral, ethical, or

10   religious beliefs that would prevent them from entering

11   judgment against another.

12   THE COURT:  And the Defense objected to that

13   question.

14         I'm not going to ask that question, during my

15   initial questioning of the 14.

16         If you feel a need to follow-up something

17   raised during the course of voir dire, once I'm done

18   with the 14, the general questions, I will tender the

19   cards to the Defense as well as State as to the

20   decision, you can ask whatever followups relevant to

21   the case.

22         Pretrial motions?

23   MR. KOPEC:  State has some motions in limine.

24   THE COURT:  Okay.

D-4

1        MS. COSTIN:  Judge, if I could make the record, so

2    you are, your Honor, advised there was a motion to

3    quash arrest and suppress that was denied by Judge

4    Suria.

5            There was also a motion to disclose the

6    confidential informant, which was also denied by Judge

7    Suria.

8        THE COURT:  All right.  Thank you.

9            Also the State is asking based on this

10    written Motion in Limine, No. 1, prevent the Defense

11    from introducing any evidence either indirect or

12    directly about the possible punishment.

13            Is there any objection to that motion in

14    limine, just Point No. 1?

15        MS. COSTIN:  No.

16        THE COURT:  That will be granted.

17            Obviously the sentence that he is facing is

18    not relevant to the charges.

19            Next thing, go ahead, State, if you want to

20    produce any argument.

21            No. 2, you want to get into evidence

22    concerning his criminal history should he choose to

23    testify.

24            I'm going to hold my ruling in abeyance on

1    that issue.

2          State, you obviously can't bring up any

3    criminal background.  If he does choose to testify, I

4    will address what, if any, prior convictions will come

5    in at that time.

6          No. 3, you want to prevent the Defense from

7    making any comments concerning police or prosecutorial

8    misconduct as portrayed in the media.

9          Defense you can argue with respect to this,

10   if you believe misconduct, if that is in fact your

11   theory of the case, but I take it the State, you don't

12   want to talk about wide-ranging issues as prosecutorial

13   misconduct that the Tribune wrote about, or any other

14   such other issues; is that what you are speaking about?

15        MR. KOPEC:  Yes.

16        THE COURT:  Do you intend on doing that, State, or

17   Defense?

18        MS. COSTIN:  No.

19        THE COURT:  Okay.  That will be granted.

20          Certainly confine any of your comments

21   regarding misconduct on behalf of police or prosecutors

22   to what you believe occurred in this case and this case

23   alone.

24          No. 4, prohibit the Defense from introducing

1        evidence of the Defendant's character in the community.

2                Do you intend on doing that?

3                At this time, I'm going to grant their motion

4        in limine.  If you want to revisit, if you choose to

5        call any witnesses during your case.

6            MS. COSTIN:  We don't anticipate calling any

7        witnesses, only insofar as if Mr. Davis chooses to

8        testify, that he is allowed to testify to what he does,

9        where he goes, and who he lives with.

10           THE COURT:  Of course, if he testifies, he will be

11       allowed to testify to that.

12               The motion in limine will be granted to any

13       other witnesses besides the Defendant.

14               No. 5, the State is prohibited from

15       introducing evidence of an order requiring

16       fingerprinting of the evidence or his request for

17       fingerprinting.

18               State, give me an argument on that or offer

19       of proof.

20           MR. KOPEC:  Well, Judge, it's a interesting,

21       unique factual situation that came up in this case.

22       The motion was heard on 6 - 30, 2005.

23               After the motion, it was set down for trial

24       on August 4th.  At that time, Judge Suria entered an

1    order requiring the evidence to be fingerprinted, but

2    the Defense also requested that the evidence be

3    produced for trial, and Defense demanded trial, so we

4    went motion State to 8- 4.

5        We contacted the Crime Lab and they indicated

6    they would not be able to complete a fingerprint order

7    by 8 - 4; and obviously, as a practical matter, if the

8    evidence went to the Crime Lab, it would not be

9    available for trial on 8 - 4.

10       So we had discussions with the Defense

11   Attorney, indicated to them the information, and they

12   indicated that they would rather have the evidence at

13   trial, rather than send it to the lab and wait for

14   fingerprints.

15       So our concern, again, technically, there is

16   an order that has not been complied with, I guess.  The

17   bag has not been fingerprinted.  We would object to

18   that being brought up.  The factual situation that

19   occurred really prevented that from occurring.

20       THE COURT:  A, I take it that the Defense, correct

21   me if I am wrong, you don't intend on introducing

22   evidence signed by the Judge in August.

23       Certainly you are not precluded from arguing

24   no fingerprints were taken initially, nor were any

1    ordered up until that date, but not intending to use

2    the Judge's order to argue that?

3         MS. COSTIN:  We were told -- and we had a demand

4    running also -- it would take 18 months for the

5    fingerprints to be completed, so we had to make a

6    choice; and our choice is that, you know, we needed to

7    see the evidence.  It's a major part of this case, so,

8    of course.

9         THE COURT:  Okay.  I think the State, I would

10   assume in fairness, the Defense can certainly comment

11   upon the fact that the State chose or the police chose

12   not to put in an order for fingerprinting on the date

13   of the arrest, or at any month after that.

14        You just are going to be precluded from you

15   can't talk about the order that was signed and then

16   trying to blame the State that it wasn't complied with,

17   I take it you are not going to do that anyway?

18        MS. COSTIN:  No.  We will blame the police

19   officers and not the State.

20        THE COURT:  Okay.

21        MR. KOPEC:  Should the Defendant testify, we are

22   also concerned that he would testify that an order was

23   signed by Judge Suria that did not --

24        THE COURT:  We can address that motion, if in fact

1    he does testify.

2            Obviously, if he chooses to testify, the same

3    thing would go.

4            If you choose to testify, you can't talk

5    about that order for fingerprints that Judge Suria

6    signed just a couple of months ago, or a month ago,

7    right?  That's off limit.

8            We will address if before he testifies, if

9    you choose to do that.

10            No. 6, prohibit the Defendant from listing

11    the State's failure to disclose information on the

12    informant as a witness in trial.

13            State, give me an argument on that.

14        MR. KOPEC:  Judge, we had previously, or today

15    actually, the Defense presented a motion to produce a

16    CI.  That was argued.  Judge Suria denied that motion,

17    based on the fact the Defendant -- or CI was not

18    transactional to the case, so we would ask for a motion

19    in limine preventing the Defendant from arguing that

20    the State failed to call confidential informant as a

21    witness.

22        THE COURT:  Do you intend to do that, State -- or

23    Defense?

24            I keep looking at you, State.  I'm

1    misspeaking.

2         Go ahead, Defense.

3    MS. COSTIN:  Judge, only thing we would ask, with

4    our own motion in limine, in order to preclude anything

5    the State did, confidential informant spot, police

6    officers, no detail.

7         They were called to the area, and based upon

8    information, there was an investigation, they spoke to

9    the person.  There was an investigation, not to go into

10   any detail of this confidential informant that's not

11   going to be produced here at trial.

12   THE COURT:  And if they are precluded from doing

13   that, you then in turn do not intend to get into where

14   the confidential informant is, is that correct?

15   MS. COSTIN:  Yes, ma'am.

16   THE COURT:  That would be my ruling.  You will be

17   able to get in the fact that the officer may have had a

18   conversation with an individual, period, like where the

19   conversation occurred.

20        Subsequent to the conversation, you know,

21   where did the officer go or what did they do, but not

22   the contents of the conversation that the officer had

23   with the confidential informant.

24   MR. KOPEC:  Judge, just to clarify that was a yes,

1    obviously the police in this case received a location,

2    a time, and a physical description of the Defendant.

3         If you are saying we can't elicit what those

4    physical descriptions were, are we able to say the

5    location?

6    THE COURT:  You are right.  You can't elicit.  You

7    can't elicit the contents of the conversation with the

8    confidential informant.

9         For instance, the officer can't say I met

10   with an individual and was told to go to this location

11   and look for someone who is described as such at a

12   certain time.

13        What you can do is get into the fact that

14   there was a conversation with an individual, and you

15   may ask the officer what did he do subsequent to that

16   conversation, and he can detail where he went, and what

17   time he went, and what he was doing, pursuant to the

18   investigation, but not -- not that it came from the

19   confidential informant or what the exact details were.

20   MR. KOPEC:  We can say, though, that they went to

21   this location based on a the tip and they found the

22   Defendant based on the tip?

23   THE COURT:  Don't use the word tip.

24        Just say they had a conversation with the

1    individual.  After the conversation, what did they do,

2    or what course did their investigation take, and they

3    can tell you what they did.

4         Warn them.  I don't want them saying CI told

5    me A, B, C.

6         MS. STEVENS:  Can they refer to the person as a

7    confidential informant or do you want them to refer to

8    them as an individual?

9         MS. COSTIN:  I would say individual.

10        Based upon the information received from an

11   individual, we went to --

12        THE COURT:  Just leave it at individual.  I don't

13   really think it matters.  I don't think the

14   terminology, the individual matters.

15        The point is you can't get into the contents

16   of the conversation with that person verbatim, but --

17        MS. STEVENS:  If we can't disclose it was a

18   confidential informant and explain what a confidential

19   informant is, and therefore, to protect their safety,

20   that's why they are not here; if we just refer to them

21   as an individual, that might leave a question in the

22   jurors' minds, well, where is this individual?

23        And if we can explain there are confidential

24   informants, and that to protect anonymity and safety,

1    they are not being called as a witness; I mean, we

2    wouldn't say it like that, but explain what a

3    confidential informant is, based on that information

4    that person gave you, what did you do next, we went to

5    this area at this time and saw somebody that we were

6    looking for.

7         MS. COSTIN:  So they are asking, if I may, they

8    are asking to prohibit us from saying anything about a

9    CI, but they want to explain what a CI is and why a CI

10   isn't here?

11        THE COURT:  You can't have it both ways.

12             If you go into the explanation, I'm

13   precluding them from bringing where is the CI, and you

14   want to answer that question on your direct

15   examination, so I don't think that that's fair.

16             So you can call the person a confidential

17   informant during closing argument down the road, I

18   mean, perhaps that opens the door for some argument.  I

19   don't know.

20             You can name the person however you want.  It

21   doesn't matter to me.  If it's an individual or you use

22   the word confidential informant, but tell the officers

23   before you call them, I don't want them saying what the

24   CI said when you ask them that question, what did you

1    do right after your conversation with this individual,

2    or confidential informant, what direction did your

3    investigation take, I don't want them to blurt out,

4    well, the informant told me such and such.  That's why

5    we went here.

6         So warn them.

7    MS. COSTIN:  If I may, why don't they just ask we

8    received information, that's it.  We received

9    information, so we went to such and such a place.

10        They don't have to go into a person or --

11   THE COURT:  It is the facts of the case.  I'm not

12   going to shroud the facts of the case.  It is what it

13   is.

14        They did it, assuming based on the all your

15   arguments, they had a conversation.  I will let them

16   set that up, where it occurred, however long it took to

17   get to the next location.

18        I think everyone understands.

19   MS. COSTIN:  With all due respect, we would like

20   to know beforehand where it took place, and we were

21   never tendered that.

22        We asked for disclosure, for where did

23   O'Grady talk to everybody.

24   THE COURT:  If you are going to go into it, the

1    Defense has a right to know that.

2              I'm assuming all of that was documented in

3    reports.

4         MS. STEVENS:  The reports just say the officers

5    had a conversation with a confidential informant.

6         MS. COSTIN:  That's it.

7         MS. STEVENS:  And the information that the

8    informant provided.

9         THE COURT:  If you are going to go into anything

10   more than that, then tender to the Defense before you

11   put the officer on.

12             If you are going to get into where it

13   occurred, what time it occurred, et cetera, let them

14   know what you intend to ask so they have some knowledge

15   of it.

16             I assume they don't know if it occurred that

17   day, the day before, was it an hour before, half hour,

18   five days before; so if you are going to set that

19   foundation, at least certainly tell them the

20   particulars.

21             Last one is No. 7, State is to prevent the

22   Defense to attempt to identify the confidential

23   informant.  That's going to be sustained based upon the

24   prior ruling.



**Law Office of the**
**COOK COUNTY PUBLIC DEFENDER**
69 W. WASHINGTON • 16TH FLOOR • CHICAGO, IL 60602 • (312) 603-0600

Edwin A. Burnette • Public Defender

June 4, 2007

Mr. Roosevelt Davis
Reg. No. N 73889
East Moline Correctional Center
100 Hillcrest Road
East Moline, Il 61244

In Re: appeals no. 06-1120

     In response to your recent voice mails, I have received the transcript copies you sent,

evaluated them and have determined not to supplement your opening brief.

     Regarding the finger print issue, Ms. Hirschboeck informed me that just prior to trial, you

indicated that the you preferred to start the trial, rather than wait for the testing. More

importantly, failure of your trial attorneys to seek the test is **not** ineffective under **Strickland v.**

**Washington**. Given the testimony of the arresting officer, a negative finding would not have

been very probative - - as failure to produce your print could have been caused by myriad

circumstances. And even without the testing, your lawyer was still in the position to argue that

your prints were not found. Also deciding not to seek testing could be termed sound strategy, as

the test could have produce a **positive** result.

     In regards to the IPI 3.11, the record was insufficient to raise the issue, as the

"inconsistency" was not discussed. The only inconsistent testimony I recalled wasn't sufficiently

egregious to constitute reversible error - - as it was minor in nature, such as the make of car. In

any event it was not sufficient to warrant error under **Strickland**.

And as I told you earlier, the issue regarding the ruling on your motion to quash is

likewise meritless - - as the plain view doctrine clearly gave the officer  probable cause to arrest.


Respectfully


Bruce C. Landrum
Assistant Public Defender


BCL

# Exhibit D

1              At the close of State's evidence, the

2      Defense, if they choose, may introduce some evidence of

3      their own.  They don't have to.  They have no burden of

4      proof here.

5              At the conclusion of all the evidence, the

6      attorneys are going to make closing arguments to you.

7              Once closing arguments are concluded, that's

8      when I will give you instructions to the law you have

9      to follow, you will deliberate, and arrive at your

10     verdict.

11             With that, folks, I believe we are set to get

12     started.

13             Are both parties ready to proceed and give

14     opening statement?

15         MR. KOPEC:  Yes, Judge.

16         THE COURT:  State, you may address the jury.

17         MR. KOPEC:  Good afternoon, everyone.

18         THE COURT:  You may proceed, sir.

19         MR. KOPEC:  Thank you, Judge.

20                    OPENING STATEMENT

21                    BY MR. KOPEC:

22             Ladies and gentlemen, the Defendant stands

23     before you today because he was caught red-handed.

24     Chicago police officer caught him with over one hundred

1    grams of cocaine.

2         And as the Judge has already introduced me,

3    my name is Jason Kopec and my partner's Emily Stevens.

4    We are Assistant State's Attorneys.  We are

5    prosecutors.

6         Over today and tomorrow, we are going to

7    present evidence to you that proves to you beyond a

8    reasonable doubt that Defendant was in possession of

9    over one hundred grams of cocaine.

10        First witness you are going to here is

11   Chicago Police Officer Briones.  He is going to tell

12   you that he is a Chicago police officer, and he works

13   in the narcotics unit.

14        He's going to tell you he had information

15   from a confidential informant, and that after he got

16   that information, he went to a place in the City of

17   Chicago, the corner of Balmoral and Lincoln up on the

18   North Side, and he and his team of officers, they

19   conducted an undercover surveillance.

20        They were not in uniform.  They were not in

21   police cars.  They were undercover blending into the

22   background.

23        They sat on the corner and they watched.

24   Their attention was drawn to the Defendant.  He arrived

1    on the scene, and you will hear at the corner of

2    Balmoral and Lincoln, there is a Jiffy Lube.

3            Defendant pulled his car into the Jiffy Lube.

4    He didn't pull into any service bay.  He parked it in

5    the parking lot.

6            He didn't go into the office of Jiffy Lube.

7    He got out of his car, stood on the sidewalk, and

8    proceeded to talk on a cell phone.

9            Officers just waited and they watched.  They

10   watched the Defendant make phone calls; and eventually

11   after some time, he began walking westbound on

12   Balmoral.  He walked about three blocks to Balmoral and

13   Western Avenue, and on that corner is a bus stop.  The

14   Defendant sat down and waited at the bus stop at

15   Balmoral and Western.

16           One bus came by.  Defendant never got on.

17   Two buses came by.  Defendant just waited, waited at

18   that bus stop.

19           Until finally, an individual pulled up in a

20   car.  You are going to hear about Mr. Martinez.

21   Mr. Martinez honked to the Defendant.  Defendant

22   acknowledged that, and then Mr. Martinez, you will

23   hear, pulled around the building that's at the corner

24   of Balmoral and Western into a parking lot into the

1    rear; and the Defendant, he went into that car and got

2    into Mr. Martinez's car, passenger side.

3              You are going to hear Officer Briones, he was

4    watching him the entire time.  In fact, as the

5    Defendant walked down Balmoral, Officer Briones

6    followed him down Balmoral, parked his car, and watched

7    him sitting at that bus stop.

8              And when the Defendant went and got into

9    Mr. Martinez's car, Officer Briones got out of his car

10   and he walked over there.  He walked down the street a

11   little bit on the other side of the street, and then he

12   kind of doubled back to get a closer view what was

13   going on in that vehicle.

14             And as he got closer, he could see Martinez,

15   the driver, hand the Defendant a large bag of what were

16   narcotics, officer thought to be cocaine.

17             At that point, Officer Briones decided to

18   arrest the Defendant, so he came closer to the car

19   walking faster.  The Defendant was literally caught

20   holding the bag.

21             What did the Defendant do?  Looked up at

22   officer, saw him coming, and he shoved this bag into

23   the glove box, but it was too late.  The officers

24   arrested the Defendant.

1          You are going to hear from another Officer

2    Cawley and Sergeant O'Grady.  He is going to tell you

3    he was in charge of this surveillance.  He saw the same

4    thing Officer Briones did.

5          He was on surveillance, saw Defendant come to

6    the Jiffy Lube, saw him making the phone call, saw him

7    waking down the street, saw him sitting at the bus

8    stop, not getting on any bus, saw him go over, get in

9    Mr. Martinez's car; but when he exited his vehicle to

10   approach the car that Martinez and Davis were in, he

11   came from the other side, and he saw the exact same

12   thing.

13         You are going to hear Sergeant O'Grady say he

14   saw Martinez sitting in the driver's seat and Defendant

15   sitting in the passenger seat, and he saw Martinez hand

16   Defendant a bag of what again Sergeant O'Grady thought

17   were narcotics, officer thought was cocaine.  Both

18   Martinez and Defendant were arrested.

19         Sergeant O'Grady went directly to that glove

20   box where he saw the Defendant put the cocaine, and

21   retrieved the cocaine.

22         You are also going to hear, after the two

23   officers testify, you are going to hear a man named

24   Brian Stevenson.  He is going to tell you he works for

1    Illinois State Police in the Crime Lab, and he is a

2    forensic chemist; and the young man is going to tell

3    you he is an expert witness.  He is going to make some

4    expert opinions.  The Judge will tell you, you can

5    believe those expert opinions.

6         What he is going to tell you is that he

7    received this in part of his duties, he took them to

8    his lab, performed scientific tests on this in his lab,

9    and he believes based on the tests and expert opinion

10   that this is in fact cocaine.

11        He is going to tell you in a sterile lab that

12   he has a calibrated weighing device.  He weighed this,

13   and in his scientific expert opinion, this weighed

14   110.0 grams.

15        That's, ladies and gentlemen, the case the

16   State's going to present to you.  That's really it.

17        When this case is done, my partner is going

18   to go over some of the jury instructions the Judge is

19   going to tell you what you are looking for.  When you

20   compare the jury instructions that you are going to get

21   with the evidence you heard, we are going to ask you to

22   go into the jury room after this case is over and find

23   the Defendant guilty of possession of more than one

24   hundred grams of cocaine.

D-152

1               THE COURT:  All right, State.

2               Defense, you may address the jury.

3                     OPENING STATEMENT

4                   BY MS. HIRSCHBOECK:

5          Good afternoon, ladies and gentlemen.

6               You know, it's very easy for the State to get

7     up here and tell you what they think their evidence is

8     going to show, but the fact is each of you has been

9     chosen as a juror in this case because of the unique

10    ability to listen and because of your willingness to

11    follow the law that Judge Brosnahan gives to you.  This

12    is an opportunity for you to listen to the evidence and

13    come to your own conclusions, your own conclusions and

14    no one else's.

15              Be critical, ladies and gentlemen, of the

16    evidence that you hear in this courtroom.  Listen,

17    observe, and watch the testimony as you hear it from

18    the witness stand, because you are going to hear

19    discrepancies, you are going to hear inconsistencies,

20    and you are going to hear contradictions, and listen to

21    the evidence and watch those witnesses.

22              As the State told you during the course of

23    the trial, you are going to hear a little bit about the

24    location where this happened.  You are going to hear

1    about the location of Lincoln and Balmoral.

2           Lincoln is a very commercial street in that

3    area.  There is a bus line.  There is commerce,

4    businesses.  There is traffic, especially at

5    2:00 o'clock in the afternoon in December.

6           There is actually a Jiffy Lube on the corner,

7    the State has told you, where the officers are going to

8    testify that they saw Mr. Davis park his car.

9           You are also going to hear about the area

10   where Mr. Davis was arrested, where Roosevelt Davis was

11   arrested, and that is Balmoral and Western, about three

12   blocks east.

13          Western, like Lincoln, is very busy.  There

14   is four lanes of traffic.  There is a couple of bus

15   lines.  There is businesses up and down the street.

16          On the other hand, like many areas in the

17   City of Chicago, when you turn off of Western and when

18   you turn off of Lincoln, Balmoral is very quiet.  It's

19   a very quiet, sort of oasis between two busy areas, and

20   that's where the State is telling you that Officer

21   Briones was able to follow Roosevelt Davis, was able to

22   shadow him in his car in this very quiet area.

23          And listen to this evidence, listen to the

24   story, because the story doesn't make sense.  When they

1    arrest Roosevelt Davis, they told you about this car,

2    the car of Miguel Martinez, Co-Defendant.  It's a 1996

3    Mercury Mystique.

4            That car has no connection to Roosevelt

5    Davis.  He didn't own it.  He didn't lease it.  He

6    didn't drive it.  He didn't borrow it.

7            The State can't tell you anything any

8    differently.  No connection to this car.  Again, listen

9    to the evidence, listen to what you hear.  It doesn't

10   make sense.

11           The indictment is the charge in this case.

12   It is an accusation, and the fact is when the State

13   brings this indictment, they do so -- they do it

14   without regard to what they will be able to prove at

15   trial, because they don't know.

16           It is at trial where these questions are

17   answered.  It is at trial where the State has the

18   burden of proof.  It is to prove beyond a reasonable

19   doubt.  That burden stays on the State throughout the

20   course of this trial.

21           Roosevelt Davis has pleaded not guilty.  He

22   has asked for a jury trial; and as he sits there before

23   you, he is innocent.

24           Ladies and gentlemen, listen to the evidence.

1  Hold the State to its burden of proof, which is proof

2  beyond a reasonable doubt; and at the close of the

3  evidence, you will come back, we will ask for a verdict

4  of not guilty because Roosevelt Davis is not guilty.

5  He did not touch those drugs.  He did not handle those

6  drugs.  He did not possess any drugs, and he is not

7  guilty.

8          THE COURT:  Thank you, Counsel.

9              State, are you prepared to call your first

10  witness?

11          MS. STEVENS:  Yes, your Honor.

12              We call Officer Ruben Briones.

13          THE COURT:  All right.  Please bring in Officer

14  Briones.

15                              (SHORT PAUSE.)

16          THE COURT:  Okay.  Officer, sir, will you please

17  raise your right hand.

18                              (WITNESS SWORN.)

19          THE COURT:  Please take a seat.

20              Keep your voice up nice and loud so everybody

21  can hear you.

22              You may proceed.

23          MS. STEVENS:  Thank you, your Honor.

24

1    I received evidence from.  And there is also the

2    initials of another evidence technician on the bag.

3        Q    But the information the State was talking

4    about, you don't know who put that information on

5    there?

6        A    I do not know.

7        MS. HIRSCHBOECK:  Nothing further.

8        THE COURT:  Okay.  Thank you, sir.  You may step

9    down.

10                   (Witness Sworn.)

11                   JAMES O'GRADY

12    called as a witness on behalf of the People of the

13    State of Illinois, having been first duly sworn, was

14    examined and testified as follows:

15                 DIRECT EXAMINATION

16                 BY MR. KOPEC:

17        Q    If you could please introduce yourself to

18    the jury.  State your name name, spell your last name

19    for the benefit of the court reporter, and state your

20    Star Number and unit of assignment?

21        A    My name is James O'Grady.  I am a sergeant

22    with the Chicago Police Department.  Star Number 2020.

23    O-G-r-a-d-y.

24        Q    And sergeant, how long have you been with

E-32

1    the Chicago Police Department?

2         A      Almost 20 years years.

3         Q      And what's your unit of assignment?

4         A      Narcotics and Gang Investigation Section.

5         Q      And in your career approximately how many

6    narcotic investigations have you participated in?

7         A      2000 maybe.

8         Q      Were you employed and working with the

9    Chicago Police Department back in December of 2004?

10        A      Yes, I was.

11        Q      Approximately December 16th you were

12   working?

13        A      Yes.

14        Q      And were you in charge a narcotics team?

15        A      Yes, I was.

16        Q      Did you and your fellow officers receive

17   information from an individual?

18        A      Yes.

19        Q      After you received that information, did you

20   and fellow officers proceed to set up an undercover

21   surveillance at Lincoln and Balmoral?

22        A      Yes we did.

23        Q      Is that in Chicago, Cook County, Illinois?

24        A      Yes.

E-33

1      Q      What is on the northeast corner of Lincoln

2    and Balmoral?

3      A      It's a Jiffy Lube oil changing business.

4      Q      Showing you what's marked as People's

5    Exhibit Number 6 for identification purposes, take a

6    look at that?

7      A      Please tell the jury what that's a photo of?

8      A      It's a street sign signs indicating Balmoral

9    and Lincoln with an Italian, I believe.  Jiffy Lube

10   sign.

11     Q      Does that accurately depict the corner of

12   Balmoral and Lincoln?

13     A      Yes.

14     Q      Officer, you said you were in charge of a

15   team that day.  What type of dress were you and your

16   fellow team?

17     A      We work narcotic investigations.  We almost

18   always dress in plain clothes.  No police identifiers.

19   Nothing indicating we were police officers at all.

20     Q      Did you and your fellow team members have

21   any vehicles?

22     A      Yes.

23     Q      Were they blue and white Chicago police

24   cars?

E-34

1          A        No.    We were an assigned -- Actually we

2     lease cars from a car rental location.    So we change

3     cars.    Grand Prix, Intrepids, whatever car is

4     available.

5          Q        Do any of these vehicles that you and your

6     team members were using that date did they have M.

7     plates on them?

8          A        No.

9          Q        Were they Fords, Crown Victoria's,  or Chevy

10    Caprise's?

11         A        No.

12         Q        Did you proceed to the area of Lincoln and

13    Balmoral?

14         A        Yes.

15         Q        And you were on surveillance?

16         A        Yes.

17         Q        On your surveillance was your attention

18    drawn to one specific person?

19         A        Yes.

20         Q        Do you see that person in court today?

21         A        Yes, I do.

22         Q        Please identify him by something that

23    individual is wearing today?

24         A        He is the gentleman to my right wearing a

E-35

1    white shirt with a blue tie and brown pants.

2         THE COURT:  The record will show the sergeant has

3    identified Mr. Davis.  You may proceed.

4         MR. KOPEC:

5         Q    Officer, you previously testified that you

6    received information which led you to that area?

7         A    Yes.

8         Q    Was your attention drawn to anyone at that

9    area other than Defendant?

10        A    We looked at just any individual pulled in

11   the lot and see what they did.  If they matched the

12   description --

13        MS. HIRSCHBOECK:  Objection.

14        THE COURT:  Sustained.  That part of the answer

15   will be stricken.  Pose another question.

16        MR. KOPEC:

17        Q    Officer, you focused on the Defendant?

18        A    Yes.

19        Q    What did you observe the Defendant do?

20        A    We observed the Defendant pull into the

21   Jiffy Lube parking lot towards the side and rear.  He

22   didn't go inside the Jiffy Lube.  He just stood by his

23   car and was using a cell phone.

24        Q    When you say the Defendant didn't go inside

1    the Jiffy Lube, did you observe the Defendant drive

2    into any of the service bays?

3        A    No.

4        Q    Did he go into the office area of the Jiffy

5    Lube?

6        A    No.

7        Q    You observed the Defendant talking on his

8    cell phone?

9        A    Yes.

10       Q    What did you do then?

11       A    We maintained surveillances on him.

12       Q    Did the Defendant at some point move

13   locations?

14       A    Yes, after about five minutes.

15       Q    Where if anywhere did he go?

16       A    He started walking east on Balmoral are

17   towards Western.

18       Q    And what if anything did you do?

19       A    I directed other officers on my team to

20   maintain surveillance on the subject as he walked

21   eastbound.

22       Q    Were you in radio contact with other members

23   of your team?

24       A    Yes.

E-37

1      Q      And what did you specifically do after the

2    Defendant was walking east on Balmoral?

3      A      I let him get about half a block in front of

4    me where I could still see him.  And then I followed

5    him like I was in normal flow of traffic.  And I

6    actually went pass him.  And right up to the team

7    members that he was still walking eastbound.

8      Q      At some point the vehicle you were driving,

9    did you come to a stop?

10     A      Yes.

11     Q      Where did you eventually stop?

12     A      Well Balmoral ends at Western.  So I had to

13   go either left or right.  As he was nearing the corner

14   I decided to take a right hand turn.

15     Q      What did you do after you made a right hand

16   turn?    You would be going south on Western?

17     A      South on western.

18     Q      Where did you go?

19     A      Maybe 50 feet south of the corner.

20     Q .    And what did you do then?

21     A      I parked.

22     Q      And were you able to observe the corner of

23   Western and Balmoral?

24     A      Yes.

1      Q      And what if anything did the Defendant do

2    then?

3      A      Talked on his cell phone.  He sat at the bus

4    stop at Balmoral and Western.

5      Q      Showing you what's been previously marked as

6    People's Exhibit Number 2 for identification purposes.

7    Officer, is that photo of the bus stop at Balmoral and

8    Western?

9      A      Yes.

10      Q      Does that photo truly and accurately depict

11    the bus stop at Balmoral and Western?

12      A      Yes.

13      Q      Is that the bus stop you saw the Defendant

14    at?

15      A      Yes.

16      Q      How were you able to observe the Defendant

17    at that location?

18      A      I could see him in my rear-view mirror

19    inside my mirrors.

20      Q      And you continued watching the Defendant?

21      A      Yes.

22      Q      And what if anything did he do?

23      A      He sat there about a half an hour just

24    talking, sitting doing nothing or talking on the cell

1    and your Honor made the ruling that the State could

2    make an objection to a confidential informant.

3         Today during closing argument the State began

4    tjeor argument by saying Mr. Davis got caught by a

5    citizen.  That objection was sustained, Judge.  She

6    then closed her argument by saying the case started

7    with a citizen.  Judge, it's improper?  It's

8    prejudicial.  It bolsters their case in a way that is

9    certainly not proper.  And we ask that your Honor grant

10   our motion for mistrial based on that.

11        THE COURT:  Thank you.  Response?

12        MR. KOPEC:  Judge, your ruling both of those

13   statements by prosecutor not only were in compliance

14   with your Honor's pre-trial ruling, but were in

15   compliance with the evidence elicited at trial.  Your

16   Honor allowed us to say that police received

17   information from a confidential informant.  And I

18   believe with respect to the first part, the first

19   statement is taken out of context because I believe

20   what Ms. Stevens actually said he was caught because of

21   the good police work of the officers, a few other

22   things and then added this information from a citizen,

23   which was allowed -- we were allowed to elicit.  So

24   that was completely in line with what the evidence and

1      with your ruling.

2             Finally, with respect to the last statement

3      that started with a citizen.  Again, that's in

4      compliance with your ruling.  No information -- that

5      statement doesn't elicit any information that that

6      citizen provided which is what your Honor prohibited us

7      from getting out.  Just said in compliance with your

8      ruling, in compliance with the evidence that a citizen

9      started this all, which again is the evidence, Judge.

10            THE COURT:  All right.  Thank you.  Listening to

11     the argument both sides.  My ruling was that it could

12     come in that the police officers got information from a

13     citizen or from an informant as a basis to show the

14     course of their investigation.  Why they did what they

15     did.  However, when the State argued during closing

16     argument it was improper in the way that it was being

17     argued.  It was going to the truth of the matter.  That

18     the contents of those conversations were true and

19     accurate and therefore allowed the police over there.

20     That was not the intent of my earlier ruling.  Just to

21     explain a course of conduct.  Not that the contents of

22     that conversation should be used to bolster the police

23     investigation.

24            However, on those objections were sustained.

1    objection was overruled.

2          Finally on page 95 I stated, "This case

3    started with a citizen."  And that was objected to, and

4    your Honor sustained that and told the jury to

5    disregard that.

6          I just would refer back to the Court's

7    original ruling on the motion in limine which is on

8    page 14.  Your Honor stated that we can call a person a

9    confidential informant during closing arguments.  And

10   you stated that you can name the person however you

11   want.  In closing argument I named the person as a

12   citizen, which is true.  The person is a citizen.  I

13   don't believe that we went beyond the bounds of your

14   Honor's motion in limine.  I believe when Officer

15   Briones was questioned that nothing regarding the

16   contents of the conversation was permitted to be heard

17   by the jury.  And in closing argument we responded

18   about the investigation.  And that investigation led to

19   more investigation.  And that was the extent of it.

20         Judge, based on those reasons, we would ask

21   that you deny counsel's motion for a new trial.

22         THE COURT:  All right.  Thank you, counsel.  Any

23   response?

24         MS. COSTIN:  Yes.

CASE NO.  08 cr 3710

ATTACHMENT NO. _____

EXHIBIT  _____ 1 _____

TAB (DESCRIPTION) _____

# Exhibit E

1

IN THE CIRCUIT COURT OF COOK COUNTY

2
COUNTY DEPARTMENT – CRIMINAL DIVISION

3
THE PEOPLE OF THE  )
STATE OF ILLINOIS  )

4
        )
  vs      ) No. 05 C 2672

5
        )
ROOSEVELT DAVIS   )

6

7
   REPORT OF PROCEEDINGS of the hearing before the

8
Honorable MARY MARGARET BROSNANHAN, on the 18th day of

9
August, 2005.

10

   APPEARANCES:

11

12
    MR. RICHARD DEVINE
     State's Attorney of Cook County, by
    MS. EMILY STEVENS

13
    MR. JASON KOPEC
     Assistant State's Attorneys

14
     for the People of the State of Illinois.

15
    MR. EDWIN BURNETTE
     Public Defender of Cook County, by

16
    MS. ROSE COSTIN
    MS. STEPHANIE HIRSCHBOECK

17
     Assistant Public Defenders
     for the Defendant.

18

19

20

21
Sharon T. McClain, CSR, RPR
Official Court Reporter

22
Crimianl Division
2650 South California

23
Chicago, IL  60608

24

1    both the issues instructions.  One of them listed as

2    propositions.

3        THE COURT:  The first one is the definition

4    instruction.  The second is the issues instruction.  So

5    you need both of them.  So that would be Number 7 is

6    without objection.  Now Number 8, which is 17.28.

7    That's the issues.  No objection to that.

8        The next one is 2.02 regarding the charging

9    document.

10       MS. KOSTIN:  No objection.

11       THE COURT:  That will be given as Number 9,

12   without objection.

13       The next one is 2.03.  The presumption of

14   innocent.

15       MS. HIRSCHBOECK:  No objection.

16       THE COURT:  All right.

17       Number 10 without objection, 2.04 is

18   indicating the fact that the Defendant did not testify.

19   Based upon your representations, I am going to take

20   that out.  Obviously he can certainly change his mind,

21   and then we'll just put it back in if he does.  But

22   right now I am going to put that off to the side.

23       So now the next instruction is 3.11 which at

24   this point would be instruction Number 11.

1      Believability of a witness for impeachment.

2            MR. KOPEC:   There are two.

3            THE COURT:   Is there any basis for the first one,

4      which includes witnesses earlier inconsistent

5      statement?   Do we have any prior under oath testimony?

6            MS. KOSTIN:   That's inconsistent?

7            THE COURT:   Yes.

8            MS. HIRSCHBOECK:   Grand jury.

9            THE COURT:   So you would be arguing based upon the

10     impeachment?

11           MS. KOSTIN:   Yes.   And the motion.

12           THE COURT:   I believe that's 3.11.   And I will

13     hear arguments later on this if you want to think about

14     it a little bit more.   But 3.11 I believe is generally

15     used when somebody goes against their earlier

16     statement.   Substantively the State is attempting to

17     argue the prior sworn statement is substantive evidence

18     versus in this case we're simply talking about

19     impeachment.   So I am going to not give the first one,

20     3.11.   And I will give the second one which is just the

21     one paragraph that doesn't include that language.   And

22     that will be given as Number 11.   And that's over

23     objection?

24           MS. HIRSCHBOECK:   Over objection.

E-7

1        THE COURT:  Now we're on 3.13.  So that would be

2   evidence of the Defendant's conviction.

3        MS. HIRSCHBOECK:  If your Honor allows it.

4        THE COURT:  All right.  We'll have to discuss this

5   one as well.  And then the next one is the concluding

6   instruction.  Is there any objection to that?

7        MS. HIRSCHBOECK:  No.

8        THE COURT:  26.01.

9            The first verdict form is the not guilty.

10  And the second is the guilty.  Any objection to those?

11       MS. HIRSCHBOECK:  No, ma'am.

12       THE COURT:  Now lastly, this is the prim

13  instruction.  So we don't need that.

14       MS. KOSTIN:  Yes.

15       THE COURT:  Hopefully.  We'll hold on to that and

16  see if we need that later.

17           So the jury instructions that basically

18  covers everything other than the issue of whether or

19  not the Defendant is going to testify and the

20  Defendant's provables, whether they do or not come in?

21       MS. STEVENS:  The chemist is here.  We can go

22  ahead and call him.

23       THE COURT:  May I please have the jury brought

24  out.

E-8

1         THE COURT:  State ready to call your next witness.

2         MS. STEVENS:  We are.  State calls Brian

3    Stevenson.

4                    (Witness Sworn.)

5                    BRIAN STEVENSON

6    called as a witness on behalf of the People of the

7    State of Illinois, having been first duly sworn, was

8    examined and testified as follows:

9                    DIRECT EXAMINATION

10                   BY MS. STEVENS:

11        Q    Please introduce yourself to the ladies and

12   gentlemen of the jury?

13        A    My name is is Brian Stevenson.

14        Q    Where are you employed?

15        A    I am employed with the Illinois State Police

16   at the Forensic Center in Chicago,

17        Q    How long have you worked there?

18        A    At the Forensic Science Center in Chicago.

19   I have worked there since December of 2004.

20        Q    What is your current job with the Forensic

21   Science?

22        A    I am a forensic scientist.  I am a drug

23   chemist.

24        Q    How long are you been in that particular

                              E-9

1      position?

2          A      For about a year and 8 months.

3          Q      What are your duties at that location?

4          A      I analyze evidence for the presence or

5      absence of controlled substances, and then testify upon

6      my findings when I am called to do so.

7          Q      What is your education?

8          A      Bachelor of science degree from the

9      University of Illinois in Champaign in chemistry.

10         Q      Have you completed any training programs?

11         A      Yes.  I have had a year of training in drug

12     chemistry with the Illinois State Police.

13         Q      And how many times have you tested for the

14     presence of a controlled substance?

15         A      Probably around one thousand or so.

16         Q      Have you ever been qualified as an expert

17     witness in the field of forensic chemistry?

18         A      Yes, I have.

19         Q      How many times?

20         A      Once

21         MS. STEVENS:  At this time subject to cross

22     examination we tender the witness as an expert in the

23     field of forensic chemistry.

24         THE COURT:  Any cross examination at this time

1      MS. HIRSCHBOECK:  No, Judge.  No cross based on

2   that.

3      THE COURT:  You may proceed.  The witness will be

4   treated as an expert in the field of forensic

5   chemistry.

6      MS. STEVENS:.

7      Q    In working on this case did you prepare any

8   notes?

9      A    Yes I have.

10     Q    And referring to those notes assist you in

11  your testimony today?

12     A    Yes it would.

13     MS. STEVENS:  Your Honor, if there is no objection

14  from the defense I would ask the witness be allowed to

15  refer to those notes if he needs to.

16     THE COURT:  All right, he may.  Any objection

17     MS. HIRSCHBOECK:  No.

18     MS. STEVENS."

19     Q    Sir, I want to show you what's previously

20  marked as People's Exhibit Number 4.  Do you recognize

21  what this is?

22     A    Yes, I do.

23     Q    And how do you recognize that?

24     A    It has my markings on it.

1          Q    Now, can you open that exhibit and take it

2    out, its contents.

3               Sir, do you recognize the contents contained

4    in People's Exhibit Number 4?

5          A    Yes, I do.

6          Q    Can you examine those contents and tell the

7    ladies and gentlemen what it is?

8          A    I have a heat sealed bag containing white

9    chunky substance, some powder, and a plastic -- knotted

10   plastic bag.

11         Q    Have you seen this exhibit before?

12         A    Yes I have.

13         Q    From whom did you receive this evidence?

14         A    Gina Wollick.

15         Q    And do you remember when you received it?

16         A    December 22, 2004.

17         Q    Where did you receive the evidence?

18         A    I received it at the Forensic Science Center

19   in Chicago at the drug chemistry vault.

20         Q    And what condition was that evidence in when

21   you received it?

22         A    It was sealed.

23         Q    And is that evidence in substantially the

24   same condition now as it was when you initially

1    received it?

2         A    It is.

3         Q    And what did you do with that evidence after

4    you received it?

5         A    I took custody of it.  I initialed the

6    evidence bag, and then I brought it to my work station

7    and locked it in my storage area until I worked it.

8         Q    And does the substance inside that bag

9    appear to be the same substance that you analyzed when

10   you first received the item?

11        MS. HIRSCHBOECK:  We are going to object now to

12   chain.

13        THE COURT:  Overruled.  You may cross on it.  Go

14   ahead.

15        MS. STEVENS:

16        Q    You can answer the question.  Does the

17   substance inside the bag appear to be in the same --

18   the same substance that you analyzed?

19        A    Yes, it does.

20        Q    What was the first thing you did when you

21   received that bag from the vault?

22        A    When I took custody of it?

23        Q    Yes.

24        A    I took custody in the computer, and then I

E-13

1    initialed the bag and brought it to my work station.

2        Q    Okay.  And when you got to your work

3    station, what did you do with the bag?

4        A    I locked it in my drawer until I worked it.

5        Q    And when did you work up that evidence?

6        A    The same day.

7        Q    And after you retrieved the evidence from

8    your locked drawer, what did you do with it?

9        A    I examined the inventory sheet that came

10   with the evidence to make sure it matched up.  And then

11   I opened it, wrote a description on my work sheet of

12   the evidence, and then after that I weighed it.

13       Q    And did the description on the inventory

14   sheet match the substance that was inside that

15   envelope?

16       A    It did.

17       Q    And after you opened the envelope, what did

18   you do with what was inside?

19       A    Well, first I placed a disposable weighing

20   dish on my balance and zeroed it so it would read zero;

21   wouldn't record the weight of the dish.  And then I

22   placed the chunky substance inside the weighing dish.

23       Q    Now when you first saw the chunky substance,

24   was it inside of the plastic bag that's also in that

E-14

1    inventory envelope?

2         A    Yes, it was.

3         Q    Did you take the chunky substance outside of

4    that smaller bag?

5         A    Yes, I did.

6         Q    And then you placed that chunky substance on

7    to that disposable dish that you talked about?

8         A    Right.

9         Q    Now when you say disposable dish, how many

10   times were these dishes used?

11        A    Only one time.

12        Q    And after you placed the substance on that

13   dish, what did you do?

14        A    I weighed it.

15        Q    And did that weight include the dish that

16   the substance was sitting in?

17        A    It did not include the dish.

18        Q    And was the equipment that used to determine

19   the weight of the substance operating properly at the

20   time of your analysis?

21        A    Yes.

22        Q    How do you know that?

23        A    I checked it.

24        Q    How did you check it?

E-15

1      A      At the beginning of the week before I begin

2   case work I place certified waits on the balance and

3   then I check the reading to make sure they match.

4      Q      And is the scale that you use also

5   calibrated?

6      A      The balance is calibrated, yes.

7      Q      And do you personally calibrate the balance?

8      A      I do not.

9      Q      Who does that?

10      A      An outside company calibrates the balance.

11      Q      And do you know whether or not that scale or

12   the weight had been calibrated prior to weighing the

13   sample

14      MS. HIRSCHBOECK:  Objection, judge hearsay.

15      THE COURT:  Overruled.  You may tell us if you

16   know.

17      THE WITNESS:  The balance HAD not been calibrated.

18      MS. STEVENS:

19      Q      And what was the total weight of this

20   evidence, excluding the packaging?

21      A      110 grams.

22      Q      And did you analyze that evidence?

23      A      Yes, I did.

24      Q      What was the first test that you did?

1          A       I did a color test.

2          Q       And can you explain what this test is?

3          A       I used a drop of cobalt vial cyanide.  And I

4     added a drop of it to the sample, and the sample turns

5     blue, which gives an indication that cocaine may be

6     present.

7          Q       And did the sample turn blue in this case?

8          A       Yes.

9          Q       And would you say the results of that test

10    were positive?

11         A       Yes.

12         Q       And what was the next test that you did?

13         A       I then did a gas chomatography mass

14    spectrometer test, otherwise known as a G.C.M.S..

15         Q       Can you explain what that test is?

16         A       I take an a representative sample, dissolve

17    it in a liquid.  It's injected into an instrument the

18    G.C.M.S.  The first part of it the G. C. part, gas

19    chromatography.  It separates any mixture that might be

20    in the sample into it's component compounds.  And when

21    the compound reaches the mass spectrometer, the M.S.,

22    the compound is broken into fragments and this gives us

23    structural information to identify the compound.

24         Q       What were the results of the first part of

1    the G. C.?

2        A    I didn't look at the G. C. part.  I only

3    looked at the mass spec.

4        Q    What was the result of the mass spec?

5        A    Positive for cocaine.

6        Q    Did you do any test to assess the operating

7    conditions of the G.C.M.S.?

8        A    The G.C.M.S. has routine maintenance weekly.

9        Q    And do you know whether or not that

10   particular device had been maintained prior to using it

11   that day?

12       A    Yes.

13       Q    Yes it had?

14       A    It had.

15       Q    And prior to conducting that test--

16       MS. HIRSCHBOECK:  Objection to the foundation of

17   that.

18       THE COURT:  You may cross on it.  Go ahead.

19       MS. STEVENS:

20       Q    Did you run a blank through the G.C.M.S.

21   prior to performing your test on this evidence?

22       A    Yes, I did.

23       Q    And what was the result of that?

24       A    Negative.

1          THE COURT:  Can you explain what that means for

2     us?

3          THE WITNESS:  The blank?

4          THE COURT:  Right.

5          THE WITNESS:  It's run through the sample to make

6     sure that the instrument is operating properly.  That

7     the instrument is clean.  There is no cocaine in it

8     before I ran the sample.

9          Q     And after you ran the sample, did it show

10    that the machine was clean?

11         A     After I ran the blank it showed the

12    instrument was clean.

13         Q     Okay.  And the test that you performed that

14    day are these tests commonly acceptped in the

15    scientific community?

16         A     Yes they are.

17         Q     After completing the analysis, what did you

18    do with the evidence?

19         A     I sealed it back in a new bag and then

20    resealed it in the originals evidence bag.

21         Q     Did you place the cocaine back into the

22    original plastic baggy it was in?

23         A     No, I didn't.  It's in this bag.

24         Q     And based on your education, training and

E-19

1    experience in drug chemistry and the tests that you

2    performed, did you form an opinion within a reasonable

3    degree of scientific certainty as to the presence of a

4    controlled substance in that exhibit?

5        A    Yes, I did.

6        Q    And what this opinion?

7        A    That this is 110 grams of white chunky

8    substance containing cocaine.

9        Q    This inventory envelope that you received

10   and took the evidence out of, did this inventory number

11   have the unique inventory number of 10452143?

12       A    Yes

13       MS. STEVENS:  Can I have one moment?

14       THE COURT:  Certainly.

15       MS. STEVENS:Q    Mr. Stevenson, just one more

16   question.  Have you ever met the Defendant before?

17       A    No I have not.

18       MS. STEVENS:  Nothing further.

19       THE COURT:  Cross.

20                       CROSS EXAMINATION

21                       BY MS. HIRSCHBOECK:

22       Q    Mr. Stevenson, if I could borrow your notes.

23   I think we might have to share them.  My understanding

24   you didn't bring your own notes?

E-20

1      A      That's correct.

2      Q      Mr. Stevenson, you indicated you've been

3      with the Illinois State Police since December of 2003;

4      is that correct?

5      A      That's correct.

6      Q      And then you trained for about a year; is

7      that right?

8      A      That's correct.

9      Q      And you actually finished your training in

10     November of 2004?

11     MS. STEVENS:  Objection, Judge.  He has already

12     been qualified.

13     THE COURT:  Overruled.  She may cross on it.  Go

14     ahead

15     MS. HIRSCHBOECK:

16     Q      You completed training in November of 2004;

17     is that right?

18     A      That's correct.

19     Q      And you performed your tests on this cocaine

20     December 21 of 2004?

21     A      December 22.

22     Q      It was received December 21, right.  So you

23     performed your test the following day?

24     A      I am not sure when it was received, but I

1    know I performed the test the 22.

2       Q     Well, would you like to see your report or

3    if I said it indicates December 21, 2004 would that be

4    accurate?

5       A     I have to see the inventory sheet I believe.

6       Q     Showing what I am marking Defense Number 2.

7    Can you describe to the court what this is, please?

8       A     This is a copy of the inventory sheet that

9    accompanies the evidence.

10      Q     And showing you what I am marking also as

11   Defense Number 3, what is this document, please?

12      A     This is my lab report.

13      Q     And does the lab report indicate when the

14   evidence was received by the Forensic Science Center?

15      A     It does not.

16      Q     Does it indicate it was received --

17      A     I am sorry; yes.

18      Q     December 21?

19      A     Yes.

20      Q     So that in fact would be when it was

21   received by the Forensic Science Center?

22      A     I believe so.

23      Q     Which would be the day before you tested it;

24   right?

1          A.     Yes.

2          Q     And that was a little more than a month

3    after you received your training, 6 months perhaps?

4          A     Yes.

5          Q     So at that point that you performed the

6    testing, you had been out of your training for about 6

7    weeks, correct?

8          A     That's correct.

9          Q     And the State asked you about the Inventory

10   Number on this, which you previously stated was

11   10452143; is that correct?

12         A     10452143.

13         Q     And that is the inventory sheet that you

14   received from the Chicago Police Department; right?

15         A     Right.

16         Q     And that is the inventory sheet that

17   reflects one clear plastic knotted bag containing a

18   white rock like substance, suspect cocaine, correct?

19         A     Correct.

20         Q     There is no weight reflected on this

21   inventory sheet; is that correct?

22         A     That's correct.

23         Q     And I believe you made reference to somebody

24   named Gina Wollick; is that correct?

E-23

1          A     That's correct.

2          Q     And is that who you said that you received

3     this evidence from?

4          A     Yes.

5          Q     And who is Gina Wollick?

6          A     She is another analyst at the lab who was

7     working at the vault that day.

8          Q     Where did she get if from you?

9          A     She's probably designee by one of the

10    evidence technicians.

11         Q     So in fact yhou don't really even know where

12    she got this evidence from, is that correct?

13         A     I don't know.

14         Q     And she is not here today?

15         A     No.

16         Q     And she is not here to explain where the

17    evidence came from; is that correct?

18         A     That's correct.

19         Q     In so in fact, sir, you don't have any idea

20    where this came from before she had it?

21         A     I don't know.

22         Q     Or where it had been before she got it?

23         A     I don't know.

24         Q     Or where Ms. Wollick received the evidence

1      from?

2              A      I don't know.

3              Q      Or if in fact it had been in a vault or

4      where it had been?

5              A      She probably received it from the vault.

6              Q      But you don't know that, is that correct?

7              A      When the cases are received from the Chicago

8      Police Department after they are brought in to the

9      evidence control center they are brought to the vault.

10             Q      But you don't have any personal knowledge of

11     when Ms. Wollick received it?

12             A      I did not witness her receiving it.

13             Q      That's my question?

14             A      Yes.

15             Q      You also iindicated you were at the vault --

16     You were ask about the scales that the drugs were

17     weighed on is that correct?

18             A      The balance; yes.

19             Q      And you said the balance is checked at the

20     beginning of the week?

21             A      Yes.

22             Q      And other people use that balance; correct?

23             A      No.

24             Q      Do you know how many times drugs have been

1    weighed on that balance since the beginning of the

2    week?

3         A     No.

4         Q     So you don't know in fact how many times

5    that scale had been used since the beginning -- used

6    since the weight had been checked; is that correct?

7         A     I do not know.

8         Q     Could it have been ten times?

9         A     Possibly.

10        Q     Could it have been 50?

11        A     I don't know.

12        Q     And in fact the reason you checked the

13   weight is to make sure it's accurate, is that correct?

14        A     That's correct.

15        Q     And you don't know whether there was several

16   days after the balance had been initially checked,

17   right?

18        A     Right.

19        Q     You also said that the balance is

20   calibrated, that is correct?

21        A     Yes.

22        Q     And that's done by an outside company?

23        A     Yes.

24        Q     And you don't have any documentation from

1    the outside company with you here today, do you?

2         A    No I do not.

3         Q    So you don't know when that balance was

4    calibrated prior to the time you weighed it?

5         A    I do know.

6         Q    But you don't have documentation with you?

7         A    Not with me.

8         Q    And you never weighed any packaging; is that

9    correct?

10        A    That's correct.

11        Q    And you said that this came -- just so I am

12   clear.  It came in a plastic baggy?

13        A    Yes.

14        Q    And the plastic baggy comes in the inventory

15   bag?

16        A    Yes.

17        Q    And you don't have that plastic baggy?

18        A    It's with the evidence.

19        Q    You never weighed it?

20        A    I never weighed it; no.

21        Q    Is it with the evidence?

22        A    Yes.

23        Q    This bag at the bottom?

24        A    Right, right.

1          Q      And you described white chunky substance

2     when you describe this cocaine; is that right?

3          A      That's correct.

4          Q      And you are familiar that there is also

5     powder cocaine, is that correct?

6          A      That's correct.

7          Q      And powder cocaine is different from chunky

8     cocaine; right?

9          A      Well, the chunky substance can be kind of

10    crushed up into a powder?

11         Q      I understand that.  But you've also done

12    testing on what you call powder cocaine, is that

13    correct?

14         A      Yes.

15         Q      And powder cocaine is actually powder;

16    right?

17         A      Yes.

18         Q      And when you look at this you describe this

19    as chunky, correct?

20         A      Yes.

21         Q      In fact, you prepared notes in this case, is

22    that correct?

23         A      Yes.

24         Q      And your notes describe the substance as

E-28

1      chunky substance; is that correct?

2           A      That's correct.

3           Q      You don't describe it as powder substance?

4           A      No.

5      MS. HIRSCHBOECK:  Nothing further.

6      THE COURT:  Any redirect?

7                       REDIRECT EXAMINATION

8                       BY MS. STEVENS:

9           Q      This evidence was recovered from the vault

10     where you work?

11          A      That's correct.

12          Q      And when you were handing what we have

13     identified as People's Exhibit Number 4, this bag that

14     you first received was sealed, is that correct?

15          A      That's correct.

16          Q      And the bag that you received into your

17     custody had a name of a person on it, is that correct,

18     of an arrestee or Defendant's name?

19          A      Yes.

20          Q      And what was the name on the front of that

21     bag?

22          A      Davis, Roosevelt.

23          Q      Did you write that name on there?

24          A      I did not.

E-29

1    the bag of cocaine that was recovered from the glove

2    box in this case?

3         A     Yes.  It's broken up into smaller pieces,

4    but yes.

5         MR. KOPEC:  Nothing further

6         THE COURT:  Thank you, sir.  Defense may proceed.

7                        CROSS EXAMINATION

8                        BY MS.  COSTIN:

9         Q     Officer you're saying this is broken up into

10   smaller pieces?

11        A     Yes.

12        Q     It was in a big chunk when you saw it?

13        A     Bigger chunk; yes.

14        Q     Now you're's the supervising officer on this

15   matter?

16        A     Yes.

17        Q     And you signed off on the report?

18        A     Yes.

19        Q     Do you remember signing off on a report

20   saying it was powder cocaine recovered?

21        A     Yes.

22        Q     You signed off on three separate reports

23   saying it was powder cocaine that was recovered?

24        A     Yes.

E—49

1      Q    And there is a difference between powder and

2  rock cocaine?

3      MR. KOPEC:  Objection.

4      THE COURT:  Overruled.

5      MS. KOSTIN:

6      Q    There is a difference between rock and

7  powder?

8      A    Depends what you mean.  If you're referring

9  to crack cocaine.  Powder cocaine and cocaine is the

10  same thing.

11      Q    A powder is like talcum powder?

12      A    I am not sure what you're asking me

13      MS. KOSTIN:  I'll withdraw it.

14      Q    Now, officer you say you went down Balmoral?

15      A    Yes.

16      Q    And that's an one-way street?

17      A    Yes.

18      Q    And you were all headed east?

19      A    At which time.

20      Q    Were you headed east down Balmoral after you

21  left Lincoln and Balmoral.  You headed east?

22      A    Yes.

23      Q    And you passed by Mr. Davis?

24      A    Yes.

1        Q      To your knowledge how many other officers

2   passed by Mr. Davis into--

3        MR. KOPEC:  Objection.

4        THE COURT:  Overruled.  You may tell us if you are

5   aware of that.  From personal knowledge.

6        A      At least three of us.

7        Q      And this is a quiet street?

8        A      Relatively, yes.

9        Q      It's a residential street?

10       A      Yes.

11       Q      And when you came around you went around and

12  you parked on the south side of western?

13       A      That's not possible.  South of Balmoral on

14  the west side of western.

15       Q      So you parked on that corner.  And you

16  parked with your back towards the bus stop?

17       A      Yes.

18       Q      And you were on the corner approximately on

19  the corner of there?

20       A      No I was probably maybe four or five -- 3 or

21  4 car lengths south of the corner.

22       Q      About 50, 60 feet?

23       A      Maybe not even.  Maybe 40 feet.

24       Q      40 feet in?

1          A    Yes.

2          Q    And you're saying Officer Briones is the one

3    that called you and told you that there was a car going

4    the wrong way up Balmoral?

5          A    Yes.

6          Q    And alerting the other officers?

7          A    Yes.

8          Q    You are a supervising officer.  So you tell

9    the other guys what to do; right?

10         A    I don't think they see it like that but

11   yeah.

12         Q    Well you didn't get fingerprints in this

13   case off the glove compartment?

14         A    No.

15         Q    You didn't get fingerprints off the bag?

16         A    No.

17         Q    You didn't get fingerprints off the money

18   money?

19         A    No.

20         Q    No money was recovered?

21         A    There was money recovered.  I can't remember

22   who had the money.

23         Q    Show you what's previously been marked

24   Defense Exhibit Number 1 for identification.  Is your

E-52

1    And the jury was instructed to disregard those

2    comments.  I feel that limiting instruction, those

3    comments would have cured any problem.  Therefore the

4    motion for a mistrial will be respectfully denied.

5              (A recess was taken.)

6        THE COURT:  The Sheriff indicates the jury has

7    reached a verdict; is that correct?

8              What I did want to put on the record was

9    about 3:40 I received a note from the jury that said,

10   "Officer Briones supplemental report."  Apaprently

11   that's what they were looking for.  I contacted Ms.

12   Hirschboeck by phone as well as Mr. Kopec.  And the

13   response was drafted that both sdies agreed was,

14   "Police reports are not evidence.  You have heard all

15   the evidence in the case.  Please continue to

16   deliberate, which I signed and dated 8-18-05 at 3:42

17   p.m.

18             Okay.  The jury has reached a verdict.

19   Please bring out the jury.

20             Mr. Foreman can you please tender the

21   verdicts to the sheriff.  The jury has reached a

22   verdict.  It appears to be in order.  The jury verdict

23   is as follows.  "We the jury find the Defendant

24   Roosevelt Davis guilty of possession of a controlled

E-110

*B. Landrum / J. Rogers*

NOTICE
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

RECEIVED

THIRD DIVISION
NOVEMBER 28, 2007

7   NOV 28  P12:03

APPEALS DIVISION 05-3786
COOK COUNTY
PUBLIC DEFENDER

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 05 CR 2672 |
| | ) | |
| ROOSEVELT DAVIS, | ) | Honorable Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge Presiding. |

## ORDER

Following a jury trial, def[...]ssion of a controlled substance and sentenced to eight [...]ntends that the State failed to prove him guilty beyon[...]sh a sufficient chain of custody of the narcotics. Defe[...]right to due process because the State failed to disclo[...] Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. [...]

Defendant was charged w[...]f cocaine. 720 ILCS 570/402(a)(2)(B) (West 2004). [...] testified that about 1 p.m. on December 16, 2004, he[...]illance when he saw defendant park his car in the rear of a Jiffy Lube parking lot. Defendant never entered the service station, but stood near his car, pacing back and forth while talking on the telephone, then walked to the intersection. As defendant walked down the street, Officer Briones followed him in his unmarked vehicle. After walking for three blocks, defendant stopped at a bus stop where he continuously paced back and forth while talking on the telephone. Officer Briones parked his car along the curb and

*Exhibit F+G*
*for Grounds*
*6 + 7 police*
*Copies of police*
*reports ap w/*
*his*

1-05-3786

watched defendant through his rearview and side mirrors for approximately 30 minutes. Several buses stopped at the bus stop, but defendant did not board any of them.

Officer Briones further testified that as a car approached the intersection, the driver, Miguel Martinez, honked at defendant, and defendant acknowledged him. Martinez turned the wrong way down a one-way street and drove about 75 feet and into an alley where he parked his car in the first space behind a building. Defendant followed Martinez into the alley and entered the car through the passenger's door. Officer Briones exited his car and walked towards the end of the alley on the opposite side of the street so that he would not be noticed. He then crossed the street and walked towards the men in the car, looking inside the vehicle as he approached it. Officer Briones testified that he observed defendant receive from Martinez a package the size of a softball wrapped in a large, clear, plastic bag containing a white substance the officer suspected was cocaine. Officer Briones identified the bag of cocaine in court.

Officer Briones testified that when he was about seven feet away from the passenger side of the vehicle, defendant looked at him, grabbed the bag of cocaine, placed it inside the glove compartment and closed the compartment door. Officer Briones then identified himself as a police officer, ordered defendant out of the car and arrested him. Chicago police Sergeant O'Grady approached the driver's side of the car and arrested Martinez. The two officers searched the vehicle and Officer Briones saw Sergeant O'Grady go directly to the glove compartment and retrieve the large plastic bag that Martinez handed to defendant.

Officer Briones further testified that Sergeant O'Grady gave him the plastic bag recovered from the glove compartment because Officer Briones was the officer designated to inventory the evidence in this case. Officer McKenna gave Officer Briones $453 that he recovered from Martinez. Officer Briones took the bag of suspect cocaine and the money to his car, placed the bag of drugs inside a narcotics bag, placed the money inside a separate inventory bag, and placed both of those bags inside his trunk. Officer Briones testified that the suspect narcotics and money remained in his

2

1-05-3786

constant care and control, and he returned to the police station and inventoried that evidence.

Officer Briones stated that he assigned a unique inventory number to each of the two bags and the number assigned to the narcotics bag was 10452143. He weighed the bag containing the suspect cocaine using a scale that was not calibrated and that was available for everyone's general use at the station. The scale indicated that the estimated weight of the bag of narcotics was 250 grams, which included both the plastic bag containing the cocaine and the larger evidence inventory bag. Officer Briones identified the narcotics inventory bag in court, noting that his handwriting appeared on the outside of the bag. He explained that information he wrote on the outside of the bag indicated the date of arrest, defendant's name, and a description of the item contained in the envelope. In this case, the outside of the narcotics bag stated that it contained one clear knotted bag containing a white rock-like substance of suspect cocaine. After the desk sergeant signed the bag, Officer Briones heat-sealed it and placed it inside the narcotics vault to be sent to the crime laboratory. Officer Briones also testified that he did not complete the arrest report in this case, but signed it.

Illinois State Police forensic chemist Brian Stevenson testified that on December 22, 2004, he received a sealed bag with inventory number 10452143 from Gina Wollick at the drug chemistry vault of the forensic science center. Wollick was another analyst who was designated to work at the vault that day. The center had received the bag of evidence the previous day. Stevenson acknowledged that he did not personally know where Wollick got the evidence from as he did not witness her receiving it, but he assumed she received it from the vault because cases submitted to the evidence control center from the Chicago police department are brought to the vault.

Stevenson testified that he took custody of the bag, initialed it, brought it to his work station and locked it in his storage area until he worked on it later that same day. The bag was heat-sealed and contained a white chunky substance with some powder and a knotted plastic bag. In court, Stevenson identified the same narcotics bag previously identified by Officer Briones and testified that it was in substantially the same condition as when he initially received it, and that the substance inside

3

1-05-3786

the bag appeared to be the same substance he analyzed.

Stevenson testified that he began his analysis of the evidence by examining the inventory sheet that came with it to ensure that the description on the sheet matched the substance inside the bag. The sheet indicated that the bag contained one clear plastic knotted bag containing a white rock-like substance of suspect cocaine, and Stevenson found that the substance in the bag matched that description. There was no weight indicated on the inventory sheet. Other information on the front of the evidence bag also indicated defendant's name, the location of his arrest, and the location from where the evidence was obtained.

Stevenson further testified that he opened the bag, wrote a description of the evidence on his work sheet and weighed the evidence. To weigh the substance, Stevenson placed a disposable weighing dish on his scale and zeroed the scale out so it would not record the weight of the dish. He then removed the chunky substance from the plastic bag and placed it inside the weighing dish. Stevenson found that the total weight of the substance, excluding the packaging, was 110 grams, and testing indicated that the substance was cocaine. Stevenson testified that he verifies the accuracy of his balancing scale at the beginning of each week, and the scale is calibrated by an outside company.

Chicago police Sergeant James O'Grady testified substantially the same as Officer Briones regarding the surveillance of defendant, adding that he approached the car occupied by Martinez and defendant from the alley in the opposite direction of Officer Briones. When he was six feet from the car, Sergeant O'Grady saw Martinez hand defendant a large softball-sized bag of cocaine. When he was next to the car, Sergeant O'Grady saw defendant place that bag of cocaine inside the glove compartment. The sergeant opened the driver's door and ordered Martinez out of the car while Officer Briones did the same with defendant. Sergeant O'Grady then opened the glove compartment, retrieved the bag of cocaine, and handed it to Officer Briones. Sergeant O'Grady testified that the substance in the bag was in the shape of a large chunk or rock with a substantial amount of powder cocaine on the bottom of the bag.

4

1-05-3786

Defendant testified that he drove to Jiffy Lube to have his car serviced, and because they were busy, he went inside, gave his keys to a mechanic and left his car parked in the lot. He walked about three blocks to catch a bus, and after waiting at the bus stop for 30 minutes, his friend Miguel Martinez happened to drive by and offered him a ride. Defendant got in the car, and after Martinez drove a quarter of a block, they were surrounded by three or four police cars. About eight police officers exited those cars, and defendant was arrested. Defendant denied that he was in possession of any drugs that day, and denied placing any drugs in the glove compartment. He also denied that he was arrested in a parking lot behind a building, and denied seeing police recover any drugs from Martinez's car.

The jury found defendant guilty of possession of a controlled substance. At a subsequent hearing, the trial court denied defendant's *pro se* posttrial motion alleging that trial counsel rendered ineffective assistance.

At the next hearing date, defense counsel noted that the newly generated presentencing investigation report (PSI) included an unsigned arrest report that the defense had not received prior to trial. Counsel stated "I don't believe that the [S]tate's [A]ttorney has received it either. Frankly, it looks like it was generated by the probation department." Counsel noted that the date on the report was August 22, 2005, which was four days after defendant's trial ended. This report stated that defendant was charged with possession of less than 15 grams of cocaine. The trial court continued the hearing and the prosecution said it would investigate the "new" report.

At a subsequent hearing on defendant's motion for a new trial, counsel argued that the defense had not received a copy of the unsigned arrest report charging defendant with possession of less than 15 grams of cocaine. Counsel again acknowledged that the State had not received the report either. Counsel noted that another arrest report stated that defendant was in possession of 250 grams of cocaine, and the chemist found the amount to be 110 grams of cocaine. She then argued that because a discrepancy in the amount of cocaine was an issue in this case, the jury should have heard about the

5

1-05-3786

third amount of cocaine, which would have made the offense a Class 4, rather than a Class 1, felony.

The State responded that it spoke with Officer Briones and faxed him a copy of the "new" arrest report. Officer Briones reviewed the report, stated that he had never seen it before, that he did not generate it, that he showed it to the other officers involved with defendant's arrest and none of them had generated it, and that the "P.C. number" on the report, which identifies who accessed the computer, did not belong to him or any of the officers working on this case. He noted that the arrest reports in this case were handwritten, and suggested that this "new" computerized report may have been created by an unknown person "down the road" who enters information into the computer system so that defendant's file can be accessed via a computer rather than having to find the physical file.

Based on Officer Briones' response, the State argued that the "new" arrest report was created by someone who was not involved in this case. The State noted that although a defendant is initially charged with an offense by police, such charges often are not the same as the charges brought by the State's Attorney in the indictment. The State further noted that it was undisputed that defendant was charged in the indictment with possession of over 100 grams of cocaine. The State confirmed that the handwritten arrest reports were tendered to the defense.

The trial court compared the information contained in the handwritten arrest report with that in the computerized report. The court noted that the computerized report was comprised of only one-half of a page and did not contain a narrative whereas the handwritten report contained a narrative stating that the amount of cocaine was 250 grams. The court found that there was no difference in the information contained in both reports, except that the computerized report expanded the description of the charge to state that the amount of cocaine was less than 15 grams. Based on its finding that the notation of less than 15 grams was not relevant in this case, and that the computerized report did not contain any additional information, the trial court rejected defendant's posttrial argument that failure to receive the "new" arrest report was a discovery violation.

6

1-05-3786

Defense counsel also challenged the chain of custody of the cocaine and argued that the discrepancy between 250 grams of cocaine as noted by Officer Briones on the handwritten arrest report and 110 grams as found by the chemist demonstrated that the chain in this case was not proper. The trial court recalled that the testimony showed that the bag of narcotics was heat-sealed when Officer Briones placed it in the vault at the police department and still heat-sealed when received by Stevenson at the laboratory vault, and found that the State established a clear chain of custody. The court denied defendant's motion for a new trial and sentenced him to eight years' imprisonment.

On appeal, defendant first contends that the State failed to prove him guilty beyond a reasonable doubt because it failed to establish a sufficient chain of custody of the narcotics. Defendant argues that the evidence analyzed by the chemist did not match the evidence seized by police because there was a discrepancy in the weight of the drugs where Officer Briones testified that the evidence weighed 250 grams and Stevenson, the chemist, testified that it weighed 110 grams. Defendant also argues that there was a break in the chain of custody where Stevenson testified that he received the evidence from Gina Wollick, but there was no testimony as to where and from whom she received the evidence, and no testimony regarding the safekeeping or method of delivery of the evidence from the police vault to the forensic science center.

The State responds that a challenge to the chain of custody does not contest the sufficiency of the evidence, but instead, questions whether a proper foundation was laid for the admissibility of the evidence. The State argues that the chain of custody was properly established as the chemist received the evidence in a heat-sealed bag, and the contents matched the inventory sheet. The State notes that Officer Briones and chemist Stevenson identified the bag of narcotics at trial and argues that the weight discrepancy could be due to the different methods used to weigh the evidence.

Our supreme court had held that a challenge to the chain of custody asserts that the State failed to lay an adequate foundation for the evidence, and thus, attacks the admissibility of the evidence, not its sufficiency. People v. Woods, 214 Ill. 2d 455, 471, 828 N.E.2d 247, 257 (2005).

7

1-05-3786

Where evidence, such as narcotics, is not readily identifiable or may be susceptible to tampering, exchange or contamination, the State must establish that there was a sufficient chain of custody to render it improbable that the evidence was tampered with or substituted. Woods, 214 Ill. 2d at 467, 828 N.E.2d at 255. The State must demonstrate that the police employed reasonable protective measures to ensure that the substance they recovered from defendant was the same as that tested by the chemist and that it had not been altered. The State is not required to exclude every possibility of tampering, nor must it present testimony from every person in the chain, unless defendant produces evidence of actual tampering or substitution. Where the State has established that the evidence was not subject to tampering or substitution, and defendant has not shown actual evidence of tampering, any deficiencies in the chain of custody go to the weight of the evidence, not its admissibility. Woods, 214 Ill. 2d at 467, 828 N.E.2d at 255. Even when a link is missing in the chain of custody, where testimony that sufficiently described the condition of the evidence when delivered matches testimony describing the evidence when analyzed, the evidence is properly admitted. Woods, 214 Ill. 2d at 468, 828 N.E.2d at 255.

Here, we find that the State established a sufficient chain of custody of the cocaine recovered from defendant's possession. Testimony from the police officers showed that Sergeant O'Grady recovered the large bag of cocaine from the glove compartment of Martinez's car moments after he and Officer Briones saw defendant place the cocaine there. The testimony further showed that Sergeant O'Grady handed the bag of drugs to Officer Briones who placed it inside a special narcotics bag in the trunk of his car, took it to the police station, and inventoried it in accordance with police procedures, assigning it inventory number 10452143, and placing the heat-sealed bag in the police narcotics vault. We find that the testimony in this case demonstrated that the police took reasonable protective measures to ensure that the recovered cocaine was not tampered with or altered.

Furthermore, forensic chemist Stevenson testified that he received the narcotics bag with inventory number 10452143 from his colleague, Gina Wollick, at the vault in their laboratory and that

8

1-05-3786

it was heat-sealed when he received it. Stevenson further testified that the narcotics bag contained one clear plastic knotted bag containing a white rock-like substance of suspect cocaine, which matched the description on the inventory sheet completed by Officer Briones. Although Wollick did not appear in court and testify as to how she came in possession of the narcotics envelope, the record shows that the description of the evidence when delivered matched the description of the evidence when analyzed, and therefore, the chain of custody was sufficient and the evidence was properly admitted.

In addition, we reject defendant's argument that the chain of custody was insufficient due to a discrepancy in the weight of the substance. Officer Briones testified that he weighed the bag of narcotics, including the packaging and inventory envelope, on a general-use scale that was not calibrated, which indicated that the "estimated" weight of the bag was 250 grams. The officer noted this weight on a police report, but it was not included in his description of the substance on the inventory sheet. In contrast, Stevenson removed the substance from all of its packaging and weighed it on a scale that had been both calibrated and "zeroed-out" to account for the weight of the weighing dish, and found that it weighed 110 grams.

Although there was a discrepancy in the two weights, we do not find that such difference demonstrates evidence of actual tampering under the facts and circumstances in this case. Stevenson's determination of the weight of the substance was calculated with the utmost care and precision, and eliminated other variables including the weight of the packaging and weighing dish. The "estimated" weight determined by Officer Briones, on the other hand, was admittedly not so precise as the scale was never calibrated or "zeroed-out" and the substance was weighed inside all packaging. As stated above, Officer Briones heat-sealed the package before depositing it into the narcotics vault, and Stevenson received that same package with an identical inventory number in a heat-sealed condition, the contents of which matched the description on the inventory sheet. As there was no evidence of actual tampering, the difference in the weight went to the weight of the evidence,

9

RECEIVED

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

8  JAN 14  P 3:34

APPEALS DIVISION
COOK COUNTY
PUBLIC DEFENDER

THE PEOPLE OF THE STATE OF ILLINOIS,       )
                                           )
          Respondent-Appellee,             )
                                           )
     v.                                    )       No. 1-05-3786
                                           )
ROOSEVELT DAVIS,                           )
                                           )
          Petitioner-Appellant.            )

### O R D E R

Upon consideration Petitioner-Appellant's petition for rehearing;

IT IS HEREBY ORDERED that the petition for rehearing be and the same is hereby

DENIED.

**ORDER ENTERED**

JAN. 1 1 2008

**APPELLATE COURT, FIRST DISTRICT**

_____
JUSTICE

_____
JUSTICE

_____
JUSTICE

1          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT – CRIMINAL DIVISION

2

   THE PEOPLE OF THE        )   JUDGE MARGARET BROSNAHAN
3  STATE OF ILLINOIS        )
                            )
4          vs               )   No. 05 C 26724
                            )
5  ROOSEVELT DAVIS          )   November 8, 2005

6

7          Court convened pursuant to adjournment.

8

9

           APPEARANCES:
10

               MR. RICHARD DEVINE
11                 State's Attorney of Cook County, by
           MS. EMILY STEVENS
12                 Assistant State's Attorney
                   for the People of the State of Illinois.
13

               MR. EDWIN A. BURNETTE
14                 Public Defender of Cook County, by
           MS. STEPHANIE HIRSCHBOECK
15         MS. ROSE COSTIN
                   Assistant Public Defenders
16                 for the Defendant.

17

18

19

20

21    Sharon T. McClain, CSR, RPR
      Official Court Reporter
22    Criminal Division
      2650 South California
23    Chicago, IL  60608

24

                           H—

1          THE CLERK:  Roosevelt Davis.

2          THE COURT:  Good morning, sir.  Both side are

3     here.  This is in post trial status.  There has already

4     been one motion filed by Mr. Davis for ineffective

5     assistance of counsel.  That was argued and denied back

6     September 20, 2005.  There are still other post trial

7     matters motions pending and it has been continued from

8     time to time for copies of the transcripts.  Those have

9     been received and and everybody is ready to proceed; is

10    that correct?

11         Can we have everybody's name for the record.

12         MS. STEVENS:  Assistant State's Attorney Emily

13    Stevens.  S-t-e-v-e-n-s.

14         MS. COSTIN:  Rose Costin, C-o-s-t-i-n, Multiple

15    Defendant Units of the Public Defender's unit.

16         MS. HIRSCHBOECK:  Stephanie Hischboeck, on behalf

17    of Mr. Davis.

18         MS. COSTIN:  Mr. Davis is present in court.

19         THE COURT:  Defense do you have a copy of the

20    post-trial motions?

21         MS. COSTIN:  I do.  Motion for new trial.

22         THE COURT:  Yes.  I've the Defendant's motion for

23    ineffective assistance.  I am just trying to find.

24         MS. COSTIN:  There is a motion for a new trial

1    which was filed on August 3, 2005.

2        THE COURT:  You may proceed withh argument on your

3    motion for new trial.

4        MS. COSTIN:  Judge, I filed with the court on

5    August 31, 2005 a motion for a new trial.  I am not

6    going to belabor.  It is actually quite lengthy in

7    laying out our points.  I am asking for three things.

8    I am asking for judgment notwithstanding the verdict

9    based upon the points that were layed out.  I'm also

10   asking for -- in the alternative a motion for a new

11   trial or in the alternative still for the Court to

12   consider a lesser charge because of the amount which

13   was brought up during the course of the trial.  I'd

14   also like to supplement our motion for a new trial with

15   a copy entitled Chicago Police Department arrest

16   report.  I'd like to supplement that and attach to the

17   motion for new trial if I may.

18       THE COURT:  All right.

19       MS. COSTIN:  Judge, that Chicago police arrest

20   report was contained inside of the P.T.I. that was

21   prepared after sentencing for Mr. Davis.  The defense

22   never saw that titled Chicago Police Department arrest

23   report.  And when we brought it to the State's

24   Attorney's attention they said they would make

1    inquiries, having not received it themselves.  Judge,

2    we are asking that to be supplemented because if your

3    Honor notices it makes in the amount it lists

4    possession, less than 15 grams.  Now that is a

5    non-signed report.  But we did not have it in order to

6    prepare for trial.  And as your Honor knows having

7    listened to the trial part and parcel, or actually the

8    large amount of our case was the amount.  What was the

9    amount that was at the trial.  And because of the way

10   Mr. Davis is charged, he is charged with a Class 1

11   amount of over -- between 100 and 400 grams.  One of

12   the impeachment parts was that initially when he was

13   charged some of tghe arrest reports said 250 grams.

14   When it got to the lab it was 110 grams.  Now we have a

15   third saying it was less than 15 grams, which makes it

16   a Class 4.

17        We didn't have an opportunity to inquire or

18   to find out who generated that report.  And because of

19   that, the jury did not hear, the trier of fact did not

20   hear that third amount, which could have made a

21   difference, Judge, based on the trier of fact.  We

22   believe it would have if we could have found out who

23   generated that call and called that person as a

24   witness.  So we would like to supplement that.  I am

1    not once again going to belabor every point in here.  I

2    will reserve argument after the State.  However, there

3    is one thing that is also not inside this report that

4    came to our attention yesterday.  The co-defendant,

5    Miguel Martinez, was charged with the amount of

6    delivery.  Charged with a Class X delivery in the

7    amount which carried between the years of 9 and 30

8    years in the penitentiary.

9          Mr. Davis, however, was charged with a Class

10   1 which carries 6 to 30 years based upon the amount of

11   drugs that was contained.  Mr. Martinez by the State's

12   own version of the facts and by the charging document

13   was the main actor, the person who had more culpability

14   in this case.  If we were to take the State's facts on

15   face value.  Mr. Martinez also has a worse criminal

16   record than Mr. Davis.  Mr. Davis as he stands before

17   you is probationable on this matter.  Mr. Martinez over

18   by no stretch of the imagination was ever probationable

19   based upon those charges.

20         However, when we inquired prior to trial

21   about a reduction in charges, they would not reduce the

22   charge for Mr. Davis.  That's in direct

23   disporportionality.  And it bears greatly on their

24   case.  Mr. Davis was not allowed or given an

1    opportunity to consider a plea agreement based upon the

2    charges.  Judge, you have the rest of our motion for a

3    new trial.  And with that we would rest.  Reserving

4    rebuttal.

5         THE COURT:  All right.  State you may proceed with

6    argument.

7         MS. STEVENS:  Thank you, you your Honor.

8              First of all with reference to the offer that

9    was and was not made to the Defendant.  What his

10   co-defendant Mr. Martinez is offered in this case is

11   irrelevant as to what happens to Mr. Davis.  I was not

12   the State's Attorney who made or did not make offers.

13   But again, Judge, it is irrelevant.  So I can't testify

14   or tell your Honor what the circumstances were

15   regarding what offers were or were not made.  What I

16   can tell you although again I still argue it's not

17   relevant is that Mr. Martinez's case was set for trial,

18   and there was a demand running on the last court date

19   when the State did not answer ready for trial.  I don't

20   know if that has some kind of impact on what happened

21   on the last court date or not.  Another State's

22   Attorney stepped up on that.  But again, Judge, Mr.

23   Martinez's backgrounds is also different from the

24   Defendant's background.  So as far as what happened to

H-7

1       Mr. Martinez that should not impact what happened to

2       Defendant Davis in this case.  He chose to have a jury

3       trial and that's exactly what the court supplied him

4       with.

5           As for this new report that has surfaced.  I did

6       speak with Officer Briones who is the main officer who

7       testified in this case.  I faxed him a copy of the

8       report that counsel had provided me that was provided

9       in the P.S.I.  Officer Briones did review that report.

10      And he explained to me that he has never seen that

11      report before.  He did not generates it.  He showed it

12      to the partners on his team on the date of this arrest.

13      They did not generate it.  His explanation for how this

14      report might have come about is that the arrest or

15      computerized by somebody else down the road.  The

16      arrest reports in this case were handwritten.  These

17      are just computerized arrests that are plugged into the

18      computer by some unknown person in case down the road

19      somebody wants to look up Roosevelt Davis on the

20      computer and see what kind of arrest he might have in

21      the computer system.  Therefore relieving a person

22      having to track down a file, a physical file for

23      Roosevelt Davis.

24              The officer said that the reports in this

1    case were handwritten and not typed into the computer.

2    He also looked at the P. C. number which is contained

3    on the bottom right-hand corner of that printout.  And

4    he indicated that P. C. number which I guess is a

5    number that an officer or someone with such authority

6    needs to get into the computer, was not his P. C.

7    number and was not the number of any of his fellow

8    officers.

9            As for the amount of substance that's

10   contained in that.  Again, it's our position that

11   somebody else filled out that report.  Not somebody who

12   was involved in this investigation.  As your Honor

13   knows, when somebody is initially charged, those

14   charges don't reflect what the State ends up indicting

15   the person for.  It's just a mere charge.  The State's

16   Attorney is the person who decides what the person is

17   charged with, with how much.  In this case the

18   Defendant was charged with possessing over 100 grams of

19   cocaine.  And there is no dispute about that, Judge.

20           As far as counsel's other allegations --

21       THE COURT:  Let me stop you there.  I would like

22   to address this issue of the arrest report.  What the

23   defense has filed to supplement the record, it is an

24   one page document but there is only -- it's typewritten

1      on half of the page.  About half of the page is blank.

2      There is no narrative whatsoever contained in this.

3      Let me ask you.  You've indicated, and I want to make

4      sure defense is in agreement.  Were arrest reports

5      tendered on Mr. Davis to the defense, the handwritten

6      reports that you're indicating or the traditional

7      arrest reports that we're used to seeing?

8          MS. STEVENS:  Yes, ma'am.

9          THE COURT:  Going to this computer generated

10     document I want to highlight.  There is no narrative.

11     I want to go through it and make sure there is no

12     information in here that is different from what's

13     contained on the original arrest reports.  So get out

14     the original arrest report that was tendered, please

15     and I just want to make sure that we have the same

16     information on both.  So we'll see what if any impact

17     this report would have generated.

18          You talked about a P.C. number on the bottom.

19     I would wonder if that number belongs to somebody from

20     the Probation Department, the P.S.I. department.

21     Because on the left hand corner it also indicates date

22     of August 12th of 2005 at 10:42, which would indicate

23     to me that's the access number they're using to

24     generate these documents to prepare the P.S.I.  So that

1    wouldn't be a Chicago Police Officer number.  That was

2    simply the person putting together the P.S.I., which is

3    what turned this up.

4                On the document is the C.B. number 016036653?

5         MS. COSTIN:  Yes, ma'am.

6         THE COURT:  Date of arrest I am showing December

7    16, '04 at 16:10 from the 20th District.

8         MS. COSTIN:  Yes, ma'am.

9         THE COURT:  The I.R. Number 706684 with the name

10   of Roosevelt Davis?

11        MS. COSTIN:  Yes, ma'am.

12        THE COURT:  Social security 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.

13        MS. STEVENS:  Yes.

14        THE COURT:  Okay.  Defense.  I am showing the date

15   of April 23rd of '67 and age of 37.  Place of birth,

16   Illinois for the Defendant.  Is that also on the

17   handwritten report?

18        MS. COSTIN:  April 24.

19        THE COURT:  So on the handwritten it says April

20   24th.  That's the one difference.  Then I am showing

21   for the sex, race, height.  Male black 5-6, 170.

22        MS. COSTIN:  Yes

23        THE COURT:  For the other physical descriptors,

24   brown eyes, black hair, bald, medium complexion.

H-11

1          MS. COSTIN:  Yes, ma'am.

2          THE COURT:  For the employment I am showing

3    unemployed and that he did not resist arrest.  There is

4    a N. there for that indicating no he did not resist

5    arrest.  I am showing the address of arrest was 5402

6    North Western in Chicago by beat 2011.

7          MS. COSTIN:  Yes, ma'am.  It also says location

8    was L.

9          THE COURT:  That's written on here 09 for alley.

10         MS. COSTIN:  I don't believe that is on the

11   original arrest report.

12         THE COURT:  So the word alley is not on the

13   original arrest report.

14         MS. COSTIN:  It is.

15         THE COURT:  It's in the body of the report; is it?

16         MS. COSTIN:  I am looking, Judge.  It is not.

17         THE COURT:  The word alley is not there.  Also the

18   residence address 6104 North Oakley Avenue in Chicago

19   for his residence that's on there.

20            For the arrest charges this is showing

21   possession of a controlled substance.  And it's typed

22   in here 402C and it's typed in less than 15 grams.  You

23   are saying that is not in the typewritten arrest

24   report.

                              H-12

1          MS. COSTIN:   It has 250 grams powder cocaine.

2          MS. STEVENS:   As far as the charges go on the

3     arrest report, it specifically says P.C.S. on 402.   It

4     doesn't spoecify an amount.

5          THE COURT:   The handwritten report says P.C.S.

6     402.   The typewritten report just has it spelled out

7     more.   Less than 15 grams.

8          MS. COSTIN:   The narrative of the arrest report it

9     says 250 grams.

10          THE COURT:   Are the names of all the arresting

11     officers that appear on this typewritten report also on

12     the handwritten report?   That would be Michana Briones,

13     B-r-i-o-n-e-s, McCray, and Post, as the lockup keeper.

14     Fingerprinter, and two officers.   You have that

15     information?

16          MS. HIRSCHBOECK:   The back page probably shows the

17     lockup keeper.

18          THE COURT:   So neither side has the back page, but

19     the two arrests officers are the same.   There is nobody

20     additional.   I would also note there is no narrative

21     whatsoever on this page.   So based upon that one issue

22     and I am certainly going to let the State argue and

23     respond and give the defense a chance to make another

24     response.   But I don't find that this computerized

H-13

1    generated half of an arrest report I would say.  I

2    hesitate to call it an arrest report because thereis

3    zero narrative in here whatsoever.  It's not sign.

4    There is really no difference in the information other

5    than there is a word alley here.  And the word alley

6    does not appear in the report, the handwritten that was

7    tendered.  As to the charge it's justs a typewritten

8    charge that corresponds to section 402.  So I don't

9    find the less than 15 grams would have been relevant in

10   the case.  And again it's not signed.  Even if it had

11   been discovered and tendered, it is not signed by

12   anybody.  I don't find that's compelling.  It doesn't

13   contain any additional information.  Post-trial motion

14   with respect to this half of a report would be

15   respectfully denied.  Continue with any other argument.

16       MS. STEVENS:  Judge, briefly with regards to the

17   chain of custody in this case and the amount of

18   narcotics, you've heard Officer Briones testify that he

19   estimated a weight, the weight that's contained on that

20   arrest report actually says approximate weight.  While

21   the weight of the substance was lower than what he

22   approximated, we don't believe that impacts the charges

23   or what the Defendant stands convicted of at this

24   point.  As far as the chain of custody goes, Officer

H-14

1   Briones did testify that he inventoried the cocaine and

2   that it was sealed.  And that when he last saw it, it

3   was in a sealed condition.

4          You also heard from Chemist Brian Stevenson

5   who said when he first received that property it was

6   all in a sealed condition.  And the description that

7   Officer Briones had given regarding the cocaine did

8   match what Chemist Brian Stevenson found when he opened

9   that package.  If you recall the cocaine was partially

10  in a chunk and partial powder.  There was both cocaine

11  chunk and cocaine powder in there.  So there is no

12  discrepancy.  If Brian Stevenson had noticed that the

13  description was different than what was contained in

14  that sealed envelope, then he would have noted that

15  discrepancy, Judge.  Because the item had been sealed

16  to seal and we represented that evidence and there is

17  no evidence that the cocaine was ever compromised or

18  tampered with we believe we have met the proper chain

19  of custody.  That that evidence did come out

20  sufficiently at trial.

21         Finally, Judge, counsel made an allegation in

22  the motion for a new trial that the Assistant State's

23  Attorney made prejudicial inflammatory and erroneous

24  statements in closing argument designed to arouse the

1    subsequent to that conversation where did the officers

2    go, what did they do.  But we could not go into the

3    contents of the conversation.

4    When Officer Briones was questioned by myself

5    during direct examination, I did ask Officer Briones

6    "QUESTION:  Prior to your meeting, did you and

7    other members receive information that led you to the

8    area of 5400 North Lincoln.

9    ANSWER:  That's correct."  The very next question.

10   "QUESTION:  After you you met to discuss

11   surveillance.  Where did you go specifically."

12   And that was the extent of the informant's tip

13   that came out during the evidence phase of the trial.

14   In opening close argument I stated, this is

15   page 159 -- on page 88 I stated, "The Defendant had got

16   caught because of information provided by a citizen."

17   And that sentence continued on, Judge.  "That

18   information sparked an investigation."  That's all that

19   was commented on by myself in opening close.  That

20   statement was objected to, sustained by your Honor, and

21   your Honor instructed the jury to disregard.

22   On page 89 I stated that officers

23   investigated and went to 5400 North Lincoln to

24   investigate.  That was objected to as well, and that

H-17

1    objection was overruled.

2         Finally on page 95 I stated, "This case

3    started with a citizen." And that was objected to, and

4    your Honor sustained that and told the jury to

5    disregard that.

6         I just would refer back to the Court's

7    original ruling on the motion in limine which is on

8    page 14. Your Honor stated that we can call a person a

9    confidential informant during closing arguments. And

10   you stated that you can name the person however you

11   want. In closing argument I named the person as a

12   citizen, which is true. The person is a citizen. I

13   don't believe that we went beyond the bounds of your

14   Honor's motion in limine. I believe when Officer

15   Briones was questioned that nothing regarding the

16   contents of the conversation was permitted to be heard

17   by the jury. And in closing argument we responded

18   about the investigation. And that investigation led to

19   more investigation. And that was the extent of it.

20        Judge, based on those reasons, we would ask

21   that you deny counsel's motion for a new trial.

22        THE COURT: All right. Thank you, counsel. Any

23   response?

24        MS. COSTIN: Yes.

1          Going in the reverse order.  Your Honor made

2     a ruling.  It was motion in liminie.  That was granted.

3     It was violated twice.  We objected and made a motion

4     for a new trial.  Our motion is to preserve it.  We

5     believe at this particular point it was a violation.

6     And you can not unring the bell.  And the jury heard it

7     and because of that they were prejudiced and made a

8     ruling against Mr. Davis.  That's the extent of our

9     motion and the motion -- in the motion for new trial.

10          Judge, also, as to the weight, which is key in

11     our case.  Police reports some of them said it was 250.

12     Police officers said they weighed the amount.  They

13     assigned a street value in the amount of $3,000.  Based

14     upon the amount they weighed.  When it got to the lab,

15     how it got to the lab we're still not sure.  It never

16     came out.  We have no idea hnow it got transported from

17     the 16 through the 24.  Somehow it passed through

18     several hands.  Whose hands we do not know.  When it

19     got there it's 110 grams.  The discrepancy in weight we

20     are not talking one or two grams.  The difference

21     between 250 grams and 110 grams.  That's a huge amount.

22          Furthermore, Judge, I know your Honor has

23     made a ruling upon our supplemental part.  But our

24     problem with this is that we did not have it in order

1    to inquire. We don't know who generated it. Indeed

2    the State does not know who generated it. But we could

3    not during the course of investigation figure out who

4    generated. If indeed that person should be called. On

5    the report it said I solemnly sincerely declare and

6    affirm the facts stated herein are accurate to the best

7    of my knowledge. Signatures on the first

8    arrestee/appearing officer/investigator. It's

9    unsigned.

10            So who did generate this report. We do not

11    know The fact it says possession less than 15 grams.

12    Somebody made that assumption and put it in the report.

13    Who. It would have been good for the jury to know that

14    there was indeed a third amount out there.

15        THE COURT: With respect to that particular point

16    on the arrest report, I do not read it that way. It

17    has the statue and under the word statue is 720

18    I.L.C.S. 570.0/402-C. And then it says description,

19    which is to me the description of the statue charged.

20    So the language is quite clearly P.C.S.-possession less

21    than 15 grams-cocaine. It wasn't a descriptor of what

22    amount was recovered in this case in particular, an

23    estimated weight. It was a statutory description.

24        MS. COSTIN: And I will go further than that for

H-20

1     you.  It says it's Class 4.  And it says and -- it gave

2     a felony weight and it says a Class 4.  But somebody

3     had to generate that and put it in there.  That's not

4     something that just popped up in the computer.  Did

5     somebody think it was not that amount.  I don't know

6     what drugs we are dealing with.  In the normal course

7     of a case perhaps it doesn't mean anything, but in this

8     case special license we have different waits and

9     substances and not a very clear chain of evidence, of

10    course, it makes a difference.  And of course it's

11    something that should have been investigated and

12    perhaps it would not have come to anything, but perhaps

13    it would have.  The fact of the matter because Mr.

14    Davis did not have the opportunity to have

15    investigators go out and find out who put that in

16    there, we didn't have an opportunity to present to the

17    trier of fact.  With that I rest.

18        THE COURT:  By having listened to the argument of

19    all the parties, let's me address some of these issues.

20    My ruling stands with respect to the police report.

21    This just appears to be one half of a pages of somebody

22    who computerized the already handwritten arrest report.

23    There is nothing in here that to me would be different

24    than what was already tendered other than the word

1       alley.  The charge itself is simply a description of

2       Section 402-C.  It's not -- There is no narrative

3       whatsoever on here.  No new officers whatsoever.  No

4       new addresses on here.  No new items on here.  No new

5       descriptors for the Defendant on here.  So this is

6       basically a half a page of a computerized version of

7       what was already tendered.  So my ruling will stand on

8       that.

9              I would like to address one of the issues

10      raised in the post-trial motion.  And that was the

11      issue of the chain of custody.  I did go through my

12      notes.  With respect to Officer Briones.  He testified

13      that Officer O'Grady gave the bag to him.  That he

14      returned to the car.  He put the narcotics as well as

15      the money in an inventory bag.  Took it to the 20th

16      District in the truck.  That he inventoried the item.

17      Each of them got a specific inventory number.  He

18      inventoried them with the date, the location, the

19      defendant's name, the description.  He took the bags to

20      the front desk of the 20th District.  Sergeant signed

21      off and he heat sealed it and put it into the vault.

22             Let me move over to the chemist's testimony.

23      The chemist testified between direct as well as

24      redirect to several points with respect to chain.  The

H-22

1      officer testified that -- I'm sorry.  The chemist said

2      that when he opened the exhibit with the narcotics he

3      took it out.  It was People's Exhibit Number 4.  The

4      bag was heat sealed with the white chunky substance.

5      And he testified the evidence was in the same condition

6      on the stand as when he initially got it.  He talked

7      about that on redirect he said when he got the evidence

8      from the vault the bag was sealed.  And after he tested

9      it he indicated he resealed it and put initials over

10     the seal.  Based upon the direct and more specifically

11     the redirect where we got the testimony that once he

12     received it from the vault it was sealed, I feel that

13     the State has established a clear chain of custody.

14     Briones said it was heat seal when it went to the

15     vault.  And the chemist told us when he got it from his

16     boss, it also was in the same heat sealed condition.

17     So as to that point your motion is going to be denied.

18           Also looking at the evidence in it's totality

19     based upon all the cross examination, the trial, your

20     motion for an A J.N.O.V. would be respectfully denied.

21     Specifically also with respect to chain of custody the

22     motion would be specifically denied.

23           With respect to the issue as to the

24     co-defendant, I also was not on this case previously

H-23

1    where the co-defendant was involved and charged with

2    delivery of a controlled substance.  I don't know what

3    the complexity or the specific facts, or any proof,

4    problems the State may have had with respect to the

5    co-defendant.  The fact that the co-defendant got his

6    case reduced on the date of trial does not have any

7    bearing on this particular case.  So your motion based

8    upon that reason as well would be denied.

9         The last thing I would like to address

10   specifically is the allegation of the violation of the

11   motion in limine.  I don't believe the State violated

12   the motion in limine on its face.  However, I did feel

13   when the State made a couple references during closing

14   argument they were using the C.I. to buttress the

15   contents of whatever that conversation might have been

16   although contents of the conversation never came out.

17   I feel the way they used it violated the spirit of my

18   motion in limine ruling.  However, I did sustain those

19   objections, told the jury to disregard.  And I feel it

20   was cured at that time.

21        Based upon those reasons I have considered

22   all of the other reasons elicited but not argued by the

23   defense.  Your motion for a new trial will be

24   respectfully denied.

H-24

1           Are both sides ready to proceed to

2    sentencing.

3           MS. STEVENS:  Yes.

4           THE COURT:  State, go forward with aggravation,

5    please.  Before that both sides have copies of the

6    pre-sentence investigation?

7           MS. STEVENS:  Right, Judge.  Before we proceed

8    there is one amendment to the P.S.I.

9           THE COURT:  Okay.  Why don't you check on that.

10                   (Discuss had off the record and the

11                   cased was passed and recalled.)

12          THE CLERK:  Roosevelt Davis.

13          THE COURT:  State you indicated you would like to

14   make a motion to amend the P.S.I.  Go ahead.

15          MS. STEVENS:  On page 3 it list the Defendant's

16   prior convictions.  However, missing from those

17   convictions is an armed robbery conviction, a Class X

18   conviction which is actually cited on the background

19   which is also attached to the P.S.I.  That would be for

20   case number 87 C.R. 943.  The Defendant was the 03

21   Defendant on that case.  He was convicted or pled

22   guilty on 8-24-87 and was sentenced to eight years

23   I.D.O.C. by Judge Schiller on October 7th of 1987.  I

24   do have a certified copy of that conviction if your

1      Honor wants that for your file.

2              THE COURT:  Okay.

3              THE COURT:  With that amendment any other

4      amendments?

5              MS. STEVENS:  No other amendments, Judge.

6              THE COURT:  All right.  You may proceed with

7      aggravation.

8              MS. STEVENS:  Judge, just briefly in aggravation.

9      In reading the P.S.I. for Defendant Roosevelt Davis, it

10     becomes clear that Mr. Davis grew up he was afforded

11     many opportunities in life.  He loved his mother.  He

12     loved his father.  He had good relationships with his

13     siblings.  But even with all of those benefits and all

14     of those good relationships, he still did not abide by

15     the laws of this state, Judge.  You can see on page 3

16     that he has a significant background, an '02 conviction

17     for which he received two years and ten months by Judge

18     Schreier for a theft.  A disorderly conduct, a

19     possession case in which he got 21 days Cook County

20     Department of Corrections.  A '93 conviction for

21     possession of a controlled substance for which he got 3

22     years probation.  A '84 conviction for which he

23     received two years probation for another theft case.

24     And then of course the armed robbery conviction for

H—26

1    which he received 8 years that we just informed your

2    Honor of.  That the Defendant was convicted of in 1987.

3    He has significant background, Judge.  An armed

4    robbery, theft, drug charges.  And and he has been

5    given probation three times.  He's been sent to the

6    penitentiary at the most eight years, but the last time

7    he was sent there it was for two years and ten months

8    by Judge Schreier.

9          It's also important to note that on page --

10    within this P.S.I. I believe the top of page 3 the

11    Defendant tells the probation officer that he was

12    arrested a few times as a juvenile, but denies having

13    any adjudication.  Well, he was arrested more than just

14    as a juvenile.  In fact we couldn't find any juvenile

15    adjudication.  They are all convictions when he was an

16    adult.  There was a significant amount of cocaine in

17    this case.  We would argue that an aggravating factor

18    is that that amount of cocaine is not commensurate with

19    personal use.  That it would be to sell on the the

20    street although he was not charged with the intent to

21    deliver it.  And based on his background, we believe

22    that the Defendant deserves a significant amount of pen

23    time.  Minimum being 6 years based on the amount in

24    this case.  We would ask for above the minimum.

1          THE COURT:  All right.  Thank you.  Defense.

2          MS. COSTIN:  Judge, you have the P.S.I. in front

3     you.  Mr. Davis is 38 years old.  The case of the armed

4     robbery he was 17 years old at the time.  The charge

5     for which he is charged with right now is probationable

6     based upon his background, even with the amount.  He

7     can get probation.  And as your Honor knows from the

8     P.S.I. he makes it through the probation, they have

9     been satisfactory -- probation has been terminated

10    satisfactory on more than one occasion.  Judge, twice

11    actually.  I'd like to go correct.  He got probation

12    twice.  Judge, he is married.  He has a 17 year old

13    daughter now that he would like to get back to because

14    she is having some problems with incarceration of her

15    father.  He also -- his wife runs an insurance company

16    which he helps out.  It's her insurance company.  It's

17    a family business, however.  He is the one that answers

18    the phones.  He is the one that runs the household.  He

19    is the one that makes sure his daughter gets to school.

20    He is the one that does the books sometimes for her.

21    He is the one -- it's a family run business, even

22    though she is the principal bread winner and it's her

23    business.

24          Judge, Mr. Davis who stands before you -- and

H-28

1    the penitentiary is always there.  I ,eam give him a

2    chance at probation.  That's what we are asking at this

3    point and time.  It's a possession case.  We are asking

4    for you to give him probation.

5        THE COURT:  All right.  Thank you, counsel.  I do

6    agree that it's a possession case.  I am not going to

7    take into account any element of intent to deliver.

8    That wasn't the charge.  It wasn't presented to the

9    jury.  I didn't hear any evidence at all intent to

10   de;overu.  So the charge is straight possession?  That

11   is all I am going to consider.

12       However, based upon the Defendant's background,

13   your request for probation would be respectfully

14   denied.  It is a straight possession charge.  Howver,

15   it is a serious charge.  Based upon the Defendant's

16   background -- before I impose sentence I will say I

17   have considered all statutory factors in both

18   aggravation and mitigation.  My review of my notes of

19   the trial as well as my recollection of the trial,

20   argument of all the attorney.  And let me ask you Mr.

21   Davis is there anything you wish to say before I impose

22   sentence.

23       THE DEFENDANT:  Yes.  First of all I want to say I

24   really can't understand how these officers just got up

1    there and lied about the fact I knew what was in that

2    car.  I had no idea Mr. Martinez had drugs in his car.

3    From the -- it just hurts me because of the fact the

4    State pursued this case knowing the lies the officer

5    perpretrated to causes me to be here.  Now I have to

6    ask you to be merciful on the fact I had no idea this

7    guy had drugs in his car.  And for me being here this

8    entire year in the county took away from me being with

9    my family.  The relationship me and my step-daughter

10   had we don't have that.  I lot a lost of things that I

11   worked legally worked hard for just because I just

12   happened to be a receipient of other crimes in my

13   background.  I have been away from being arrested for

14   years.  Even with this '87 armed robbery that the State

15   brought up from the time I left the penitentiary in

16   1990, it was 12 years before I was even arrested again

17   let alone convicted.  I just don't feel like it's

18   right.  I didn't know what this guy had in his car.

19          THE COURT:  Thank you for your comments, sir.

20   Based upon my review of the testimony as well as the

21   jury's verdict, considering the Defendant's statements

22   as well as all the other factors in the case, my

23   sentence in this case is going to be eight years in the

24   Illinois Department of Corrections.  Credit for how

H-30

1    much time, defense?

2         MS. COSTIN:  It will have to be calculated.

3         THE COURT:  You do have the right to appeal.  You

4    want to an appeal the judgment and conviction you must

5    file within 30 days from today's date a motion to

6    appeal.  If you desire to challenge any part of the

7    sentence or sentence hearing, you must file prior to an

8    appeal a motion to reconsider the sentence or any

9    challenge to the sentence hearing within 30 days of

10   today's date.  This motion must be in writing and must

11   set for all of the issues or claims of error about the

12   sentence or the sentence hearing.  If you can't afford

13   a copy of the transcript of the sentence hearing it

14   will be provided for you.  If you can't afford an

15   attorney one will be appointed to assist upi om the

16   appeal or motion to reconsider the sentence.  If that

17   notice of appeal or motion to reconsider is not filed

18   within 30 days of today's date, you will lose the right

19   to appeal and to challenge your sentence.  If the

20   motion to reconsider sentence is denied and you still

21   desire to appeal, you must request the clerk to file a

22   notice of appeal within 30 days of the date that the

23   motion to reconsider was denied.  Any issue or claim of

24   error about the sentence imposed or any part of the

H-31

1          sentence hearing you fail to raise in the written

2          motion will not be considered by the Appellate Court.

3          Do you understand that, sir?

4                  THE DEFENDANT:  Sure do.

5                  MS. COSTIN:  At this time we make a motion to

6          reconsider the sentence of eight years Illinois

7          Department of Corrections.  We file with a written

8          motion.

9                  THE COURT:  Your motion to reconsider will be

10         denied.  It will be filed stamped and noted for the

11         record.

12                 MS. COSTIN:  I will have a notice of appeal ready

13         for your Honor to sign.

14                 THE COURT:  Okay.

15                 MS. COSTIN:  Let me figure out the credit.

16                 MS. STEVENS:  We would be asking for statutory

17         fines, fees, and costs.

18                 MS. COSTIN:  We are objecting to that?  He is

19         indigent, obviously, and will be unemployed for awhile.

20                 THE COURT:  Okay.

21                 THE COURT:  Credit for 313 days.

22                         (Which were all the proceedings had

23                          in the above-entitled caue.)

24

H-32

1              IN THE CIRCUIT COURT OF COOK COUNTY

2           COUNTY DEPARTMENT -- CRIMINAL DIVISION

3

4         I, Sharon T. McClain, an Official Court Reporter

5    for the Circuit of Cook County, Criminal Division, do

6    hereby certify that I reported in shorthand the report

7    of proceedings had on the hearing in the above-entitled

8    cause; that I thereafter caused the foregoing to be

9    transcribed into typewriting, which I hereby certify to

10   be a true and accurate transcript of proceedings had

11   before the Honorable Margaret Brosnahan, Judge of said

12   court.

13

14

15

16                              Sharon T. McClain, CSR, RPR

17                              Official Court Reporter

18

19

20

21

22

23

24

1          THE COURT:  Sustained.

2     BY MS. COSTIN:

3          Q.   Mr. Davis was at the bus stop?

4          A.   That's correct.

5          Q.   And you parked your car?

6          A.   Yes, I did.

7          Q.   Now you were approximately 50 feet away from

8     the bus stop?

9          A.   Approximately.

10         Q.   And you were on Western?

11         A.   That's correct.

12         Q.   Or on Balmoral?

13         A.   Western.

14         Q.   You saw another vehicle come up?

15         A.   That's correct.

16         Q.   Now you testified today that that vehicle was

17    a Mercury Mystique?

18         A.   That's correct.

19         Q.   Do you remember testifying previously at the

20    Grand Jury?

21         A.   Yes, I do.

22         Q.   And that was in January of 2005?

23         A.   That's correct.

24         Q.   Less than a month after this occurred?

1          A.    That's correct.

2          Q.    Page 3.

3                And you were asked if Mr. Davis pulled up, a

4    van pulled up, Mr. Davis got into a van?

5          MS. STEVENS:   Objection.

6          THE COURT:   Sustained.

7    BY MS. COSTIN:

8          Q.    Yes, you were asked, Line 22,

9                "And did you observe Defendant Davis standing

10   on the corner of that location for approximately

11   15 minutes before a van pulled up, which was driven by

12   Defendant Martinez?"

13               And you answered, "That's correct"?

14         A.    That's correct.

15         Q.    Did you not testify to that at the Grand

16   Jury?

17         A.    Yes, I did.

18         Q.    Okay.  And were you also asked, "Did

19   Defendant Davis then enter that van on the passenger

20   side?"

21               And your answer was, "Yes, he did"?

22         A.    That's correct.

23         Q.    Now you say today that vehicle is a Mercury

24   Mystique?

1          A.    That's correct.

2          Q.    So we are clear, the Mercury Mystique you are

3    talking isn't owned by Mr. Davis?

4          MS. STEVENS:  Objection.

5          THE COURT:  You may tell us if you know that based

6    on your investigation, sir.

7          THE WITNESS:  I did not run the plates, so I

8    couldn't tell you if it came back to him.

9    BY MS. COSTIN:

10         Q.    It wasn't driven by him?

11         A.    No.

12         Q.    You saw this vehicle come up and the person

13   inside of it honked at Mr. Davis?

14         A.    That's correct.

15         Q.    You testified it turned on Balmoral going

16   west?

17         A.    That's correct.

18         Q.    Okay.  Did you give the driver, just out of

19   curiosity, a traffic ticket for going the wrong way?

20         A.    No.

21         Q.    You said it went in an alley?

22         A.    That's correct.

23         Q.    And then you got out of your car?

24         A.    That's correct.

1    Q.    Okay.  And you walked back past the vehicle?

2    A.    Which vehicle?

3    Q.    You are saying passed your vehicle first?

4    A.    That's correct.

5    Q.    And then you turned the corner?

6    A.    Onto Balmoral, that's correct.

7    Q.    So you are on Balmoral now?

8    A.    That's correct.

9    Q.    Where does Sergeant O'Grady come from?

10   A.    Where?  He essentially was on the driver's

11   side.

12         I don't know where he was parked before that.

13   Q.    Did you call him?

14   A.    Call him personally?

15   Q.    Did you call him to come?

16   A.    No.

17   Q.    He just showed up?

18   A.    No, we were on constant radio contact.

19   Q.    And once again, we have no record of the

20   conversation, on a transcript?  We have no transcripts

21   or anything showing that?

22   A.    No.

23   Q.    So you are walking down; did you call him to

24   go over or did anybody else call him to go over there

1    after the car parked?

2         A.   I don't recall.

3         Q.   Now it's approximately 250 feet to the alley?

4         MS. STEVENS:  Objection.  From where?

5    BY MS. COSTIN:

6         Q.   From the bus stop?

7         THE COURT:  You may answer that, sir, if you know.

8         THE WITNESS:  I don't know.

9              I don't think, no, it's not that far.

10   BY MS. COSTIN:

11        Q.   How far was it from your car to the bus stop,

12   50 feet?

13        A.   No, I believe I said it was about 125 feet.

14        Q.   No, from your car to the bus stop?

15        A.   Oh, from the bus stop.

16             Oh, I said approximately 50 to 75 feet.

17        Q.   And then from your car to the alley is

18   another 125 feet from the bus stop -- if you were from

19   the bus stop -- excuse me.

20             If I may.

21        THE COURT:  You may.

22   BY MS. COSTIN:

23        Q.   Officer, you are parked on Western?

24        THE COURT:  Indicating for the record you are

1    using Exhibit No. 5 which was the map for

2    identification.

3         MS. COSTIN:   Thank you, Judge.

4    BY MS. COSTIN:

5         Q.   You are parked on Western?

6         A.   That's correct.

7         Q.   And it's approximately 50 feet to the bus

8    stop?

9         A.   Approximately 50 to 75 feet, yes.

10        Q.   And the bus stop is across the street?

11        A.   That's correct.

12        Q.   So you were approximately -- you weren't

13   standing right on the corner of Western, were you?

14        A.   I wasn't standing.

15        Q.   I mean, parked on the corner of Western?

16        A.   I was right on the corner, yeah.

17        Q.   So then you have how much between you and the

18   corner of Western, Balmoral and Western?

19        A.   I was probably only like a couple feet from

20   the corner.

21        Q.   This is 50 feet across the street?

22        A.   Toward the bus stop.

23        Q.   And then the bus -- from the bus stop to the

24   alley is approximately 125 feet?

1          A.   I'd say about that.

2          Q.   So about 175 feet, would that be fair?

3          A.   Yeah.

4          Q.   Okay.  Now as soon as that car parked, you

5     got out of your car?

6          A.   No.

7          Q.   You waited a while?

8          A.   I didn't exit my vehicle until the Defendant

9     got into the Ford -- or the Mercury Mystique.

10         Q.   Now from this Mercury Mystique, 250 grams of

11    cocaine were recovered?

12         A.   That was the estimated value.

13         Q.   That was what you --

14         A.   Or the estimated amount.

15         Q.   -- the weight you estimated was 250 grams?

16         A.   That's correct.

17         Q.   And it was one inventoried item?

18         A.   Can you ask that question again.

19         Q.   One item was inventoried?

20         A.   No, there was more items.

21         Q.   One item -- excuse me -- one inventoried item

22    of cocaine?

23         A.   That's correct.

24         Q.   None came from Mr. Davis' person?

1          A.    The narcotics?

2          Q.    Right.

3          A.    It was in his possession.

4          Q.    None came from his person when it was taken

5     out of the car?

6          A.    No.

7          Q.    And there was no large amount of money taken

8     from Mr. Davis?

9          A.    No.

10         Q.    And you sent that one item to the Crime Lab?

11         A.    That's correct.

12         Q.    The one item of cocaine.

13               Now when you recovered that item, were you

14    careful to preserve any prints on it?

15         A.    No.

16         Q.    Did you send it down for prints,

17    fingerprints --

18         A.    No.

19         Q.    -- so these folks, no?

20               How about did you fingerprint the glove

21    compartment that you say you saw?

22         A.    No, I did not.

23         Q.    You didn't take any pictures, by the way, of

24    this?

1        A.    No.

2        Q.    You didn't take a picture of where the car

3   was in the alley supposedly?

4        A.    No.

5        Q.    Okay.  And Mr. Davis was searched?

6        A.    That's correct.

7        Q.    Okay.  His cell phone was recovered?

8        A.    I don't know.

9        Q.    Did you search Mr. Davis?

10        A.    I performed a protective pat down on him.

11        Q.    So you don't know if his cell phone was

12   recovered?

13        A.    No, I do not.

14        Q.    Did you ask?

15        A.    No.

16        Q.    Did you ever go and try to find out who he

17   was calling by using -- subpoenaing the records for his

18   cell phone?

19        A.    No.

20        Q.    How about Mr. Martinez?  Did you get his cell

21   phone?

22        A.    I don't recall.

23        Q.    So you never got Mr. Davis's cell phone and

24   hit redial just to find out?

1    A.    No.

2    Q.    No, you didn't do it?

3    A.    No, I did not.

4    Q.    How about that car that was parked in the
5    Jiffy Lube, did you go back and get it?

6    A.    Are we talking about Mr. Davis' car?

7    Q.    Right.

8    A.    No.

9    Q.    It was never inventoried?

10   A.    No.

11   Q.    Searched?   Never got a warrant for it?

12   A.    No.

13   Q.    Don't know what happened to it?

14   A.    No.

15   Q.    You called for a tow truck for the other car
16   though, for the car in the alley?

17   A.    The Mystique?

18   Q.    The vehicle in the alley?

19   A.    It wasn't -- it was parked legally in the
20   parking spot.  It was not in the alley.

21   Q.    But did you call for a tow truck and that car
22   was towed?

23   A.    It was towed from the station, yes.

24   Q.    How did it get to the station?

1          A.    An officer drove it in.

2          MS. COSTIN:  If I could have a moment, please.

3          THE COURT:  You may.

4                              (SHORT PAUSE.)

5     BY MS. COSTIN:

6          Q.    Just a couple more things.

7                You said when I asked you about the 250 grams

8     of cocaine, that you said it was an estimate?

9          A.    That's correct.

10         Q.    But you weighed it?

11         A.    That's correct.

12         Q.    So it wasn't an estimate, it was 250 grams?

13               You wouldn't write something down it didn't

14    say?

15         A.    No, we got --

16         Q.    It said 250 grams?

17         A.    That's correct.

18         Q.    On that scale?

19         A.    That's correct.

20         Q.    And you didn't bring that scale here today,

21    did you?

22         A.    No, I did not.

23         Q.    And these pictures, so we are clear, you

24    didn't take these, nor did any of your brother officers

1      take these?

2          A.    No.

3          Q.    So you don't know what time these pictures

4      were taken?

5          A.    No, I do not.

6          Q.    Or when?

7          A.    No.

8          Q.    So in December, there could have been snow on

9      the ground?

10         A.    Yes.

11         Q.    So these pictures really don't accurately

12     depict what you saw?

13         THE COURT:  With respect to what, Counsel?

14     BY MS. COSTIN:

15         Q.    With respect to how it was on the date that

16     you arrested Mr. Davis?

17         THE COURT:  I mean, the weather conditions?

18         MS. COSTIN:  Weather conditions?

19         THE WITNESS:  It could have been, yes.

20     BY MS. COSTIN:

21         Q.    It could have been what, Officer?

22             Do they accurately depict how the weather was

23     when you arrested Mr. Davis?

24         A.    Well, I don't recall.

1          There wasn't -- I don't recall if there was

2    snow on the ground, if that's what you are asking.

3          Q.   And there is cars in these parking lots that

4    they have showed you for People's Exhibit No. 1 and 2.

5    Those weren't the same cars that were there?

6          A.   It could have been.

7               I'm not sure.  I don't recall.

8          Q.   Going back just one quick question, when you

9    assigned a street value, when you weigh cocaine, it's

10   important?

11         MS. STEVENS:  Objection.

12   BY MS. COSTIN:

13         Q.   Isn't is important when you weigh --

14         THE COURT:  Let her finish the question.

15              Let her finish the question.

16   BY MS. COSTIN:

17         Q.   When you weigh the cocaine, it's important?

18         THE COURT:  All right.  Overruled.

19              Would you consider that to be important?

20         THE WITNESS:  Yes.

21   BY MS. COSTIN:

22         Q.   To a point were you even assigned a street

23   value?

24         MS. STEVENS:  Objection.

1          MS. COSTIN:  Side bar.

2          THE COURT:  All right.  We will have a side bar.

3                (WHEREUPON, THE PROCEEDINGS WERE

4                HAD OUTSIDE THE PRESENCE OF THE JURY

5                AND THE COURT REPORTER .)

6          THE COURT:  You may proceed.

7    BY MS. COSTIN:

8          Q.    Who assigned the street value?

9          A.    Who?

10         Q.    For the cocaine, the 250 grams of cocaine,

11   you weighed it?

12         A.    That's correct.

13         Q.    And you told somebody about it?

14         A.    Yes.

15         Q.    And you made up a report?

16         A.    That's correct.

17         Q.    And you put in the street value --

18         MS. STEVENS:  Objection, which report?

19   BY MS. COSTIN:

20         Q.    The supplemental report?

21         A.    That's correct.

22         Q.    Okay.  And you came up with a number, an

23   amount, based on that 250 grams of cocaine?

24         A.    As far as the value?

1          Q.    Yes, the street value.

2          A.    The street value is determined by the City of

3     Chicago.

4          Q.    Okay.  And who gave you that value?

5          A.    There is a chart.

6          Q.    Okay.  So you took 250 grams of cocaine and

7     you walked over to the chart, and you went down the

8     list, and you found out what the street value was, is

9     that correct?

10         A.    That's correct.

11         Q.    And you assigned it a value based upon what

12    you weighed?

13         A.    The weight, yes.

14         Q.    When you arrested Mr. Davis, he didn't resist

15    arrest?

16         A.    No.

17         Q.    He didn't run?

18         A.    No.

19    MS. COSTIN:  Thank you.

20    THE COURT:  All right.  Thank you, Counsel.

21         Any redirect, State?

22    MS. STEVENS:  Briefly, Judge.

23

24

1              R E D I R E C T   E X A M I N A T I O N

2    BY MS. STEVENS:

3         Q.   Officer, the Defendant didn't run when he saw

4    you, but he did try to hide the cocaine, didn't he?

5         A.   That's correct.

6         Q.   Had you ever met the Defendant before?

7         A.   No, I did not.

8         Q.   And had you ever met the Co-Defendant,

9    Mr. Martinez, before December 16th of 2004?

10        A.   No.

11        Q.   And do you know whether or not any of your

12   partners had ever met either one of those Defendants

13   before?

14        A.   No.

15        Q.   They had not ever met them before?

16        A.   No, they had not.

17        Q.   Now, Counsel asked you about the weight of

18   this cocaine.

19             When you placed this bag of cocaine on the

20   scale, it was in the bag that you recovered it in, is

21   that correct?

22        A.   That's correct.

23        Q.   You didn't take the cocaine out of that bag

24   and place it on the scale, did you?

1        A.    No.

2        Q.    And that bag that the cocaine was originally

3    in was also in the larger evidence bag that you

4    identified today in court, wasn't it?

5        A.    That's correct.

6        Q.    And so when you got that weight, it was with

7    all of these bags around it, is that correct?

8        A.    That's correct.

9        Q.    Okay.  And again, you did testify that that

10    is not an actual calibrated scale, is that correct?

11        A.    That's correct.

12        Q.    Now, Counsel asked you about prints.

13              Why didn't you take the prints off of the

14    bag?  Why didn't you get prints in this case?

15        A.    Well, at that time, we didn't feel we needed

16    prints.

17              We saw that the actual cocaine in both of the

18    Defendants' possession.

19        Q.    And when do you need to get prints in a case?

20        MS. COSTIN:  Objection, Judge.

21        THE COURT:  Sustained as to the general form of

22    the question.

23              You can ask him specifically why it wasn't

24    done here.

1    BY MS. STEVENS:

2        Q.   Is it fair to say you did not get the prints

3    in this case because you knew who possessed it?

4        MS. COSTIN:  Objection, Judge.  That's for the

5    jury.

6        THE COURT:  Overruled.

7            You may answer.

8            Is that why you didn't get it?

9        THE WITNESS:  Yes.

10   BY MS. STEVENS:

11       Q.   You also saw that cocaine in the possession

12   of Mr. Martinez too, is that correct?

13       A.   That's correct.

14       Q.   Now, the reports that were completed in this

15   case, are those word-for-word recitations of what

16   occurred that day or are they summaries?

17       A.   It's a summary.

18       Q.   Now Counsel asked you about your testimony at

19   the special Grand Jury that occurred back on

20   January 20th of 2005.

21           Have you ever testified in front of a Grand

22   Jury before?

23       A.   Yes, I have.

24       Q.   And when you testify in front of a Grand

1    Jury, somebody is asking you questions, is that

2    correct?

3         A.    That's correct.

4         Q.    And generally are those questions yes or no

5    questions?

6         MS. COSTIN:  Objection, Judge.

7         THE COURT:  Sustained.

8    BY MS. STEVENS:

9         Q.    Well, Counsel had asked you about a question

10   where you were asked about a van.

11               You never said the word "van," is that

12   correct?

13        A.    That's correct.

14        Q.    In fact, the word "van" was stated in a

15   question that was posed to you, is that correct?

16        A.    That's correct.

17        Q.    Now, you had testified earlier about several

18   reports that were generated in this case, is that

19   right?

20        A.    That's correct.

21        Q.    And in any of those reports, did you ever say

22   anything about a van?

23        A.    No.

24        MS. COSTIN:  Objection, Judge.

1          THE COURT:  Overruled.

2     BY MS. STEVENS:

3          Q.   In fact, all of those reports, this was

4     described as a Mercury Mystique or sedan, is that

5     correct?

6          A.   That's correct.

7          Q.   Now why didn't you tow the car that the

8     Defendant had driven to the Jiffy Lube?

9          A.   It wasn't a part of the narcotics

10    transaction.

11         Q.   And the cell phones that Counsel asked you if

12    these phones were in the car, Mercury Mystique, would

13    they have been left in the car and not inventoried?

14         A.   That's correct.

15         Q.   Officer, Counsel also asked you about your

16    report where you stated in your report that the

17    Defendant stood on the corner of Balmoral and Western

18    for about 15 minutes.

19              You corrected her earlier and said that was a

20    typo, and it was really Balmoral and Lincoln, is that

21    correct?

22         A.   That's correct.

23         Q.   And, in fact, in the next line in your

24    report, it states that the subject then began walking

1    east on Balmoral to Western, is that correct?

2        A.    That's correct.

3        Q.    Is it fair to say that it would be impossible

4    for Defendant to stand on Balmoral and Western and then

5    walk to Balmoral and Western?

6        A.    That's correct.

7        MS. STEVENS:  Nothing further.

8        THE COURT:  Okay.  Thank you.

9            R E C R O S S - E X A M I N A T I O N

10   BY MS. COSTIN:

11       Q.   You go to the Grand Jury, and they asked you

12   questions?

13            You go to the Grand Jury and they asked you

14   questions?

15       A.   Yes.

16       MS. STEVENS:  Objection.  Who?

17       THE COURT:  In this case, referring back to the

18   specific date, what was the date of Grand Jury

19   transcript?

20   BY MS. COSTIN:

21       Q.   January 2005, on January 20th, 2005, did you

22   go to the Grand Jury and they asked you questions?

23       MS. STEVENS:  Objection to the form.  Who?

24       THE COURT:  Overruled.

1              Go ahead.

2         THE WITNESS:  That's correct.

3    BY MS. COSTIN:

4         Q.   And you have been to the Grand Jury before on

5    many occasions?

6         A.   That's correct.

7         Q.   You have been an officer 11 years?

8         A.   That's correct.

9         Q.   You know you don't have to just answer yes or

10   no?

11        A.   In the Grand Jury, I have testified there I

12   think hundreds of times, and I don't think I have ever

13   never -- I have always answered yes or no.

14        Q.   When someone puts information out there that

15   you believe is wrong, you would correct them?

16        A.   Yes.

17        Q.   And in this case, they asked you about a van,

18   and you said that it was a van?

19        A.   That's correct.

20        Q.   And you did it on more than one occasion?

21        A.   That's correct.

22        Q.   You didn't correct them?

23        A.   No.

24        Q.   And this phone she asked, the State's

1    Attorney just asked you about, she asked if they were

2    left in the car, but -- well, you towed that car,

3    right?

4         A.    That's correct.

5         Q.    And that car was inventoried?

6         A.    No.

7         Q.    You didn't inventory the car?

8         A.    There is no inventory number that goes to a

9    towed car.

10        Q.    So -- but it was towed, and it was towed to

11   the police station?

12        A.    No.

13        Q.    It wasn't towed to the police station?

14        A.    It was driven.

15        Q.    Driven.

16              And then it was towed from the police

17   station?

18        A.    That's correct.

19        Q.    Okay.  Now, did you go through it?

20        A.    I did not.

21        Q.    Okay.  They took stuff out of it?

22        MS. STEVENS:  Objection.

23        THE COURT:  Sustained.

24   BY MS. COSTIN:

1          Q.    They took drugs out of it?

2          MS. STEVENS:  Objection.

3          THE COURT:  Sustained as to the form of the

4    question.

5                Let's confine it to your response to her most

6    recent redirect.

7    BY MS. COSTIN:

8          Q.    Well, the phones, you never bothered to look

9    to see if the phones were in there?

10         MS. STEVENS:  Objection.

11         THE COURT:  Asked and answered.

12               He said he did not go through the car.

13   BY MS. COSTIN:

14         Q.    Did anybody, to your knowledge, any of your

15   brother officers?

16         A.    Yes.

17         Q.    Do you know if they found them?

18         A.    I don't know.

19         Q.    And this scale, you are an experienced

20   officer of 11 years, and you put an inventory number on

21   this?

22         A.    I generated an inventory number.

23         Q.    Okay.  And this is what got to the -- sent to

24   the Crime Lab?

1        A.    That's correct.

2        Q.    Okay.  And this is rock cocaine?

3        A.    It's cocaine.

4        Q.    Rock cocaine?

5        THE COURT:  Sustained.

6        MS. STEVENS:  Objection.

7        THE COURT:  Sustained.

8    BY MS. COSTIN:

9        Q.    Officer, when you inventoried, did you put

10   down that it was narcotics, one clear plastic-knotted

11   bag containing a rock white-like substance?

12       A.    What was -- could you repeat.

13       Q.    You inventoried this under 1452143, and you

14   when you sent it to the Crime Lab, you said it was one

15   narcotic drug containing one clear plastic bag

16   containing a white rock-like substance, suspect

17   cocaine?

18       A.    That's correct.

19       Q.    And that's what you wrote down in your report

20   or your inventory?

21       A.    That's correct.

22       Q.    Rock-like cocaine, and it was in one clear

23   plastic bag?

24       A.    That's correct.

1          Q.   Now the scale she asked you about, the scale,
2     it's not calibrated?
3          THE COURT:  Sustained.  I have already heard.
4             Anything about the scale I haven't heard?
5          MS. COSTIN:  Your Honor, I think you have heard
6     all about it.
7          THE COURT:  Okay.  Anything further, Defense?
8          MS. COSTIN:  No.  Thank you.
9          THE COURT:  All right.  Thank you.
10            State, anything further that I haven't heard?
11            If I have already heard it once, I don't need
12    to hear it a third time, so think carefully.
13         MS. STEVENS:  Nothing, further Judge.
14         THE COURT:  All right.  Thank you.
15            Thank you, sir.  You are excused.
16                                  (WITNESS EXCUSED.)
17         THE COURT:  Ladies and gentlemen, that's going to
18    conclude the testimony that we are going to hear on
19    today's date.
20            What I would like you to do, come back to
21    this room tomorrow 10:30 in the morning.
22            Now when you get here, you have to walk
23    through the courtroom.  There may be people in the
24    gallery.  It's likely there's proceedings that will be